Edward W. Swanson (SBN 159859)
August P. Gugelmann (SBN 240544)
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9100
Email: ed@smllp.law
Email: august@smllp.law

Neal J. Stephens (SBN 152071)
Jeffrey B. Schenk (SBN 234355)
Thao Donnelly (SBN 355632)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 739-3939
Facsimile: (650) 739-3900
Email: nstephens@jonesday.com
Email: jbschenk@jonesday.com
Email: tdonnelly@jonesday.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID DUONG,<br><br>Defendant. | Case No. CR 25-0003 YGR<br><br>**NOTICE AND MOTION FOR *FRANKS* HEARING AND FOR SUPPRESSION OF EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: February 19, 2026<br>Time: 9:00 a.m.<br>Court: Hon. Yvonne Gonzalez Rogers |

**NOTICE**

PLEASE TAKE NOTICE that on February 19, 2026 at 9:00 a.m., or as soon as the matter may be heard before the Honorable Yvonne Gonzalez Rogers, that defendant David Duong will and hereby does move the Court for an order (1) granting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 165 (1978), regarding material mispresentations and/or omissions in the search warrant affidavit sworn on June 14, 2025 before Magistrate Judge Kandis Westmore; (2) suppressing all fruits of the search of his residence on June 20, 2025; and (3) suppressing evidence other than location data seized pursuant to the search warrant signed on March 22, 2024 by Magistrate Judge Donna M. Ryu. This motion is based on the instant notice, the attached memorandum of points and authorities, the concurrently filed declaration of Neal J. Stephens, the files and records in this matter, and upon such evidence and argument as may be presented at the hearing.

Dated: October 31, 2025

/s/
Edward W. Swanson
August Gugelmann
SWANSON & McNAMARA LLP

Neal J. Stephens
Jeffrey B. Schenk
Thao Donnelly
JONES DAY

Attorneys for David Duong

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. THE JUNE 2024 WARRANT AFFIDAVIT ..... 2

1. ALLEGATIONS BASED ON DOCUMENTARY EVIDENCE ..... 2

2. ALLEGATIONS BASED ON CO-CONSPIRATOR 1'S STATEMENTS ..... 5

3. ALLEGATIONS RELATED TO THE JUNE 9, 2024 SHOOTING AT CO-CONSPIRATOR 1'S RESIDENCE ..... 6

4. DISCLOSURES REGARDING CO-CONSPIRATOR 1'S CREDIBILITY, BIAS, AND VERACITY ..... 7

B. THE JUNE 2024 "ROLLOVER" AFFIDAVIT ..... 7

C. THE MARCH 2024 WARRANT AFFIDAVIT ..... 8

III. LEGAL STANDARD ..... 8

A. THE *FRANKS* ANALYSIS ..... 8

B. THE *LEON* GOOD FAITH EXCEPTION ..... 11

IV. ARGUMENT ..... 11

A. MATERIAL EVIDENCE WAS OMITTED FROM THE JUNE 2024 WARRANT AFFIDAVIT ..... 11

1. CO-CONSPIRATOR 1'S HISTORY OF FRAUD, BIAS, AND LACK OF VERACITY ..... 12

2. THE JUNE 9, 2024 SHOOTING ..... 14

B. ABSENT THE ALLEGATIONS BASED ON CO-CONSPIRATOR 1'S UNRELIABLE STATEMENTS, THE AFFIDAVIT LACKS PROBABLE CAUSE AS TO DAVID DUONG. ..... 17

C. THE JUNE 2024 AFFIDAVIT FAILS TO ESTABLISH PROBABLE CAUSE TO SEARCH DAVID DUONG'S HOME. ..... 20

D. THE MARCH 2024 AFFIDAVIT FAILS TO STATE PROBABLE CAUSE TO OBTAIN INFORMATION OTHER THAN LOCATION DATA ..... 22

V. CONCLUSION ..... 24

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Center Art Galleries-Hawaii, Inc. v. United States,*
875 F.2d 747 (1989) .......... 24

*Commonwealth of Northern Mariana Islands v. Bowie*,
243 F.3d 1109 (9th Cir. 2001) .......... 10

*Franks v. Delaware*,
438 U.S. 154 (1978) .......... passim

*Georgia v. Randolph*,
547 U.S. 103 (2006) .......... 20

*Illinois v. Gates,*
462 U.S. 213 (1983) .......... 8

*United States v. Bernal-Obeso*,
989 F.2d 331 (9th Cir. 1993) .......... 10

*United States v. Esparza*,
546 F.2d 841 (9th Cir. 1976) .......... 10

*United States v. Grant*,
682 F.3d 827 (9th Cir. 2012) .......... 21

*United States v. Hall*,
113 F.3d 157 (9th Cir. 1997) .......... 10, 18

*United States v. Hill*,
459 F.3d 966 (9th Cir. 2006) .......... 8

*United States v. Hove*,
848 F.2d 137 (9th Cir. 1988) .......... 20, 22

*United States v. Leon*,
468 U.S. 897 (1984) .......... passim

*United States v. Lull,*
824 F.3d 109 (4th Cir. 2016) .......... 9

*United States v. Luong*,
470 F.3d 898 (9th Cir. 2006) .......... 22

*United States v. Luong*,
470 F.3d 898 (9th Cir. 2006) .......... 11

*United States v. Martin*,
615 F. 2d 318 (5th Cir. 1980) .......... 9

*United States v. Perkins,*
850 F.3d 1109 (9th Cir. 2017) .......... passim

*United States v. Ramos*,
923 F.2d 1346 (9th Cir. 1991)........ 20

*United States v. Reeves*,
210 F.3d 1041 (9th Cir. 2000)........ 11

*United States v. Ruiz,*
758 F.3d 1144 (9th Cir. 2014)........ 10, 20

*United States v. SDI Future Health, Inc.*,
568 F.3d 684 (9th Cir. 2009)........ 23

*United States v. Seybold*,
726 F.2d 502 (9th Cir. 1984)........ 21

*United States v. Spilotro*,
800 F.2d 959 (9th Cir. 1986)........ 23

*United States v. Stanert,*
762 F. 2d 775 (9th Cir. 1985)........ passim

*United States v. Troxel*,
564 F. Supp. 2d 1235 (D. Kan. 2008)........ 10

*United States v. Underwood*,
725 F.3d 1076 (9th Cir. 2013)........ 22

*United States v. Weber*,
923 F.2d 1338 (9th Cir. 1990)........ 22

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

David Duong is a long-time resident of Oakland whose business, California Waste Solutions (CWS), is a large employer in Oakland and San Jose. In June 2024, the government filed an affidavit seeking a warrant to search Mr. Duong's business, home, cars, and person,[1] asserting that he was part of a scheme to bribe the mayor of Oakland. The affidavit's showing of probable cause rested on the claims of informant Co-Conspirator 1, himself the target of the same investigation. Before Co-Conspirator 1 agreed to cooperate, the government's year-long investigation, as it related to David Duong, had yielded only allegations of guilt by association and ambiguous text messages—between third parties, not including David Duong—that the agent believed tied David Duong to the scheme. When the government met with Co-Conspirator 1, he finally gave them allegations that could tie David Duong to the alleged conspiracy: the uncorroborated claim that David Duong attended meetings where, Co-Conspirator 1 said, the bribery was discussed. Relying on these allegations, the government sought the warrant in question. Of course, Co-Conspirator 1's claims could only justify issuing a warrant if a magistrate judge found him credible. But in evaluating his credibility, the court was deprived of crucial information. The government failed to disclose that Co-Conspirator 1, the central figure in this supposed scheme, has a decades-long history of fraud and has been repeatedly found liable for fraud in lawsuits. More egregiously, the affidavit did not reveal that Co-Conspirator 1 has repeatedly falsely accused business partners of crimes and other wrongdoing in efforts to escape liability for his own actions—just as he did here. And it did not disclose that the most incendiary allegation in the affidavit, that the Duongs had supposedly orchestrated an attempt to kill Co-Conspirator 1 for cooperating with law enforcement, was based on Co-Conspirator 1's lies to law enforcement about what happened the night of a shooting at his house. That allegation is false,

---

[1] The June 2024 affidavit authorized the search of David Doung, Andy Duoug, Sheng Thao, Andre Jones, their respective residences and automobiles, the offices of California Waste Solutions ("CWS"), the Vietnamese American Business Association ("VABA"), and Evolutionary Homes, LLC as described in the warrant affidavit. *See* Declaration of Neal Stephens in Support of Motion for *Franks* Hearing and Suppression of Evidence ("Stephens Decl." ¶ 2 and Ex. 1.)

and evidence that was available to the agent but was omitted from the affidavit shows the shooting had nothing to do with David Doung and his family. Mr. Duong respectfully seeks an order requiring the government to produce its affiant, FBI Special Agent Duncan Haunold, at a *Franks* hearing so that defense counsel can question Agent Haunold about the material omissions and thereby demonstrate that the Court should suppress all materials seized from David Duong pursuant to the June 2024 warrant.

Second, and separate from the omissions regarding Co-Conspirator 1, the same warrant authorized search of David Duong's house but offered no evidence suggesting that any evidence related to the search would be found there. For this separate reason, any evidence seized from the house pursuant to that warrant should be suppressed.

Finally, an earlier warrant affidavit laid out probable cause to seek historical location data from David Duong's cell phone provider based on an asserted need to determine whether he attended an in-person meeting. But the attached warrant sought broad categories of cellular data that were never even mentioned in the affidavit. Because there was no probable cause asserted to obtain information other than location data, any other evidence obtained pursuant to this separate warrant should be suppressed.

## II. FACTUAL BACKGROUND

### A. The June 2024 warrant affidavit

While the affidavit in support of the warrant to search David Duong's home, cars, and business is lengthy, stretching nearly 80 pages, the allegations related to David Duong himself are sparse—until the agent gets to what Co-Conspirator 1 said in his meeting with prosecutors.

#### 1. Allegations based on documentary evidence

The affidavit begins by explaining that in the course of investigating Co-Conspirator 1's defrauding of the printer he commissioned to print and mail election mailers attacking Sheng Thao's rivals in the 2022 Oakland mayoral race, agents located information pertaining to the alleged scheme now charged in the indictment. Stephens Decl. ¶ 2 and Ex. 1, ¶¶ 25-26. Based on text messages and electronic notes, the affidavit alleges an agreement between Co-Conspirator 1 and Thao in which Thao would "commit[] to the City purchasing 100 housing units from

Evolutionary Homes" and, in exchange, Co-Conspirator 1 would fund mailers targeting Thao's rivals, and "Evolutionary Homes would pay Jones $300k per year." Ex. 1 at ¶ 52. Following that meeting, the affidavit alleges, Co-Conspirator 1 texted Andy Duong about the agreement. *Id.* at ¶ 53. In mid-October, Co-Conspirator 1 deposited a $75,000 check from CWS; based on the timing and amount of the check as well as "A. Duong's and D. Duong's association with CWS," the agent concluded this was a payment from the Duongs to finance the mailers. *Id.* at ¶ 65. The affidavit describes text messages between Co-Conspirator 1 and Andy Duong discussing an invoice for a $75,000 payment (*id.* at ¶¶ 66-70) and alleges that Co-Conspirator 1 was directed "to falsify invoices to mask the nature of the funds" provided to him. *Id.* at ¶ 69. It also describes text messages between Co-Conspirator 1 and Andy Duong discussing the outcome of the 2022 elections in Oakland, including messages in which the agent believes Co-Conspirator 1 "express[ed] concern about going to jail because they were in the middle of a criminal conspiracy to bribe Thao and others and that their preferred District Attorney candidate lost the race." *Id.* at ¶ 74-75.

The affidavit describes that in December 2022, Co-Conspirator 1 received $120,000 from an entity called "Duong Family Investments," which he repaid in April 2023. *Id.* at ¶ 44. Next, the agent describes March 2023 messages from Co-Conspirator 1 to Andy Duong containing drafts of a letter written by Co-Conspirator 1, purporting to be from Thao to David Duong, expressing the City's interest in purchasing housing units. *Id.* at ¶ 79. The affidavit alleges that Co-Conspirator 1 texted Jones asking him to have Thao sign the letter and also stating "David Duong called Sheng 3 times without a return call, is she ok?" *Id.* at ¶ 80. The affidavit describes evidence indicating that David Duong, Thao, Co-Conspirator 1, and possibly Andy Duong met for dinner in March 2023. *Id.* at ¶ 81.

Next, the affidavit describes messages initiated by Co-Conspirator 1 to Andy Duong related to payments to Jones, which the agent interprets as being about "additional funds in exchange for assistance from Thao regarding Evolutionary Homes." *Id.* at ¶¶ 83-85. It recounts a series of messages which, in the agent's view, expressed surprise at a request from Thao or Jones that Evolutionary Homes submit a proposal to the city for funding. *Id.* at ¶¶ 86-87. David Duong

is referenced in one message, which the agent interprets as Andy Duong "questioning why Jones had called D. Duong instead of calling [Co-Conspirator 1]" (*id.* at ¶ 87) and Co-Conspirator 1 speculating in response that Jones may have done so "because David Duong would provide more direct access to money from Evolutionary Homes and/or CWS." *Id.* at ¶ 89. Co-Conspirator 1 then sent an Apple Note he created, which the agent believes summarizes the alleged deal, to Andy Duong. *Id.* at ¶¶ 90-92. The note describes purported benefits to CWS and mentions David Duong in one line: "Move reference of D. Duong, A. Duong and [Co-Conspirator 1] from company." *Id.* at ¶ 90. The affidavit then recounts the following exchange:

> Later in the conversation on or about March 26, 2023, [Co-Conspirator 1] wrote "I am adding the directive to communicate" and A. Duong responded "Ok." [Co-Conspirator 1] then wrote "Should we share with David?" A. Duong responded "We go hear first … Then share after … David knows already … We share to him numerous times."

*Id.* at ¶ 92. The agent interprets this exchange to mean that "[Co-Conspirator 1] was asking A. Duong if they should share the note summarizing the deal with D. Duong, and A. Duong told him that they had already shared the note 'numerous times.'" *Ibid.* Co-Conspirator 1 then sent messages to Andy Duong which the agent interprets as reflecting Co-Conspirator 1's proposal "that Jones would communicate with Co-Conspirator 1 and Thao would communicate with A. Duong." *Id.* at ¶ 92.

Next, the affidavit describes messages from Co-Conspirator 1 to Andy Doung regarding what the agent describes as a "draft proposal for the City describing the housing units created by Evolutionary Homes" and evidence that Evolutionary Homes wired $750,000 to Co-Conspirator 1, after which Co-Conspirator 1 wrote additional checks to Jones. *Id.* at ¶¶ 94-96.

Finally, the affidavit describes communications, not including David Duong, concerning payments to Jones and language for a contract with Jones. *Id.* at ¶ 97-98. Thereafter, it describes a message from David Duong to Co-Conspirator 1 and Andy Duong stating "please call AJ tell him we just finished our meeting and we decided to give home [sic] what he asked for but he need to sign before fund." *Id.* at ¶ 102. It describes a message from Co-Conspirator 1 to David Duong sending a draft independent contractor agreement with Jones and stating "this is a good agreement." *Id.* at ¶ 104. It describes a message from Co-Conspirator 1 to David Duong

informing him that Jones had signed the agreement and stating "I asked him point blank if he was going to delivered [sic] and he said 109 percent he will because he knows what people are saying backstage," which the agent interprets to mean Jones was "aware of discussions happening within the City regarding the allocation of funding." *Id.* at ¶¶ 109-110. Finally, it describes a message from Co-Conspirator 1 to Andy Duong in September 2023 stating "I want to meet with Larry you and DD because I got this nagging feeling that Sheng is fucking with us[.]" *Id.* at ¶ 116.

**2. Allegations based on Co-Conspirator 1's statements**

In sum, the affidavit contains no documentary evidence connecting David Duong to the alleged bribery scheme. It alleges that David Duong may have had dinner with Thao, Jones, and Co-Conspirator 1 (though it does not claim that anything illegal was discussed); that David Duong may have received a call from Jones about submitting a bid to the city for the sale of container homes (with no allegation of a bribe discussion); that David Duong had been involved with a contract between Evolutionary Homes and Jones (with no evidence that he did so in furtherance of a scheme); and that Andy Duong texted Co-Conspirator 1 that "David knows already … We share to him numerous times" (with no evidence that anything about a so-called bribe had actually been shared with David Duong). Instead, the affidavit's allegations related to David Duong come principally from the agent's inferences and from Co-Conspirator 1 himself. Indeed, the only direct evidence proffered in the affidavit that David Duong had any hand in the alleged deal with Thao and Jones came from Co-Conspirator's uncorroborated claims.

First, Co-Conspirator 1 told prosecutors that, shortly after he struck the purported deal with Thao, he and Andy Duong "informed D. Duong" about the arrangement. According to Co-Conspirator 1, David Duong "said he would think about the deal, and later A. Duong gave [Co-Conspirator 1] a $75,000 check that D. Duong wrote to fund the negative mailer campaign." *Id.* at ¶ 132. While there was documentary evidence suggesting that David Duong met with Thao in March 2023 (*see id.* at ¶ 81), Co-Conspirator 1's statements are the only support for the allegation that, at that meeting, Thao, Jones, and Andy and David Duong "reaffirmed the core of their bribery scheme" (*id.* at ¶ 82), that Thao asked for $300,000 upfront, and that David Duong "pushed back and said they needed to see something first" and discussed Jones receiving up to $3

million in commissions on sales of units. *Id.* at ¶ 135. Co-Conspirator 1 also told prosecutors that Thao said they would have to prepare proposals for Evolutionary Homes to submit to the City Council, and that David Duong stated "that they should make it seem like Jones was working on projects outside of Oakland for Evolutionary Homes to distance him from the proposed deal in Oakland." *Id.* The affidavit offers no support for this claim beyond Co-Conspirator 1's statement.

The affidavit also recounts Co-Conspirator 1's version of the events that ultimately led him to contact law enforcement. Co-Conspirator 1 alleged that the Duongs locked him out of the Evolutionary Homes offices "for failure to pay rent" and that one of David Duong's sons then "called numerous individuals who subsequently assaulted him and robbed him of his personal belongings, including a Rolex watch, a gold chain, and [Co-Conspirator 1's] cell phones." *Id.* at ¶ 120. Several days later, Co-Conspirator 1 reported the incident to the police and made allegations regarding the alleged bribery scheme. *Ibid.*

### 3. Allegations related to the June 9, 2024 shooting at Co-Conspirator 1's residence

The most incendiary allections in affidavit are contained in a section titled "[Co-Conspirator 1] targeted in shooting." *Id.*, ¶¶ 144-150. The affidavit frames the shooting as an attempt to murder Co-Conspirator 1 that was orchestrated by the Duong family because the Duongs allegedly had learned that Co-Conspirator 1 was cooperating with the FBI. To support the claim of a targeted attack, the affidavit alleges that "shots were fired at [Co-Conspirator 1's] residence" and "[Co-Conspirator 1] returned fire." *Id.,* ¶ 144. The affidavit further alleges that "the shooter or shooters were waiting for [Co-Conspirator 1] to return home and may have attempted to draw [Co-Conspirator 1] out of his home before they opened fire." *Id.* The affiant concludes that, "based on my training and experience, and knowledge of the investigation, given that the shooter or shooters were waiting at [Co-Conspirator 1] home, and the shooting occurred three days after [Co-Conspirator 1] spoke with FBI agents, I believe that the shooting was targeted and may have been coordinated by the Duong family in an attempt to kill or harm [Co-Conspirator 1] to prevent him from cooperating with the investigation." *Id.,* ¶ 144.

The affidavit also included a toll analysis of phone calls between a phone associated with

Andy Duong and a phone associated with another individual, J.T. *Id.*, ¶¶ 148-50. It describes J.T. as having a violent criminal history including "arrests for attempted extortion, hit and run ending with death or injury, felon in possession of a firearm, and murder." *Id.*, ¶ 148. The affidavit further asserts that Andy Duong and J.T. "may have been communicating about the shooting regarding [Co-Conspirator 1]." *Id.* ¶ 149.

#### 4. Disclosures Regarding Co-Conspirator 1's Credibility, Bias, and Veracity

The affidavit contains impeaching evidence about Co-Conspirator 1 in a footnote. Ex. 2, ¶ 30, fn. 2. It says Co-Conspirator 1 is likely cooperating in the hopes of obtaining leniency and that he "appears to be motivated by revenge against the Duongs and a desire to obtain protection from law enforcement from the Duongs." *Id.* It discloses a then-pending Alameda County prosecution against Co-Conspirator 1 for fraud against the printer. *Id.*[2] It discloses prior arrests for theft, embezzlement, battery, battery of a spouse, and inflicting injury on a spouse or child, most of which were dismissed, and none of which resulted in a conviction. *Id.* It notes that in 2024, an individual filed a police report accusing Co-Conspirator 1 of failing to repay a loan of $250,000, which did not result in arrest or charges. *Id.* Finally, it references the crimes at issue in the alleged bribery scheme and recounts that law enforcement had provided funds to Co-Conspirator 1 for relocation after the shooting. *Id.*

### B. The June 2024 "rollover" affidavit

On June 20, 2024, while executing the warrants described above, law enforcement sought a so-called "rollover" warrant to seize items not listed in the original application. Stephens Decl. ⁋ 3 and Ex. 2. Regarding the search of David Duong's house, the affidavit describes finding cash and, in a bedroom with indicia of Andy Duong, a safe containing ammunition. Ex. 2, ¶¶ 19-20. The affidavit describes text messages between Co-Conspirator 1 and uncharged individual J.W., which the agent interprets as evidence of "the Duong's use of cash for illegal activities." *Id.* at ¶ 22. The affidavit also provides additional information about the shooting at Co-Conspirator 1's house. This includes that Co-Conspirator 1 had given inconsistent statements about the type of

[2] This case has since been dismissed.

Glock firearm he used "to defend himself" during the shooting and new evidence that the shooter appeared to have used a 9mm firearm. *Id.* at ¶ 23. On this basis, the affidavit seeks permission to seize cash and 9mm ammunition from David Duong's home. *Id.*, Attachment B-2.

### C. The March 2024 warrant affidavit

The March 2024 affidavit was submitted "in support of an application for a search warrant … for information about the location of the following cellular telephones." Stephens Decl. ¶ 4 and Ex. 3, ¶ 1. It explains the basis for this request as being the need to corroborate the agent's belief that David Duong had attended in-person meetings where the scheme might have been discussed. Ex. 3, ¶ 88. The warrant itself, however, authorizes seizure of an expansive array of additional categories of information, including subscriber identities and addresses; billing and payment information; account start and service records; device and instrument identifiers; and complete connection/ session records, including IP addresses, sector information, and timing-advance data. *Id.*, Attachment B-2. Nothing in the affidavit explains the basis for these requests.

## III. LEGAL STANDARD

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. The warrant affidavit "must set forth particular facts and circumstances … so as to allow the magistrate to make an independent evaluation of the matter." *United States v. Perkins,* 850 F.3d 1109, 1116 (9th Cir. 2017) (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his [or her] action cannot be a mere ratification of the bare conclusions of others." *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 239 (1983)). An officer presenting a search warrant application has a duty to provide, in good faith, all relevant information to the magistrate. *Id.* (citing *United States v. Hill*, 459 F.3d 966, 971 n.6 (9th Cir. 2006)).

### A. The *Franks* analysis

What is known by a court reviewing a warrant application is limited to the information and circumstances set forth in the affidavit before it, and therefore, the veracity of the affidavit is

paramount. *Gates,* 462 U.S. at 238. “When the Fourth Amendment demands a factual showing sufficient to comprise ‘probable cause,’ the obvious assumption is that there will be a *truthful* showing.” *Franks*, 438 U.S. at 164-65 (quotation omitted, emphasis original). Evidence seized pursuant to a warrant based on materially false and misleading information must be suppressed. *Franks*, 438 U.S. at 155-56; *Perkins,* 850 F.3d at 1116. To determine whether suppression is appropriate, a defendant must first make only a substantial preliminary showing that (1) the affidavit contained a false statement or material omission made either intentionally or with reckless disregard for the truth, and (2) the allegedly false statement was necessary to the finding of probable cause. *Franks*, 438 U.S. at 155-56. This preliminary showing does not need to prove an actual *Franks* violation. *United States v. Stanert,* 762 F. 2d 775, 781 (9th Cir. 1985). Once the defendant has made the preliminary showing, the court conducts an evidentiary hearing to determine whether a preponderance of the evidence establishes the allegation of perjury or reckless disregard. *Franks*, 438 U.S. at 155-56. If so, and if the affidavit is insufficient to establish probable cause after the Court disregards the false material, the court must void the search warrant and suppress all fruits of the search. *Id.*

The first step at this stage is a substantial showing that the affidavit reveals intentional or reckless disregard for the truth. The use of deliberately falsified information is not the only way by which police officers can mislead a magistrate judge when making a probable cause determination. *Stanert,* 762 F.2d at 781. Deliberate or reckless omissions that tend to mislead are also sufficient. *Id*. By reporting less than the total story, an affiant can manipulate the inferences a magistrate judge will draw and thereby usurps the magistrate’s duty to conduct an independent evaluation of probable cause. *Id.*; *Perkins,* 850 F. 3d at 1118 (citing *United States v. Lull,* 824 F.3d 109, 116-17 (4th Cir. 2016)). In assessing material omissions, if the fact omitted from the affidavit is clearly critical to a finding of probable cause, the fact of recklessness may be inferred from the proof of the omission itself. *united States v. Martin*, 615 F. 2d 318, 329 (5th Cir. 1980).

The second step ”n the preliminary showing which” whe“her the omitted facts or false statements are material, that is, whether they are “necessary to the finding of probable cause.” *Perkins,* 850 F.3d at 1119 (quoting *Franks,* 438 U.S. at 156). “The key inquiry is ‘whether

probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions" (*id.,* quoting *United States v. Ruiz,* 758 F.3d 1144, 1149 (9th Cir. 2014)), and the Court disregards any false information included in the warrant affidavit. *Franks,* 438 U.S. at 155-56. In performing this inquiry, courts consider not only the evidence that remains after the affidavit has been "purged of those falsities" but also whether, with the added context of the omissions, any remaining allegations are sufficient to support probable cause. *See Stanert,* 762 F.2d at 775; *see also United States v. Troxel*, 564 F. Supp. 2d 1235, 1250 (D. Kan. 2008) (striking the false statements and adding the omissions for the purpose of evaluating whether the remaining portions of the affidavit provided a substantial basis for probable cause). And even where misrepresentations taken alone may not be fatal to the warrant, where "the cumulative effect of the inaccuracies" is substantial, an affidavit may not support a finding of probable cause. *United States v. Esparza*, 546 F.2d 841, 844 (9th Cir. 1976).

The Ninth Circuit "as described the use of whichnformants, like Co-Conspirator 1, to investigate and prosecute criminal activity as "fraught with peril." *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). "Criminals caught in our system understand that they can mitigate their own problems with the law by becoming a witness against someone else." *Id.* at 334. "Some of these informants will stop at nothing to maneuver themselves into a position where they have something to sell." *Id.* at 333. Put another way, due to "the perverse and mercurial nature of the devils with whom the criminal justice system has chosen to deal, each contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to 'get' a target of sufficient interest to induce concessions from the government." *Commonwealth of Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1124 (9th Cir. 2001). "Defendants or suspects with nothing to sell sometimes embark on a methodical journey to manufacture evidence and to create something of value, setting up and betraying friends, relatives and cellmates alike." *Id.* "Such false testimony and false evidence corrupts the criminal justice system and makes a mockery out of its constitutional goals and objectives." *Id.*

Where a warrant affidavit relies heavily on statements from an informant as to whom officers fail to disclose significant impeachment information, courts ask whether the warrant,

stripped of the informant's evidence, still supports probable cause. *See United States v. Hall*, 113 F.3d 157, 161 (9th Cir. 1997) (finding warrant supported primarily by informant evidence invalid where substantial impeaching information was not disclosed to the magistrate); *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) ("If an informant's history of criminal acts involving dishonesty renders his/her statements unworthy of belief, probable cause must be analyzed without those statements.").

### B. The *Leon* good faith exception

Generally, the Fourth Amendment does not require suppression of evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). For this good faith exception to apply, "the officer's affidavit must establish at least a colorable argument for probable cause." *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006). The good faith exception is limited, however. Where an affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," there can be "no reasonable grounds for believing that the warrant was properly issued," and suppression is necessary. *Leon*, 468 U.S. at 922. And officers may not rely on a warrant issued based on mispresentations or omissions. *Id.* at 923 ("Suppression … remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.").

## IV. ARGUMENT

### A. Material evidence was omitted from the June 2024 warrant affidavit.

The affidavit fails to disclose information highly relevant to Co-Conspirator 1's veracity and credibility and to his motivation to lie about David Duong and the Duong family. The omissions fall into two categories. First, the affidavit omits copious public information about Co-Conspirator 1's history of fraud, including his history of targeting former business partners with false allegations of criminal conduct. Second, the affidavit omits evidence demonstrating that Co-Conspirator 1 falsely portrayed the shooting outside his residence as a targeted attack rather than a chance encounter between strangers—possibly tied to a failed "smash and grab" theft from Co-

Conspirator 1's car.

**1. Co-Conspirator 1's history of fraud, bias, and lack of veracity**

The affidavit does not disclose readily available, public information that Co-Conspirator 1 has a decades-long track record of defrauding business partners, like David Duong, including situations where Co-Conspirator 1 accused his creditors of crimes to try to prevent them from being able to recoup debts he owed.

As an initial matter, a simple search of Co-Conspirator 1's name through the Alameda County Superior Court records reveals that he has been sued approximately 33 times between 1992 and 2022, including numerous fraud cases involving former business partners. Stephens Decl. ¶ 5 and Ex. 4. Even a cursory review of those matters and related press reports demonstrates that Co-Conspirator 1 has a history of diverting monies entrusted to him and accusing his business partners of misdeeds to try to discredit them and avoid paying his debts. This motion will not recount the facts of every fraud case against Co-Conspirator 1 but cites these examples:

Public records show that in 2008, M.B. and H.B. loaned Co-Conspirator 1 $210,000 for a biodiesel fuel project. Stephens Decl. ¶ 6 and Ex. 5. When Co-Conspirator 1 ran for Oakland City Council in 2012, M.B. and victims of Co-Conspirator 1's other scams raised concerns about their dealings with Co-Conspirator 1. *Id.*, ¶ 7 and Ex. 6. The media reported that Co-Conspirator 1 responded by filing a police report against M.B. alleging that M.B. assaulted him at one of the campaign events, a charge M.B.'s attorney denied. *Id.* The plantiffs ultimately obtained a judgment against Co-Conspirator 1 for $338,040. *Id.*, ¶ 8 and Ex. 7. These were not the only victims of the biodiesel fraud scheme: another investor sued Co-Conspirator 1 over his $50,000 investment into the project, claiming Co-Conspirator 1 never had any intention of founding a company but instead took the money with the sole intention of using it for his own purposes. *Id.*, ¶ 9 and Ex. 7. The court ultimately dismissed that case with prejudice, but not before Co-Conspirator 1 filed a notice of bankruptcy with the court in January 2013. *Id.*, ¶ 10 and Ex. 9.

Another example occurred in 2010, when Co-Conspirator 1's landlord sued him for fraud and trespassing. Stephens Decl. ¶ 11 and Ex. 10. As part of that dispute, the landlord's attorney alleged that Co-Conspirator 1 "pushed her, hit her in the side, arm, and face, and tore her

clothes." *Id.*, ¶ 12 and Ex. 11. Before the landlord's attorney sought an injunction against Co-Conspirator 1, Co-Conspirator 1 filed a petition seeking protection from the attorney by alleging she "stepped towards him and hit his forehead with her fist." *Id.* Co-Conspirator 1 submitted declarations from his sister claiming to have seen the attorney yelling into her phone that Co-Conspirator 1 hit her and ripped her clothes off, while at the same time "ripping her own clothes off and hitting herself." *Id.* In other words, in his attempt to discredit his accuser, Co-Conspirator 1 alleged that a female attorney had intentionally injured herself—in front of Co-Conspirator 1's friends and family no less—and then lied to the court about it.

The affidavit omits many other cases that evidence Co-Conspirator 1 engaging in fraud. On June 22, 2006, A.C. and L.T. sued Co-Conspirator 1 for fraud, alleging Co-Conspirator 1 entered a contract to collect a debt they were owed. Stephens Decl. ⁋ 13 and Ex. 12. Co-Conspirator 1 agreed to pay 62% of the amount collected but instead kept the money for himself. *Id.* The plaintiffs obtained a judgment for $164,100.54. *Id.*, ¶ 14 and Ex. 13.

Also not disclosed in the affidavit is Co-Conspirator 1's history of defrauding the City of Oakland—the very target of the supposed scheme in this case. In 2006, the City of Oakland sued Co-Conspirator 1 for bad faith and breach of contract for illegally withholding more than $30,000 in payments from collections of unpaid judgments. Stephens Decl. ⁋ 15 and Ex. 14. Co-Conspirator 1 reportedly had to pay $31,942. *Id.*, ¶ 7 and Ex. 6. Co-Conspirator 1 was also the subject of a 2016 money laundering probe by both the FBI and the San Francisco U.S. Attorney's Office that investigating agents were aware of as early as May 8, 2023. *Id.*, ¶ 6 and Ex. 15 at 4.

And while the affidavit describes Co-Conspirator 1 as CEO of a real estate business, it does not reveal that he was forced to surrender his real estate license after being accused of fraud by the Department of Real Estate ("DRE"). Stephens Decl. ⁋ 17 and Ex. 16. The DRE alleged that Co-Conspirator 1 was acting as leasing agent for a landlord and falsified a lease agreement to increase his commission. Specifically, the lease agreement that Co-Conspirator 1 presented to the landlord showed monthly rent of $3,500 and a $7,000 security deposit. *Id.* But Co-Conspirator 1 had the tenant sign a different lease agreement, with $3,500 in rent, a $21,000 security deposit, and $10,000 in broker commissions. The tenant paid the security deposit and broker commission;

Co-Conspirator 1 gave $7,000 to the landlord and pocketed the rest. *Id.* These actions ultimately forced Co-Conspirator 1 to surrender his real estate license. *Id.*, ¶ 18 and Ex. 17.

None of these actions were disclosed to the magistrate judge, despite their being readily publicly available. The affidavit does disclose that Co-Conspirator 1 has been charged with crimes related to theft, but it notes that in each instance there was no conviction. *Id.*, ¶ 30, n.2. Disclosing prior allegations of theft is very different from disclosing a decades-long pattern of repeatedly being found liable for defrauding business partners, including by falsifying documents, and of accusing those same business partners of crimes or other misconduct in an effort to avoid paying debts. In a case where Co-Conspirator 1 was accusing his business partners of crimes, and in the context of a business dispute that led to him being locked out of the offices for nonpayment of rent, the failure to disclose this history was reckless at best.

**2. The June 9, 2024 shooting**

The most dramatic and potent allegations in the affidavit concern Co-Conspirator 1's claim that the Duongs organized a plot to kill Co-Conspirator 1. But the affidavit omits evidence showing that Co-Conspirator 1's account of the shooting was not true and that he lied to police in an attempt to accuse the Duongs falsely and save himself from his own legal troubles.

As an initial matter, the affidavit asserts probable cause to believe the Duongs had targeted Co-Conspirator 1 because "the shooting occurred three days after [Co-Conspirator 1] spoke with FBI agents." Ex. 2, ¶ 144. But the affidavit never suggests how the Duongs could possibly have known that Co-Conspirator 1 met with the FBI or was cooperating in the investigation. Without some credible basis establishing the Duongs were aware of Co-Conspirator 1's cooperation, the proximity in time is meaningless.

Second, the omitted evidence establishes that Co-Conspirator 1 initiated the shooting—he did not return fire at hit men sent to kill him. Co-Conspirator 1's son told the responding officers that night that he heard four shots coming from the front of his house. Stephens Decl. ⁋ 19 and Ex. 18 at 5. The police interviewed one of Co-Conspirator 1's neighbors that night who also told the police that he heard four shots in the initial round of gunfire. *Id.*, ¶ 20 and Ex. 19 at 4.

Shotspotter technology confirms there were four initial shots fired at 9:52 p.m.[3] The responding officers found four 40 caliber casings on Co-Conspirator 1's front yard, and Co-Conspirator 1 told the responding officers that he had fired a 40 caliber gun. *Id.*, ¶ 20 and Ex. 18 at 2. In short, the evidence collected on the night of the shooting demonstrated that Co-Conspirator 1 initiated the gunfire by firing four shots from his 40 caliber pistol at individuals in the street outside his house. Thus, the omitted evidence regarding the initial blast of gun fire directly contradicts the allegation that shooters were lying in wait for Co-Conspirator 1 and opened fire in an attempt to kill him to prevent him from cooperating with the FBI.

Moreover, the affidavit omits additional evidence undercutting Co-Conspirator 1's claims. It does not recount that Co-Conspirator 1 claimed to have gone back inside his house after the initial round of shooting and waited about 10 minutes before opening his front door again. Stephens Decl. ⁋ 22 and Ex. 21 at 2. Co-Conspirator 1 claimed that when he opened his front door again, the shooters fired two rounds at his house, and he then "shot at the vehicle and emptied his magazine." *Id.* Co-Conspirator 1 estimated that he shot six rounds during this second encounter because the magazine of his gun holds ten rounds, and he had already fired four rounds. *Id.* ShotSpotter reports refute Co-Conspirator 1's version of the second round of shots. The responding officer who analyzed the relevant ShotSpotter recording "observed a slight pause in-between the initially bally [sic] of six shots and the last 3 shots." *Id.*, ¶ 19 and Ex. 18 at 3. Thus, the omitted evidence related to the ShotSpotter recording is more consistent with Co-Conspirator 1 initiating the second volley by firing the last six rounds from his pistol before the individuals in the street finally returned fire at Co-Conspirator 1, who had just fired 10 shots at them in two separate volleys of gunfire.

Third, the affidavit recounts at length evidence suggesting the shooting was committed by J.T., without mentioning that the cars driven by the individuals outside Co-Conspirator 1's residence that night do not match automobiles registered to J.T. Stephens Decl. ⁋ 23 and Ex. 22 at

[3] Discovery received to date indicates that agents obtained this ShotSpotter report on June 15, 2024, five days before seeking the "rollover" warrant. Stephens Decl. ⁋ 21 and Ex. 20 at 4-5. But while the rollover affidavit discloses an inconsistency in Co-Conspirator 1's description of his gun, it does not disclose ShotSpotter reports undercutting his narrative, and it continues to allege that Co-Conspirator 1 fired in self defense.

3, 40-41 (police records showing J.T. owns a light blue Subaru BRZ and a dark gray Honda minivan); *compare id.*, ⁋ 20 and Ex. 19 at 1; ⁋ 19 and Ex. 18 at 3; ⁋ 24 and Ex. 23 at 4 (witness statements and surveillance footage showed a gray Honda hatchback (not a minivan), and a white Acura SUV).

Fourth, the affidavit omits evidence, collected by the FBI immediately after the shooting, that suggests the shooting was not an assassination attempt but a botched car burglary. Co-Conspirator 1 lived in a high-crime area where gunfire and criminal activity is common. The FBI interviewed two of Co-Conspirator 1's neighbors who reported prior shootings nearby, including a possible homicide, and specifically told agents "there is always suspicious/criminal activity occurring at the apartments … and suspected that the shooting was tied to that location." Stephens Decl. ⁋ 20 and Ex. 19 at 4. A neighbor also told the FBI that, on the night of the shooting, he saw "two Mexican males" hitting Co-Conspirator 1's car with a brick. Ex. 19 at 1. The same neighbor said he'd seen these men in the neighborhood before, hanging out at a nearby liquor store, and surveillance footage showed the suspects (and suspect vehicles) hanging around outside Co-Conspirator 1's apartment building.[4] *Id.*, ⁋ 21 and Ex. 20 at 7. Indeed, the police found a red brick near Co-Conspirator 1's car, which had a smashed window with red dust possibly from the brick. *Id.*, ⁋ 24 and Ex. 23 at 5-6, 8-9. Co-Conspirator 1 also told law enforcement that when he came outside to investigate "two booming sounds" in front of his house (likely the window glass breaking), he saw an individual inside his vehicle. *Id.* ⁋ 22 and Ex. 21 at 1. All of this omitted evidence is consistent with a random encounter between strangers, not a targeted shooting. It strongly suggests that Co-Conspirator 1 heard someone breaking into his car and shot at the suspected thief, who then returned fire, and that the suspects were local to the neighborhood. It does not suggest a targeted assassination attempt by a hit man, who would presumably have attempted to kill Co-Conspirator 1 by surprise from close range before Co-Conspirator 1 entered his house, rather than allowing Co-Conspirator 1 to enter his house before drawing the attention of the entire neighborhood (and an armed Co-Conspirator 1) by loudly breaking the window on

[4] Agents received this surveillance footage after obtaining the June 2024 warrant but before submitting the rollover affidavit.

Co-Conspirator 1's car to "draw him out."

**B. Absent the allegations based on Co-Conspirator 1's unreliable statements, the affidavit lacks probable cause as to David Duong.**

Information showing (1) Co-Conspirator 1's history of defrauding business partners and accusing them of crimes and (2) Co-Conspirator 1's lies about the circumstances of the shooting to make it appear he was targeted by the Duongs would have materially changed the affidavit's showing of probable cause. As to David Duong, the affidavit relied on two categories of evidence: documents (text messages, emails, and phone logs) and statements from Co-Conspirator 1 himself. As discussed above, the first category is made up of speculation and inference from the agent; the second category, Co-Conspirator 1's statements, formed the only non-speculative link between David Duong and the alleged scheme. But Co-Conspirator 1's claims are rendered fundamentally unreliable by his history of fraud, lies, and attacking his former business partners, and his willingness to lie to law enforcement about the circumstances of the shooting. And bsent Co-Conspirator 1's statements, there was no probable cause to establish that David Duong was a participant in the scheme.

David Duong agrees the affidavit contains some allegations related to him. It alleges that Co-Conspirator 1 and Andy Duong established Evolutionary Homes, that Co-Conspirator 1 sought David Duong's agreement to help fund Evolutionary Homes, and that David Duong was eventually listed as chairman of that company. It establishes that David Duong is president of CWS, that Andy Duong is an employee, and that Co-Conspirator 1 received a CWS-issued check for $75,000. It recounts evidence that David Duong was involved in an agreement for Evolutionary Homes to hire Jones as a consultant. But nothing about these allegations establishes probable cause to believe David Duong was part of a bribery scheme. There is no evidence that he participated in conversations or text messages about bribes or corruption or that he otherwise had knowledge of the alleged plot. Co-Conspirator 1's after-the-fact notes of the purported deal mention David Duong only to say his name should be removed from Evolutionary Homes, and messages between Co-Conspirator 1 and Andy Duong appear to express surprise that Jones had communicated with David Duong instead of with Co-Conspirator 1.

Outside Co-Conspirator 1's statements, the only allegation that the agent claims ties David Duong to the scheme is the March 26, 2023 text exchange:

> [Co-Conspirator 1] wrote "I am adding the directive to communicate" and A. Duong responded "Ok." [Co-Conspirator 1] then wrote "Should we share with David?" A. Duong responded "We go hear first … Then share after … David knows already … We share to him numerous times."

Ex. 2, ¶ 92. The agent interprets this text to mean that the note summarizing the purported deal had already been shared with David Duong "numerous times." But that is not a plausible reading. Co-Conspirator 1's question about whether to "share" information with David Duong indicates that Co-Conspirator 1 understood David was *not* aware of the scheme at that time. And whatever Andy Duong meant in his self-contradictory message ("we go hear first … then share after … David knows already … we share to him numerous times"), it could not have been that Co-Conspirator 1's note had been shared "numerous times" with David Duong, because the affidavit establishes that Co-Conspirator 1 created the note that very day. *Id.* at ¶ 90 (describing that the note was "created and last modified on March 26, 2023").

In the absence of documents tying David Duong to the scheme, the agent had to rely on Co-Conspirator 1. And Co-Conspirator 1's statements gave the agent the allegation that David Duong participated in meetings about the supposed scheme. Co-Conspirator 1 claimed, but no documents showed, that the plan was explained to David Duong after Co-Conspirator 1 struck the deal with Thao and that the CWS check was presented to Co-Conspirator 1 only after David Duong had taken time to consider the matter. Co-Conspirator 1 also claimed that the dinner with Sheng Thao that David Duong attended was where the deal was reaffirmed and renegotiated—but here again, no documents support his description of what happened. It is only Co-Conspirator 1's word supporting those claims, and what the affidavit failed to reveal was that Co-Conspirator 1 is profoundly untrustworthy.

The Ninth Circuit has invalidated warrants where the government omitted information undercutting the reliability of an informant whose evidence was central to establishing probable cause. In *United States v. Hall*, 113 F.3d. 157, 158 (9th Cir. 1997), the showing of probable cause depended entirely on the word of an informant. Agents seeking the warrant disclosed that the

informant had been convicted of burglary, assault, and larceny, but they did not reveal his conviction for making a false report to a police officer. *Id*. The Ninth Circuit found the omission vitiated probable cause. The informant's evidence would not amount to probable cause if he was not "worthy of belief." *Id.* at 159. Even though the informant's more serious crimes were disclosed, revealing the conviction for making a false report "would doubtless have led to more skepticism" because the crime "suggested the possibility that [the informant] would lie to the police to frame an innocent man." *Id.* at 160. Because there was "virtually no evidence at all without the informant's testimony," the warrant could not stand once the impeaching information was known. *Id*.

In *United States v. Perkins,* the defendant was detained by Canadian Border Services as he traveled through Toronto International Airport. 850 F.3d at 1112-13. Canadian authorities searched his laptop and found images that they ultimately determined did not constitute child pornography under Canadian law. *Id.* They referred the matter to the Department of Homeland Security, which obtained a search warrant. *Id.* at 1113-14. The affidavit omitted (1) the fact the Canadian authorities found the images were not pornographic, (2) important portions of the Canadian constable's description of the images (which explained why they were not pornographic), and (3) copies of the images. *Id.* at 1116. The Ninth Circuit found that by withholding the images and providing an incomplete and misleading factual recitation, the affiant had "effectively usurped the magistrate's duty to conduct an independent evaluation of probable cause." *Id.* at 1118. The court reversed the district court's denial of the motion to suppress evidence and vacated the conviction. *Id.* at 1123.

In *United States v. Stanert,* law enforcement obtained a search warrant for the defendant's residence. 762 F. 2d at 777-78. The affidavit implied that a tipster had personally observed drug activity at Stanert's residence but did not reveal that the tipster's statement was based on speculation, not personal knowledge. *Id.* at 780. The affidavit also referenced a prior explosion of a clandestine laboratory at the residence, but it failed to state that Stanert purchased and moved onto the property *after* the explosion. *Id.* at 778, 781. The Court reversed Stanert's conviction and remanded to the district court to conduct a *Franks* hearing. *Id.* at 782, 783.

The warrant here should be voided for the same reasons. The showing of probable cause as to David Duong relied almost entirely on Co-Conspirator 1's claim that David Duong had participated in meetings about the supposed scheme. But the magistrate judge was deprived of crucial information to evaluate the credibility of that claim. She knew nothing of Co-Conspirator 1's decades-long history of defrauding business partners, including by forging documents, of his penchant for falsely accusing those same partners of wrongdoing in order to escape liability himself, or of his willingness to lie to law enforcement in an attempt to implicate the Duongs in a shooting. This information would have caused her to discount Co-Conspirator 1's claims, resulting in there being no probable cause to search David Duong's business, house, cars, or person.

### C. The June 2024 affidavit fails to establish probable cause to search David Duong's home.

The Supreme Court has repeatedly emphasized that the home enjoys increased protection under the Fourth Amendment. "[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people[.] … We have, after all, lived our whole national history with an understanding of 'the ancient adage that a man's house is his castle[.]'" *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) (internal alterations and citations omitted). Accordingly, "probable cause to believe that a suspect has committed a crime is not by itself adequate to secure a search warrant"for the suspect's home." *United States v. Ramos*, 923 F.2d 1346, 1351 (9th Cir. 1991) (citations omitted), *overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001). Instead, "there must exist reasonable cause to believe that the things listed as the objects of the search are located in the place to be searched." *Id*. Suppression is proper where a warrant "contains no facts making it likely that anything the officers sought was present" in a residence. *Id*. at 1352; *see also United States v. Hove*, 848 F.2d 137, 138 (9th Cir. 1988) (finding it "clear" that there was no probable cause where "the affidavit submitted to obtain the warrant did not explain the significance or relevance of searching this particular location").

Even setting aside the June 2024 affidavit's withholding of material information about Co-Conspirator 1, the affidavit fails to establish any likelihood that relevant items would be

located in David Duong's residence or vehicles. The affidavit supplies no logical or factual link between the alleged bribery scheme and those locations. Indeed, it does not even mention the house or cars except to say they should be subject to search. It does not claim that meetings took place at the house, that correspondence was ever sent there, or that any records were stored there. Nothing suggests that David Duong used the subject vehicles to attend meetings, to transport money, documents, or co-conspirators, or otherwise to conduct any part of the alleged scheme. The affidavit's failure to articulate even a single instance connecting the house or any vehicle to the suspected offense renders this portion of the warrant unsupported by probable cause. *See United States v. Grant*, 682 F.3d 827, 832–35 (9th Cir. 2012) (no probable cause to search defendant's residence where there was no evidence either of his sons brought the murder weapon there).

Rather than alleging facts related to the house or cars, the affidavit relies on boilerplate assertions that people who engage in crime "often keep the above-described records in their residences, vehicles, or on their person." Ex. 2, ¶ 166. It is true that magistrate judges may rely on "the opinions of experienced law enforcement agents … in making probable cause determinations." *United States v. Seybold*, 726 F.2d 502, 504 (9th Cir. 1984). But the opinions here are not entitled to such deference. Not only are there no allegations about the house or cars on whichh an expert could base conclusions ab"ut what might be found there, but even the generic boilerplate is fatally flawed. Many of the things the agent claims are "often" stored in residences are not, in fact, stored in residences, and certainly not in cars. People do not use their houses or cars to store "email correspondence" (¶ 158) or "emails and text messages" (¶ 163). And "records in digital form" (¶ 158), "use of communications" (¶ 162), "travel reservations records, diaries, calendar invitations, memos, and contact information" (¶ 164) and "electronic files" such as "correspondence documenting contact information, telephone directories, [and] address books" are also unlikely to be stored in hard copy in a house, rather than digitally online. At this stage in the investigation, agents had already obtained warrants for David Duong's Apple ID (including content of all emails and text messages and all files of any type stored on iCloud), his CWS email account, his AOL email account, and his cellular phone data. The affidavit offers no reason why

the electronic evidence it describes would plausibly be found in hard copy in the home or vehicles. Flawed and incomplete boilerplate guesses about what certain offenders "often" do cannot substitute for a factual nexus showing what *this* defendant likely did in *this* case. *See United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) (rejecting warrant's reliance on "rambling boilerplate recitations designed to meet all law enforcement needs" that were not "drafted with the facts of this case or this particular defendant in mind"); *United States v. Underwood*, 725 F.3d 1076, 1084 (9th Cir. 2013) (rejecting warrant's reliance on "conclusory allegations" that did not include "underlying facts that the issuing judge may use to evaluate the affiant's reasoning or to draw his or her own inferences").

*Leon*'s good-faith exception cannot save this aspect of the search warrant. The affidavit was so lacking in facts connecting David Duong's residence or vehicles to the alleged bribery scheme that no reasonable officer could have believed it established probable cause. The Ninth Circuit has repeatedly refused to apply *Leon* where the affidavit contains no factual nexus between the place searched and the alleged crime. *See Hove*, 848 F.2d at 140 (declining to apply *Leon* where affidavit failed to "offer an explanation of why the police believed they may find incriminating evidence" at defendant's residence); *Weber*, 923 F.2d at 1345-46 (good faith exception did not apply to warrant based on "foundationless expert testimony"); *United States v. Luong*, 470 F.3d 898, 903–04 (9th Cir. 2006) (declining to apply the good-faith exception where the affidavit "contain[ed] no appreciable indicia of probable cause," including no factual basis linking the suspected methamphetamine activity to the residence to be searched). Here, the affiant relied on nothing more than boilerplate "training and experience" assertions untethered to any investigative facts about David Duong or his property. Because the warrant was "so lacking in indicia of probable cause" that no reasonable officer could have believed it valid, the *Leon* exception does not apply, and suppression is required.

### D. The March 2024 affidavit fails to state probable cause to obtain information other than location data.

Finally, the March 2024 warrant's request for cell phone data was overbroad. A search warrant is overbroad if it authorizes seizure of items unsupported by probable cause. *See United*

*States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) ("Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.") (citation omitted); *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (warrants must be sufficiently specific to "ensure[] that the magistrate issuing the warrant is fully apprised of the scope of the search and can thus accurately determine whether the entire search is supported by probable cause.").

The affidavit supporting the March 2024 establishes, at most, probable cause to obtain location information associated with David Duong's cell phone. It explicitly states that it seeks only such data. Stephens Decl. ¶ 4 and Ex. 3, ¶ 1 (affidavit's introduction stating "I make this affidavit in support of an application for a search warrant … for information about the location of the following cellular telephones"). And it is equally explicit in explaining why location data—but only location data—is relevant to the investigation: historical cell cite records "could corroborate [David Duong's attendance at] in person meetings." Ex. 3, ¶ 88. But while the affidavit is limited, the warrant is not. It authorizes seizure of an expansive array of additional categories of information, including subscriber identities and addresses; billing and payment information; account start and service records; device and instrument identifiers; and complete connection/session records, including IP addresses, sector information, and timing-advance data. *Id.*, Attachment B-2. None of those categories is supported by the affidavit's theory of probable cause. *SDI Future Health, Inc.*, 568 F.3d at 703-05 (requiring probable cause for each category of information seized). The warrant is impermissibly overbroad.

Here again, the good-faith exception is not available to the government. The warrant is "so facially deficient" that officers should have recognized its failure to limit seizure to evidence for which probable cause exists. *Leon*, 468 U.S. at 923. The defect is plain on the warrant's face—it seeks seizure of multiple categories of subscriber, billing, and service-history information but articulates probable cause only for historical location data. Because those additional categories lacked any demonstrated nexus to the alleged bribery scheme, officers could not reasonably presume the warrant be valid. *Center Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 753 (9th Cir. 1989) (declining to apply good-faith where overbreadth was apparent

from the face of the warrant); *SDI Future Health*, 568 F.3d at 706 (no good-faith exception where there was "no evidence … agents in fact relied on the affidavit to restrict their search.") (citing *United States v. Luk*, 859 F.2d 667, 677 (9th Cir. 1988)).

## V. CONCLUSION

For the reasons stated above, David Duong respectfully requests that this Court (1) order a *Franks* hearing regarding the affidavit's failure to disclose relevant information about Co-Conspirator 1; (2) suppress evidence stemming from the search of his business,[5] home, cars, and person pursuant to both the June 2024 warrant and the rollover warrant; and (3) suppress evidence, other than location data, seized pursuant to the overbroad warrant for his cellular phone records.

Dated: October 31, 2025

Respectfully submitted,

/s/
Edward W. Swanson
August Gugelmann
SWANSON & McNAMARA LLP

Neal J. Stephens
Jeffrey B. Schenk
Thao Donnelly
JONES DAY

Attorneys for David Duong

[5] David Duong has standing to challenge the search of his personal office at CWS. *SDI Future Health, Inc.*, 568 F.3d at 698 (holding that to establish standing "to challenge the search of a workplace *beyond his internal office*," a defendant mus establish "personal connection or exclusive use" the searched space) (emphasis added).