CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

MOLLY K. PRIEDEMAN (CABN 302096)
ABRAHAM FINE (CABN 292647)
LLOYD FARNHAM (CABN 202231)
Assistant United States Attorneys

 1301 Clay Street, Suite 340S
 Oakland, California 94612
 Telephone: (510) 637-3717
 molly.priedeman@usdoj.gov
 abraham.fine@usdoj.gov
 lloyd.farnham@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>  v.<br><br>SHENG THAO,<br>ANDRE JONES,<br>DAVID TRUNG DUONG, AND<br>ANDY HUNG DUONG,<br><br>   Defendants. | No. 25-CR-0003-YGR<br><br>**UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS FOR A *FRANKS* HEARING AND FOR SUPPRESSION OF EVIDENCE** |

# **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................................1

FACTUAL BACKGROUND ...................................................................................................................5

I.      Initiation of Investigation ............................................................................................................5

II.     The Government Obtained Several iCloud and Email Search Warrants Before
        Interviewing Co-Conspirator 1 ...................................................................................................6

        A.      February 2024 iCloud warrants for Thao, Jones, Andy Duong's accounts. .................6

        B.      March 2024 cell site location data warrant. ..................................................................7

        C.      April 2024 iCloud warrant for David Duong's account. ...............................................8

        D.      May 2024 email warrant for David Duong, Andy Duong, and Thao's
                accounts. .........................................................................................................................8

III.    The Government Interviewed Co-Conspirator 1 on June 6, 2024. ...............................................9

IV.     The June 9, 2024, Shooting at Co-Conspirator 1's Residence. .................................................9

V.      The June 2024 Residential Warrants. ........................................................................................10

        A.      The warrant affidavit contained significant documentary evidence
                independent of Co-Conspirator 1's statements to law enforcement. ...........................10

        B.      The warrant affidavit contained significant disclosures about Co-Conspirator
                1's motivations and credibility. ..................................................................................14

VI.     Execution of Residential Warrants and Rollover Warrant. .......................................................14

ARGUMENT ...........................................................................................................................................15

I.      Defendants Have Not Made the Required Showing For a *Franks* Hearing ............................15

        A.      Defendants have not made a substantial showing that the affiant intentionally
                or recklessly made false statements or omitted material facts. ...................................16

        B.      The alleged omissions are not material to the probable cause determination. ............23

        C.      The cases Defendants cite do not support their arguments. .........................................28

II.     The June 2024 Affidavit Establishes Probable Cause to Search Defendants'
        Residences. ................................................................................................................................31

        A.      The affidavit alleged a sufficient nexus between Defendants' residences and
                the crimes they committed. ..........................................................................................31

        B.      The good faith exception precludes suppression in this case. .....................................33

III.    The March 2024 Cell Site Warrant Was Not Overbroad. ..........................................................35

IV.     The February 2024 iCloud Warrant and the May 2024 Email Warrants were not Overbroad ............................................................................................................................37

CONCLUSION......................................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Donahoe v. Arpaio,*
   986 F. Supp. 2d 1091 (D. Ariz. 2013) .................................................................. 30

*Franks v. Delaware,*
   438 U.S. 154 (1978) ............................................................................. 16, 23

*Guest v. Leis,*
   255 F.3d 325 (6th Cir. 2001) ...................................................................... 35

*Illinois v. Gates,*
   462 U.S. 213 (1983) .............................................................................. 31

*United States v. Abboud,*
   438 F.3d 554 (6th Cir. 2006) ...................................................................... 33

*United States v. Alexander,*
   2022 WL 743179 (D. Alaska March 11, 2022) ........................................................ 29

*United States v. Bennett,*
   219 F.3d 1117 (9th Cir. 2000) ..................................................................... 26

*United States v. Chavez-Miranda,*
   306 F.3d 973 (9th Cir. 2002) ............................................................. 15, 16, 31

*United States v. Crews,*
   502 F.3d 1130 (9th Cir. 2007) ........................................................... 33, 34, 36, 37

*United States v. Elliot,*
   322 F.3d 710 (9th Cir. 2003) ...................................................................... 25

*United States v. Estrada,*
   733 F.2d 683 (9th Cir. 1984) ...................................................................... 28

*United States v. Forrester,*
   512 F.3d 500 (9th Cir. 2008) ...................................................................... 35

*United States v. Foster,*
   711 F.2d 871 (9th Cir. 1983) ...................................................................... 27

*United States v. Grant,*
   682 F.3d 827 (9th Cir. 2012) ...................................................................... 34

*United States v. Greany,*
   929 F.2d 523 (9th Cir. 1991) ...................................................................... 37

*United States v. Hall,*
   113 F.3d 157 (9th Cir. 1997) ................................................................... 28, 29

*United States v. Hove,*
   848 F.2d 137 (9th Cir. 1988) ...................................................................... 34

*United States v. Huggins,*
   299 F.3d 1039 (9th Cir. 2002) ..................................................................... 25

*United States v. Johns,*
   948 F.2d 599 (9th Cir. 1991) ...................................................................... 22

*United States v. Kiser,*
   716 F.2d 1268 (9th Cir. 1983) ..................................................................... 15

*United States v. Kvashuk,*
   29 F.4th 1077 (9th Cir. 2022) ........................................................... 31, 32, 33

*United States v. Lam,*
  2020 WL 4349851 (N.D. Cal. July 29, 2020)..................................................... 38

*United States v. Larkins,*
  2025 WL 501405 (9th Cir. Feb. 14, 2025) ....................................................... 25

*United States v. Lauria,*
  70 F.4th 106 (2d Cir. 2023) ............................................................... 23, 32

*United States v. Leon,*
  468 U.S. 897 (1984)............................................................................ 33

*United States v. Lewis,*
  733 Fed.Appx 83 (4th Cir. 2018) ........................................................... 34

*United States v. Loloee,*
  2025 WL 671107 (E.D. Cal. Mar. 3, 2025) ................................................. 30

*Untied States v. Martinez-Garcia,*
  397 F.3d 1205 (9th Cir. 2005) .............................................................. 19

*United States v. Meek,*
  366 F.3d 705 (9th Cir. 2004) ............................................................... 25

*United States v. Meling,*
  47 F.3d 1546 (9th Cir. 1995) ......................................................... passim

*United States v. Miller,*
  753 F.2d 1475 (9th Cir. 1985) .......................................................... 16, 17

*United States v. Nunez,*
  2021 WL 3037705 (N.D. Cal. July 19, 2021)................................................ 16

*United States v. Patayan Soriano,*
  361 F.3d 494 (9th Cir. 2004) ............................................................... 28

*United States v. Perdomo,*
  800 F.2d 916 (9th Cir. 1986) ........................................................... 20, 21

*Untied States v. Perkins,*
  850 F.3d 1109 (9th Cir. 2017) .......................................................... 29, 30

*United States v. Perrine,*
  518 F.3d 1196 (10th Cir. 2008) ......................................................... 35, 36

*United States v. Ramos,*
  923 F.2d 1346 (9th Cir. 1991) .............................................................. 33

*United States v. Reeves,*
  210 F.3d 1041 (9th Cir. 2000) .................................................. 15, 25, 26, 28

*United States v. Rosenow,*
  50 F.4th 715 (9th Cir. 2022) ............................................................... 35

*United States v. Ruiz,*
  758 F.3d 1144 (9th Cir. 2014) .......................................................... 25, 29

*United States v. Sayakhom,*
  186 F.3d 928 (9th Cir. 1999) ........................................................... 32, 33

*United States v. Sears,*
  411 F.3d 1124 (9th Cir. 2005) .............................................................. 39

*United States v. Senchenko,*
  133 F.3d 1153 (9th Cir. 1998) .......................................................... 15, 21

*United States v. Seybold,*
  726 F.2d 502 (9th Cir. 1984) ............................................................... 34

*United States v. Smith,*
  155 F.3d 1051 (9th Cir. 1998) .............................................................. 36

*United States v. Stanert*,
   762 F.2d 775 (9th Cir. 1985) ......................................................................... 23, 30
*United States v. Staves*,
   383 F.3d 977 (9th Cir. 2004) ................................................................................. 15
*United States v. Terry,*
   911 F.2d 272 (9th Cir. 1990) ......................................................................... 34, 36
*United States v. Ward*,
   237 Fed.Appx. 289 (9th Cir. 2007)........................................................................ 26

**Statutes**

18 U.S.C. § 2703(c)(2)................................................................................................ 36
18 U.S.C. §§ 2701-2713 ............................................................................................. 35
California Penal Code § 476A(A)............................................................................... 18

The government's investigation into Defendants Sheng Thao, Andre Jones, Andy Duong, and David Duong's ("Defendants") corruption scheme began in early 2023. By the spring of 2024, the government had amassed a significant amount of documentary evidence tying each of the Defendants and Co-Conspirator 1 to the conspiracy, including incriminating text messages, Apple notes, calendar entries, financial records showing the corrupt payments, phone records showing significant communication among Defendants at key points relating to the agreements and payments, and other documentary evidence relating to the scheme. Based on this documentary evidence alone, between February and May of 2024, two different magistrate judges issued four separate search warrants for Defendants' iCloud accounts, email accounts, and location data for their cell phones. On June 6, 2024, the government interviewed Co-Conspirator 1 for the first time. When the government sought the residential search warrants shortly thereafter, the affiant included the same documentary evidence that had supported the previous warrants. In addition, the affiant included statements Co-Conspirator 1 made to the government, which corroborated the existence of Defendants' bribery scheme. The affidavit noted that Co-Conspirator 1's statements were included for merely "context and completeness," and explicitly informed the magistrate judge that these statements to law enforcement were not necessary to a finding of probable cause. The affidavit further included a multi-page footnote disclosing information relevant to Co-Conspirator 1's credibility that the affiant was aware of when he authored the affidavit.

Now, Defendants seek a *Franks* hearing relating to the June 2024 residential search warrants. The legal standard is undisputed: to be entitled to a *Franks* hearing, a defendant bears the burden of making a substantial preliminary showing that the search warrant affidavit (1) contained intentional or reckless false statements or omissions, ***and*** (2) that any false statements or omitted information was material, such that the reviewing judge could not have found probable cause supporting the warrant had she been apprised of the false statements or omissions. Moreover, a defendant's showing must challenge the veracity of the affiant, not that of her informant.

Defendants fall far short of meeting their burden to obtain a *Franks* hearing for three primary reasons. ***First***, the warrant affidavit contained significant disclosures about Co-Conspirator 1's criminal history and potential concerns about his motivations and credibility. Specifically, the affidavit disclosed

then-pending fraud charges against Co-Conspirator 1 initiated by the Alameda County District Attorney's Office; it disclosed six sets of previous charges and arrests over a two-decade period covering grand theft, embezzlement, battery, and other offenses; and it also disclosed recent allegations of fraud relating to a $250,000 loan. The affidavit further described Co-Conspirator 1's potential motivations for talking to the government, explicitly stating that Co-Conspirator 1 "appears to be . . . motivated by revenge against the DUONGs and a desire to obtain protection from law enforcement from the DUONGs, among any number of other potential personal motivations he may have" and also that Co-Conspirator 1 appears to talking "with the hope of obtaining some form of leniency in exchange." The affidavit also contained extensive details about Co-Conspirator 1's criminal activity and involvement above-captioned case, namely the conspiracy to commit bribery and fraud he engaged in with Defendants.

Simply put, the disclosures contained in the affidavit were sufficient to permit the reviewing magistrate judge to assess the credibility of Co-Conspirator 1 and his motivations for speaking with the government. Given these fulsome disclosures, the information Defendants claim was omitted—largely consisting of decades-old civil complaints and a discrepancy in Co-Conspirator 1's statements about the shooting—were not material. As described below, Ninth Circuit case law makes clear that the government's disclosures were sufficient and the cases Defendants rely on come nowhere close to supporting a *Franks* hearing in this case.

***Second***, the 78-page warrant affidavit submitted in support of the June 2024 residential warrants contained significant probable cause separate and apart from Co-Conspirator 1's statements to law enforcement. Defendants' characterization that the warrant affidavit relied predominantly on Co-Conspirator 1's statements to law enforcement is contradicted by the record. As described below, the affidavit described in detail documentary evidence tying Defendants and Co-Conspirator 1 to the corruption scheme, including incriminating text messages, notes and calendar entries from Co-Conspirator 1's iCloud, financial records showing the corrupt payments made directly to Jones, phone records showing significant communication among all Defendants surrounding these corrupt payments, and other documentary evidence relating to the scheme. In fact, the affidavit explicitly stated that Co-Conspirator 1's statements to law enforcement were not necessary to a finding of probable cause and

were included merely for context and completeness.

The government had been investigating Defendants' bribery scheme for over a year before interviewing Co-Conspirator 1 and two different magistrate judges determined that four separate warrant affidavits (which did not include any statements Co-Conspirator 1 gave to law enforcement) contained sufficient probable cause to issue warrants for Defendants' iCloud, email accounts, and cell phone data. Defendants have not challenged these warrants on the basis that they contained insufficient probable cause.[1]

Accordingly, even if the Court excised from the June 2024 warrant affidavit all of Co-Conspirator 1's statements to law enforcement (which it should not), there would still remain sufficient probable cause to issue the June 2024 residential warrants. Ninth Circuit case law holds that the Court can and should deny Defendant's request for a *Franks* hearing on that basis alone.

***Third***, and perhaps most fundamentally, Defendants have not met their burden of showing that the affidavit actually contained intentional or reckless false statements or omissions by the affiant. As laid out in detail below, the supposed omissions about Co-Conspirator 1 that Defendants rely on include several civil litigation documents (most of which consist of decades-old unsworn civil complaints), news articles, a state search warrant issued a month after the residential search warrant, a 2015-2016 investigation into Co-Conspirator 1 (that was closed with no charges or arrests), and a discrepancy in Co-Conspirator 1's description of the shooting at his house (that is collateral to the corruption scheme and that the government did not discover until months after execution of the search warrant). Defendants assert that the Court should find the affiant misled the magistrate judge based on information he did not know but was available on court dockets, or could have been learned by the affiant through further investigation. But as described below, that is not the correct legal standard and Ninth Circuit case law holds the exact opposite.

Here, the affiant disclosed the material information he knew about Co-Conspirator 1 (including the significant disclosures described above) and was not aware of Co-Conspirator 1's litigation history

---

[1] While Defendants assert that the February 2024 iCloud warrants, March 2024 cell site warrant, and May 2024 email warrants were overbroad in that they improperly permitted the seizure of certain data, they have not argued that those warrant affidavits failed to establish probable cause that crimes had been committed or that Defendants' accounts contained evidence of those crimes.

or the discrepancy in his statements about the shooting. Any omissions about Co-Conspirator 1 were neither intentional nor reckless because the affiant was not aware of the information, the affiant included significant disclosures about Co-Conspirator 1, and the affiant was not required to do the additional investigation Defendants describe to comply with *Franks*. Accordingly, Defendants have also failed at the first prong of the *Franks* analysis because they have not shown that any omissions were intentional or reckless.[2]

While Defendants' motions contain significant hyperbole and aggressive language, their arguments are hollow in substance and repeatedly misstate and mischaracterize the record and applicable case law. An objective and holistic review of the June 2024 warrant affidavit, as well as the applicable the Ninth Circuit case law, show that Defendants have come nowhere close to making the substantial showing necessary to obtain a *Franks* hearing. Accordingly, the government respectfully requests that the Court deny Defendants' *Franks* motion.

Defendants also challenge the June 2024 residential warrants on the basis that the affidavit did not sufficiently allege a "nexus" between the places to be searched (Defendants' residences, vehicles, and persons) and the crimes committed. As an initial matter, the Ninth Circuit has long held that findings of probable cause by magistrate judges are entitled to great deference, and a defendant faces a high burden to invalidate duly issued search warrants. Defendants' challenge on this front fails for two main reasons. Primarily, the affidavit did describe a sufficient nexus between Defendants' residences and the crimes they committed. Specifically, the affidavit set forth that Defendants lived at the residences to be searched and described that cell phone location data showed three of the Defendants' cell phones at their location in the days leading up to the warrant (the same cell phone numbers which the affidavit described as sending incriminating text messages). The affidavit then described, based on the affiant's training and experience, the various types of relevant records and electronic devices expected to be found at the residences, and specifically stated that individuals like Defendants often keep such records at their residences. Relevant case law makes clear that such information is sufficient

---

[2] Defendant Thao also asserts that the affiant intentionally concealed evidence of Co-Conspirator 1's alleged racial bias against Defendant Jones based on two short messages omitted from the affidavit. As described below, the record shows that the allegations about the affiant's intent are wrong and Defendant Thao has not cited a single case to support such an argument.

to establish nexus in white-collar cases, and that generally a residence and place of business is exactly where evidence of these crimes would be found. Defendants have not shown that any purported flaws overcome the great deference that this Court must give to a magistrate judge's probable cause determinations.

Even if this were a borderline case (which it is not), a long line of Supreme Court and Ninth Circuit cases make clear that the good faith doctrine precludes suppression in this case. The reviewing magistrate judge signed the warrants based on the assertions made in the affidavit and the agents reasonably relied on that warrant in good faith in conducting their searches. Certainly, Defendants cannot show that the affidavit failed to establish a colorable argument for probable cause such that the agents could not have relied on the search warrant in an objectively reasonable manner.

Finally, Defendants assert that the February 2024 iCloud warrant, March 2024 cell-site warrant, and May 2024 email warrants were partially overbroad in that they permitted seizure of items beyond what was discussed in the warrant affidavit. Defendants' motions fail for a multitude of reasons. As to the cell-site warrant, the items Defendants seek to suppress (consisting of non-content subscriber and account information) are not protected by the Fourth Amendment and thus there is no basis for suppression. For the iCloud and email warrants, the affidavits recounted relevant events dating back to July 2021 and earlier and the affidavits also described the likelihood of a preexisting financial relationship between Thao and Andy Duong. In addition, the affidavit detailed multiple instances where Andy Duong and others attempted to bribe various City of Oakland and Alameda County officials. As such, there was a basis for the reviewing magistrate judges to allow seizure of relevant items dating back to January 1, 2020 (and January 1, 2019 for the email accounts) and also to allow seizure of communications with state and local officials. Furthermore, even if these were borderline cases (which they are not), the good faith doctrine bars the partial suppression Defendants seek here.

## FACTUAL BACKGROUND

### I. Initiation of Investigation

The FBI began investigating Co-Conspirator 1 after he failed to pay for a negative political mailer targeting Thao's opponents in the lead up to the November 2022 election. Fine Decl. Ex. 6 (June 2024 affidavit) at ¶ 25  As part of the investigation into Co-Conspirator 1, FBI obtained a warrant for

Co-Conspirator 1's iCloud account. *Id.* Messages and other electronic documents from Co-Conspirator 1's iCloud account revealed evidence of a corruption scheme in which Co-Conspirator 1, Andy Duong, and David Duong agreed to fund a negative mailer campaign against Thao's opponents in the November 2022 mayoral election and make payments to Thao's long-term partner, Jones, in exchange for, among other things, the promise of future official acts such as city contracts for David Duong, Andy Duong, and Co-Conspirator 1's housing company, Evolutionary Homes. *Id.* ¶ 26. Based on the information obtained Co-Conspirator 1's iCloud account, the FBI sought and obtained additional warrants for electronic data from accounts controlled by Andy Duong, David Duong, Thao, and Jones, in addition to a phone location data search warrant, as described below.

## II. The Government Obtained Several iCloud and Email Search Warrants Before Interviewing Co-Conspirator 1

### A. February 2024 iCloud warrants for Thao, Jones, Andy Duong's accounts.

On February 26, 2024, the FBI obtained warrants for Thao, Jones, Andy Duong, and Co-Conspirator 1's iCloud accounts. Fine Decl., Ex. 1. That warrant was issued by Magistrate Judge Kandis A. Westmore. The affidavit (which was longer than 50 pages) described that leading up to the 2022 Oakland mayoral election, Thao promised to take official actions as mayor to benefit David Duong, Andy Duong, and Co-Conspirator 1 in exchange for various benefits to Thao and Jones. Among other acts, Thao promised to commit the City of Oakland to purchase housing units from Evolutionary Homes (Andy Duong, David Duong, and Co-Conspirator 1's housing company), to help secure a contract extension for California Waste Solutions ("CWS") (Andy Duong and David Duong's recycling company), to help push through a CWS land deal at the former Oakland Army Base, and to appoint senior city officials selected by David Duong, Andy Duong, and Co-Conspirator 1. In exchange, David Duong, Andy Duong, and Co-Conspirator 1 promised to pay $75,000 to fund negative mailers targeting Thao's opponents in the mayoral election and to make $300,000 in direct payments for a no-show job to Jones for the benefit of Thao and Jones.

The documentary evidence and information cited in the affidavit included the following evidence, which is described more fully below because it is also included in the June 14, 2024, residential warrant affidavit:

- Text messages between Thao and Co-Conspirator 1 setting up an October 7, 2022 meeting, and text messages between Co-Conspirator 1 and Andy Duong describing an agreement to have the City of Oakland purchase Evolutionary Homes units if she became mayor, but with "one catch." *Id*. at ¶¶ 34-40.

- Messages involving variously Co-Conspirator 1, Thao, and Jones regarding Jones providing information or materials to Co-Conspirator 1, presumably for the negative mailer that Co-Conspirator 1 later orchestrated. *Id*. at ¶¶ 41-56.

- Financial records showing Co-Conspirator 1 deposited a $75,000 from CWS that was later connected with the negative mailer campaign. *Id*. at ¶¶ 48-50.

- A communication from Co-Conspirator 1 to Andy Duong that outlined the terms of a negotiated quid pro quo involving Thao, Jones, David Duong, Andy Duong, and Co-Conspirator 1, documenting an agreement from Thao to have Oakland purchase housing units, extend the CWS contract, complete a land deal, and obtain City appointments, among other items. *Id*. at ¶¶ 74-76.

- Financial information that showed significant payments to Jones from Evolutionary Homes and Co-Conspirator 1. *Id*. at ¶¶ 24, 43-44, 67-68, 81.

- Communications in March 2023 with statements consistent with the corrupt agreement, including regarding the signing of a sham consulting agreement with Jones, a draft letter of interest regarding Oakland's purchase of Evolutionary Homes units prepared for Thao's signature, and messages indicating that Jones was "asking for $." *Id*. at ¶¶ 62-77.

Importantly, the FBI obtained this warrant before interviewing Co-Conspirator 1 and the warrant affidavit does not contain any statements from Co-Conspirator 1 to law enforcement. Defendants have not challenged these warrants on the basis that the affidavit did not contain sufficient probable cause or that the affiant failed to disclose material information under *Franks*.

**B.  March 2024 cell site location data warrant.**

On March 29, 2024, the FBI obtained a warrant for location data for cell phones used by Defendants and Co-Conspirator 1. Fine Decl., Ex. 2. That warrant was signed by Chief Magistrate Judge Donna M. Ryu. As with the iCloud warrants issued in February 2024, the affidavit submitted in support of that warrant described in detail documentary evidence tying Defendants and Co-Conspirator 1 to the corruption scheme and did not include any statements from Co-Conspirator 1 to law enforcement. The warrant affidavit specifically described several in-person meetings amongst

Defendants and Co-Conspirator 1, text messages, phone calls, and other instances in which Defendants used their cell phones in relevant ways during the conspiracy. Defendants have not challenged these warrants on the basis that the affidavits did not contain sufficient probable cause or that the affiant failed to disclose material information under *Franks*.

### C.     April 2024 iCloud warrant for David Duong's account.

On April 24, 2024, the FBI obtained a warrant for David Duong's iCloud account. Fine Decl., Ex. 3. That warrant was issued by Magistrate Judge Kandis A. Westmore. As with the above-described warrants, the affidavit submitted in support of that warrant did not contain any statements from Co-Conspirator 1 to law enforcement and described in detail documentary evidence tying Defendants and Co-Conspirator 1 to the corruption scheme and did not include any statements from Co-Conspirator 1 to law enforcement. The affidavit included the documentary and financial evidence included in the February and March 2024 warrants that is described above. David Duong has not challenged or moved to suppress that iCloud warrant for his account.[3]

### D.     May 2024 email warrant for David Duong, Andy Duong, and Thao's accounts.

On May 7, 2024, the FBI obtained a warrant for email accounts used by David Duong, Andy Duong, Thao, and Co-Conspirator 1. Fine Decl., Ex. 4. On the dame day, the FBI obtained a warrant for an email account used by Thao. Fine Decl. Ex. 5. Those warrants were signed by Chief Magistrate Judge Donna M. Ryu.[4] Similar to the above, those warrant affidavits did not contain any statements from Co-Conspirator 1 to law enforcement and described in detail documentary evidence tying Defendants and Co-Conspirator 1 to the corruption scheme and did not include any statements from Co-Conspirator 1 to law enforcement. The affidavit included the documentary and financial evidence included in the February, March, and April 2024 warrants that is described above. Defendants have not challenged the probable cause set forth in those warrant affidavits.

---

[3] While David Duong filed a joinder in Andy Duong's motion to partially suppress the February 2024 iCloud warrant and May 2024 email warrant (Dkt. No. 142), he does not have standing to challenge the February 2024 iCloud warrant because his account was not included in that warrant.

[4] The FBI obtained separate warrants for the Duongs' email accounts and Thao's email account because their email accounts were hosted by different companies (Microsoft and Google). The facts contained in those separate affidavits, however, were nearly identical, apart from separate sections describing how Microsoft and Google store email accounts.

**III.    The Government Interviewed Co-Conspirator 1 on June 6, 2024.**

On May 5, 2024, Co-Conspirator 1 reported a dispute with the Duong family to the Oakland Police Department (OPD) and made a series of criminal allegations against the Duongs, including referencing the bribery scheme involving Thao and Jones.  Fine Decl. Ex. 6 at ¶ 29.  The FBI learned of those allegations in approximately the middle of May 2024.  Haunold Decl. ¶ 9.

On June 6, 2024, the government interviewed Co-Conspirator 1 for the first time pursuant to a proffer agreement. Fine Decl., Ex. 6 at ¶ 30.  During the interview, Co-Conspirator 1 admitted his involvement in the bribery scheme and confirmed Defendants' involvement in the scheme.  *Id.* at ¶¶ 128-138.  Co-Conspirator 1 described several meetings with Thao, Jones, Andy Duong, and David Duong during which the bribery scheme was explicitly discussed.  *Id.*  Co-Conspirator 1's statements about the bribery scheme were corroborated by text messages, phone tolls, financial records, and other evidence.  *Id.* at ¶ 30, note 2.  Co-Conspirator 1 also alleged that during a confrontation with the Duongs on May 3, 2024, a Duong family member called individuals who subsequently assaulted him and robbed him of his personal belongings, including a Rolex watch, a gold chain, and his cell phones.  *Id.* ¶ 120.

**IV.    The June 9, 2024, Shooting at Co-Conspirator 1's Residence.**

On June 9, 2024, three days after the FBI interviewed Co-Conspirator 1, Co-Conspirator 1 was involved in a shooting at his residence.  *Id.* ¶ 144.  Given that the shooting occurred three days after Co-Conspirator 1 spoke to federal law enforcement, Co-Conspirator 1's prior allegations that the Duongs had directed an assault on him, as well as suspicious phone tolls leading up to the shooting, the FBI believed that Co-Conspirator 1 may have been part of a targeted attack instigated by the Duongs.  *Id.* ¶¶ 144, 148-150.  In initial reports to OPD and FBI, Co-Conspirator 1 reported that on the night of the shooting, Co-Conspirator 1 confronted two individuals breaking into his vehicle, one of whom shot at him, and Co-Conspirator 1 returned fire.  Stephens Decl. Exs. 18, 21.

In approximately August or September 2024, based on analysis of Co-Conspirator 1's interview after the shooting, surveillance videos from the shooting, and ShotSpotter reports, the FBI determined it was likely that Co-Conspirator 1 shot first, rather than returning fire.  Haunold Decl. ¶ 27.  On September 13, 2024, after learning that the ShotSpotter reports were consistent with Co-Conspirator 1 shooting first rather than returning fire, FBI agents interviewed Co-Conspirator 1 again about the

circumstances surrounding the shooting. *Id.* During that interview, Co-Conspirator 1 stated that he shot first after another individual pointed a firearm at him, and he believed his life was in danger. *Id.* Co-Conspirator 1 further stated that after this initial round of shooting, the individuals retreated, and returned several minutes later and returned fire. *Id.*

## V. The June 2024 Residential Warrants.

### A. The warrant affidavit contained significant documentary evidence independent of Co-Conspirator 1's statements to law enforcement.

On June 14, 2024, five days after the shooting at Co-Conspirator 1's residence, FBI obtained warrants to search Defendants' persons, residences and vehicles. Fine Decl. Ex. 6. The affidavit, authored by FBI Special Agent Duncan Haunold, relied largely on the evidence previously submitted to obtain iCloud and email warrants that the FBI had gathered before interviewing Co-Conspirator 1. *Id.* That evidence included significant documentary evidence tying David Duong, Andy Duong, Thao, Jones, and Co-Conspirator 1 to the corruption scheme, including messages and notes from Co-Conspirator 1's iCloud, financial records showing the corrupt payments, phone records showing significant communication surrounding these corrupt payments, and other documentary evidence relating to the scheme. As set forth above, two different magistrate judges determined that same documentary evidence constituted sufficient probable cause to issue warrants for Thao, Jones, David Duong, and Andy Duong's iCloud accounts, email accounts, and cell site location data.

For example, the affidavit described records indicating that Andy Duong and Co-Conspirator 1 began discussing the idea for Evolutionary Homes during the summer of 2022, and David Duong agreed to fund the project in October 2022. Fine Decl. Ex. 6 at ¶¶ 38-44. On October 5, 2022, Thao and Co-Conspirator 1 exchanged text messages setting a meeting for two days later (on October 7). *Id.* ¶ 48. Shortly after the October 7 meeting between Co-Conspirator 1 and Thao, Co-Conspirator 1 described the meeting with Thao in text messages to Andy Duong. *Id.* ¶ 53. In these messages, Co-Conspirator 1 relayed to Andy Duong that Thao would commit the City of Oakland to purchase housing units from Evolutionary Homes, if she became mayor with "one catch," and that Thao would call Andy Duong "re $$$." *Id.* Thirteen days later, Thao called Andy Duong and the call lasted approximately one minute. *Id.* ¶ 71.

On October 8 (the day after he met with Thao), Co-Conspirator 1 initiated a text conversation with Jones, followed by several phone calls over the next week. *Id*. ¶ 56. After this flurry of phone calls, on October 12, Co-Conspirator 1 texted Thao and asked "Where is Andre and my stuff?" *Id*. ¶ 58. Several phone calls between Thao, Jones, and Co-Conspirator 1 followed, after which Thao messaged Jones and stated: "Hey do you have want [sic] [Co-Conspirator 1] needs? He's asking for it . . . Pls pls connect with him . . ." *Id*. ¶ 59.

Within weeks, financial records reveal that Co-Conspirator 1 deposited a $75,000 check from CWS (David Duong and Andy Duong's family company), and Co-Conspirator 1 commissioned a negative political mailer targeting Thao's main opponent in the November 2022 Oakland mayoral race. *Id.* ¶ 65. The affidavit described additional messages and calls between Thao, Jones, and Co-Conspirator 1, the timing of which indicate Thao and Jones's knowledge of, and involvement in, the corruption scheme. *Id.* ¶¶ 56-62.

After it became likely Thao would win the mayoral election, and also that Andy Duong and Co-Conspirator 1's preferred district attorney candidate would lose the race, Andy Duong and Co-Conspirator 1 exchanged additional text messages relating to the bribery scheme. Specifically, the affidavit sets forth that on November 18, 2022, after discussing the election results, Co-Conspirator 1 stated, "[s]o we may go to jail… But we are $100 million dollars richer." *Id*. ¶ 74. Andy Duong replied: "Money buys everything" and Co-Conspirator 1 replied "You are right!... Plus we have a 10 year extension to CWS." *Id*.

The affidavit described multiple messages indicative of David Duong's involvement in the bribery scheme. For example, the affidavit described a series of messages between Co-Conspirator 1 and Andy Duong where they expressed frustration that Jones was calling David Duong about the scheme rather than Co-Conspirator 1, and described a message from Co-Conspirator 1 where he opined that Jones was calling David Duong because he wanted "direct access" to the "$$," to which Andy Duong responded that if he "wants that access better get to work . . . . Aint nothing free or front cuz we did all that to help her ass win." In the same conversation, Co-Conspirator 1 stated "I feel sure David will back us up." *Id.* ¶ 88.

In the context of the same conversation, Co-Conspirator 1 sent Andy Duong the following

explicit summary of the negotiated quid pro quo:

> Deal Points for Sheng Thao :: Election :: Post Election ::
>
> We will invest $75k cash to hit voters with mailers – CWS
>
> We will advance $40k cash to complete mailers, design and website – [CO-CONSPIRATOR 1] – we may recover in the future
>
> We produced and sent mailers for 68,000 households x 3
>
> We produce websites / TaylorFraud.com and StopIgnacio.com
>
> For:
>
> The purchase of 300 of our modular units at a price point of $300,000 each FOB at Oakland
> AJ will be part of development team paid $300k flat on sale of units – contract maybe renew for other clients
> We will get a 10 year extension for CWS from Mayor staff
> We will get land deal at Army base done from Mayor staff
> One appointment to Port of Oakland commission
> Appointments to 1. Public Works 2. Building and Permits 3. Housing and 4. City administrators office

*Id.* ¶ 90.

After sending the above summary to Andy Duong , Co-Conspirator 1 asked "…Am I missing something?" Then Co-Conspirator 1 wrote "We are missing communications assignments." In response, Andy Duong confirmed that Co-Conspirator 1's description of the corrupt deal was accurate, writing "Not missing" and "All right." *Id.* ¶ 92. Co-Conspirator 1 then asked if they should share the summary of the arrangement with "David," and Andy Duong responded and said that "David knows already," and that Andy Duong had shared it with him numerous times. *Id.*

The affidavit also detailed financial records that corroborated the above-described scheme, specifically that Jones received checks totaling $25,000 from Co-Conspirator 1 between October 2022 and April 2023, and two additional checks for $35,000 each from Evolutionary Homes in April 2023 and November 2023. *Id.* ¶¶ 27, 63, 96, 109, 117. Messages and notes on Co-Conspirator 1's iCloud account also indicated that Jones would receive additional money from Evolutionary Homes in exchange for Thao's commitment to purchase housing units from Evolutionary Homes on behalf of the City of Oakland. *Id.* ¶¶ 27, 97.

Messages described in the affidavit between Co-Conspirator 1 and David Duong indicated that

David Duong signed off on the corrupt payments to Jones. On April 18, 2023, David Duong messaged Co-Conspirator 1 and Andy Duong and stated "[Co-Conspirator 1]. please call AJ tell him we just finished our meeting and decided to give home what he asked for but he need to sign before fund." *Id.* ¶ 102. On April 26, 2023, the same day that notes from his iCloud indicated that Co-Conspirator 1 had lunch with Jones, Co-Conspirator 1 messaged David Duong and stated "Partner," "AJ signed," "Look happy," "I asked him point blank if he was going to delivered [sic] he said 109 percent he will because he knows what people are saying backstage." *Id.* ¶ 109. Two days later, Jones deposited a check for $35,000 from Evolutionary Homes LLC into his bank account. *Id.*

Additional messages in the affidavit confirm David Duong, Andy Duong, Thao, and Jones' involvement in the scheme. For example, on March 7, 2023, Co-Conspirator 1 messaged Andy Duong what appears to be a screenshot of a conversation with Jones. *Id.* ¶ 80. In the screenshotted message, Co-Conspirator 1 appears to have sent Jones a draft letter of intent addressed to David Duong, as President of Evolutionary Homes and purports to be authored by Thao. *Id.* Co-Conspirator 1 then wrote to Jones "Andre – can you help us get this non binding non committal letter of interest signed" and "Also, David Duong called Sheng 3 times without a return call. Is she ok ?" *Id.*

On March 16, 2023, Co-Conspirator 1 wrote to Andy Duong "Hey Brother – AJ is asking for $," and on March 17, 2023 Co-Conspirator 1 wrote "So what we do with Andre and his $5k can you deliver to him ?" to which Andy Duong replied "Check be ready tomorrow." *Id.* ¶ 83. On March 18, 2023, Co-Conspirator 1 wrote "Let me know when AJ picks up check please" and "Bro AJ Is set?" Andy Duong responded "All set yesterday." *Id.*

The affidavit further described a review of Thao and Jones' financial records, which showed that their financial behavior changed after Jones began receiving money from Co-Conspirator 1 and Evolutionary Homes, indicating Thao knew that Jones was receiving the money for their mutual benefit. *Id.* ¶ 118. The affidavit further asserted that financial records, as well as communications between Thao and Jones, indicate that they struggled to pay bills and discussed money issues frequently, demonstrating a financial motivation to accept bribes. *Id.*

**B. The warrant affidavit contained significant disclosures about Co-Conspirator 1's motivations and credibility.**

In addition to the extensive documentary evidence, examples of which are described above, the affidavit included additional statements made by Co-Conspirator 1 during the June 6, 2024, interview for "context and completeness." *Id.*, at ¶ 30, n. 2. The affidavit made clear that Co-Conspirator 1's statements were not necessary to a finding of probable cause. SA Haunold explicitly stated in the affidavit that he believed "there is sufficient probable cause to issue the search warrants without including any of the statements [Co-Conspirator 1] made during the June 6 interview." *Id.*

The affidavit also included a lengthy footnote that spanned two pages disclosing information about Co-Conspirator 1's criminal history and background, including pending theft charges, previous charges and arrests, and recent allegations of fraud. *Id.* The affidavit described Co-Conspirator 1's potential motivations for speaking with the government, explicitly stating that Co-Conspirator 1 "appears to be . . . motivated by revenge against the DUONGs and a desire to obtain protection from law enforcement from the DUONGs, among any number of other potential personal motivations he may have" and also that Co-Conspirator 1 appears to be interviewing with the government "with the hope of obtaining some form of leniency in exchange." *Id.*

**VI. Execution of Residential Warrants and Rollover Warrant.**

On June 20, 2024, the FBI, USPIS, and IRS-CI executed search warrants at Thao and Jones's residence, David Duong's residence, Andy Duong's residence, and CWS. Haunold Decl. ¶ 21. During the search of Andy Duong's residence, the FBI found ███████████████████████████████

▮▮▮▮▮▮▮▮▮▮▮▮

## ARGUMENT

## I.   Defendants Have Not Made the Required Showing For a *Franks* Hearing

"A defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant if the defendant can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041,1044 (9th Cir. 2000). "The movant bears the burden of proof and must make a substantial showing to support both elements." *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002).  "The offer of proof [for a *Franks* hearing] must challenge the veracity of the affiant, not that of his informant."  *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983).  For a false statement or omission in an affidavit to be reckless, the affiant must have a "high degree of awareness of probable falsity."  *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998) (citation omitted). "Allegations that the affiant negligently or innocently included false information are insufficient to require a *Franks* hearing."  *United States v. Staves*, 383 F.3d 977, 983 (9th Cir. 2004).

Here, Defendants' motions fall well short of meeting either prong of the *Franks* analysis.  First, Defendants have not made a substantial showing that the affiant intentionally or recklessly made false statements or omissions to mislead the magistrate judge who issued the warrants.  Second, even if Defendants had satisfied this first prong, Defendants would still not be entitled to a *Franks* hearing because they have failed to satisfy the materiality element, which requires a substantial showing that without the allegedly false information, or with the allegedly intentionally misleading omissions corrected, the affidavit cannot support the magistrate judge's probable cause determination.  The affidavit here contained significant disclosures regarding Co-Conspirator 1's credibility and motivations and also contained more than sufficient probable cause without the allegedly false or omitted information.  As set forth above, two different magistrate judges found probable cause to search Defendants' iCloud and email accounts before the government interviewed Co-Conspirator 1 and which affidavits did not include any statements from Co-Conspirator 1 to law enforcement.

**A. Defendants have not made a substantial showing that the affiant intentionally or recklessly made false statements or omitted material facts.**

Defendants have not made the required showing that SA Haunold intentionally or recklessly misled the magistrate judge. The breadth and length of SA Haunold's disclosures regarding Co-Conspirator 1, including the multi-page footnote describing Co-Conspirator 1's criminal history and potential motivations for cooperation, reflect SA Haunold's efforts to ensure that the magistrate judge was well informed about the information he had that could reasonably bear on Co-Conspirator 1's credibility. Defendants' motions misstate the Ninth Circuit's standard for an intentional or reckless omission under *Franks* and vastly overstate the significance of the information that they allege was omitted.

Defendants' motions repeatedly allege that SA Haunold omitted information that was "readily available," that was "public information," or that was "publicly available at the time the affidavits were submitted." *See* Dkt. No. 119 (David Duong Motion) at 12; Dkt. No. 138 (Andy Duong Motion) at 10. But "availability" of additional impeachment information is not the standard under *Franks*. *See, e.g.*, *Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an order of proof."); *Chavez-Miranda*, 306 F.3d at 979 (bare assertion that omission was reckless or misleading falls short of the preponderance of evidence that *Franks* requires); *United States v. Nunez*, 2021 WL 3037705 at *9 (N.D. Cal. July 19, 2021) ("Nunez' bald assertion of recklessness falls far short of the substantial preliminary showing required for a *Franks* hearing.")

On the standard for an intentional or reckless omission, the Ninth Circuit's decision in *United States v. Miller*, 753 F.2d 1475, 1478 (9th Cir. 1985) is instructive. In *Miller*, the defendant made a *Franks* challenge to a residential search warrant by asserting that the affidavit contained material omissions regarding the key informant's credibility. Specifically, the affidavit did not disclose that the affiant (1) "failed to discover that [the informant] had been convicted of perjury; (2) they did not ask county officers about the circumstances of [the informant's] arrest and therefore did not learn of [the

informant's] 'bizarre' behavior as described by witnesses who were interviewed; and (3) they did not review [the informant's] rap sheet." *Id*. at 1477. After a hearing, the district court denied the *Franks* challenge because these omissions were merely negligent rather than reckless or intentional. *Id*. at 1478.

In rejecting the defendant's *Franks* challenge, the Ninth Circuit reiterated that "*Franks* requires that a defendant show intentional falsehoods or reckless disregard for the truth. Allegations of negligence or innocent mistake are insufficient." *Id*. (internal citations omitted). The Ninth Circuit went on to hold:

> ***It might have been prudent for the federal agents to check on [the informant's] background and criminal record, but their failure to do so is not reckless disregard***. The federal agents knew of the charges for which [the informant] was being held, and they knew of his Oregon narcotics and firearms convictions. They observed [the informant's] demeanor and behavior during the interview and testified that he appeared rational and coherent.

*Id*. (emphasis added).

Here, SA Haunold was not aware of the vast majority of the supposed omissions Defendants point to. Haunold Decl. ¶ 18. Furthermore, Defendants significantly overstate, and in some cases explicitly misstate, the record regarding the affidavit's supposed omissions. Defendant David Duong's motion (which the other Defendants have joined) argues that the affidavit failed to disclose that Co-Conspirator 1 has a "decades-long history of fraud and has been repeatedly found liable for fraud in lawsuits," and that Co-Conspirator 1 "falsely portrayed the shooting outside his residence as a targeted attack rather than a chance encounter between strangers." Dkt. No. 119 at 1, 11. In support of the suggestion that Co-Conspirator 1 has been "repeatedly found liable for fraud," the motion attached six unsworn civil complaints, all of which are over a decade old (Stephens Decl. Exs. 5, 8, 10, 12, 14, and 16), a 2012 news article referencing a judgment (Ex. 6), a single default judgment divorced of any findings or facts (Ex. 7), a 2013 notice of stay of proceedings relating to a bankruptcy petition involving Co-Conspirator 1 (Ex. 9), a Court of Appeal decision in which Co-Conspirator 1 prevailed (Ex. 11), an application for the renewal of a judgment related to a 2006 complaint (Ex. 13), an order wherein Co-Conspirator 1 voluntarily agreed to surrender his real estate license (Ex. 17), and a list of lawsuits in Alameda County in which Co-Conspirator 1 appears to have been involved (many of which he was the plaintiff) (Ex. 4). The relevance of the decades-old complaints, news articles, and judgments is difficult

to discern, and at most, establishes that Co-Conspirator 1 has been repeatedly *accused* of fraud in civil litigation over the years. It is a far cry, however, from the "decades-long pattern of repeatedly being found liable for defrauding business partners" that Defendants purport it to be.

More importantly, SA Haunold was not aware of the civil lawsuits cited by the defendants. Haunold Decl. ¶ 18. Defendants do not suggest otherwise, instead arguing that SA Haunold acted "recklessly" because evidence of the civil lawsuits was "readily publicly available" by searching for and obtaining Alameda County Superior Court records. They cite no precedent for the suggestion that agents must search and disclose all court records related to civil lawsuits related to informants, nor could they. *See United States v. Meling*, 47 F.3d 1546, 1554 (9th Cir. 1995) (rejecting argument that FBI was required to search for records available at county records office). Defendants also cite to a 2015-2016 money laundering investigation into Co-Conspirator 1. Dkt. 119 at 13. But that investigation was quickly closed with no arrests and no charges. Haunold Decl. ¶ 19. Given the fulsome disclosures regarding Co-Conspirator 1's actual criminal history, his criminal involvement in Defendants' bribery scheme, more recent criminal investigations involving fraud, and his motivations for speaking with law enforcement, not including Co-Conspirator 1's civil litigation history (which the affiant was not aware of) cannot be considered to be reckless or material.

Defendants Thao, Jones, and Andy Duong have joined David Duong's motion and allege that SA Haunold intentionally or recklessly omitted additional material from the affidavit. But these Defendants explicitly misstate the record and overstate the significance of supposed omissions. For example, Defendant Thao's motion describes then-pending 2024 check fraud charges against Co-Conspirator 1 amongst a bullet point list of supposed omissions from the warrant and asserts that "[n]ot a single one of the aforementioned incidents (nor the incidents described in David Duong's motion) were recounted in Agent Haunold's affidavit despite being publicly available to the government (and anyone with access to the Internet)." Dkt. No. 136 at 8-9. This is completely false. Not only did the affidavit devote over a page to describing the facts underlying the alleged check fraud, it explicitly disclosed that in 2024 the Alameda County District Attorney's Office charged Co-Conspirator 1 "with a violation of California Penal Code § 476A(A) (passing a check with insufficient funds greater than $950), a felony, for the bad checks he wrote to VICTIM-1. Those charges are currently pending." Fine Decl. Ex. 6 at ¶ 30, n. 2; ¶¶

32-34.

Similarly, Defendant Thao's motion asserts that the affidavit did not disclose that Co-Conspirator 1 was charged with grand theft and forgery and pled no contest to a misdemeanor in 2016. Dkt. No. 136 at 8. As an initial matter, the affidavit disclosed occasions on which Co-Conspirator 1 was arrested for committing grand theft (in 2017) and a separate occasion where he was charged with grand theft (in 2021). Fine Decl. Ex. 6 ¶ 30, n. 2. Moreover, the record makes clear that the incident described in Defendant Thao's motion resulted not in a conviction, but in a deferred entry of judgment, which means that the case was dismissed after Co-Conspirator 1 met certain conditions. *See* Tarver Decl., Ex. 7 at 2-3. To the extent Defendant Thao is asserting that the affiant was required to go beyond Co-Conspirator 1's rap sheet (which did not include this incident), the Ninth Circuit has rejected that argument. *See Untied States v. Martinez-Garcia*, 397 F.3d 1205, 1215 (9th Cir. 2005) (affiant did not demonstrate intentional or reckless dishonesty by relying in good faith on criminal history, even if flawed); Haunold Decl. Ex. A. The other supposed omissions Defendant Thao points to—that Co-Conspirator 1 allegedly listed himself as a real estate broker on a 2018 campaign donation and that he was sued in 2006—do not move the needle. SA Haunold did not have knowledge of these incidents, and even if he did, they are not material when compared to the robust disclosures SA Haunold did include.

Defendant Jones' motion also mischaracterizes the record. Specifically, it spends several pages describing an Alameda County District Attorney's Office warrant affidavit and asserts "there is a reasonable inference that SA Haunold knew or should have known additional and important information as to those allegations against Co-Conspirator-1 at the time he signed and submitted the search warrant affidavit." Dkt. No. 141 at 7. But Defendant Jones neglects to mention that this Alameda County warrant affidavit was dated July 17, 2024, more than a month ***after*** Judge Westmore signed the affidavit at issue here.[5] Haunold Decl. ¶ 20 and Ex. B. Not only was SA Haunold unaware of the allegations contained in the Alameda County warrant, he could not have been aware of the warrant itself because it

_____

[5] Defendant Jones' motion states that the version of this document produced in discovery was "not dated or signed," but then describes a publicly available version of the document available at https://oaklandside.org/wp-content/uploads/2025/11/Affidavit_89106176761.pdf. Dkt. No. 141 at 8, n.4. A review of the publicly available version shows the warrant is dated July 17, 2024, but Defendant Jones' motion strategically did not explain that this state warrant post-dates the warrant at issue here by over a month. None of the other Defendants mentions or relies on this Alameda County warrant.

was issued after the residential warrant was issued in this case. Defendant Jones' assertion that "SA Haunold should have contacted Inspector Bettencourt to learn more about the status of the investigation," seemingly based on the fact that fact that SA Haunold had a separate OPD report about a separate purported victim (which was disclosed in the affidavit), is nothing but speculation and is wholly unsupported by any case law.

Defendants' allegations related to SA Haunold's alleged failure to disclose information related to the June 9, 2024, shooting fare no better. Defendants' argument hinges on an allegation that SA Haunold omitted information that was "available to the agent" that was inconsistent with Co-Conspirator 1's initial account of the June 9 shooting. Dkt. No. 119 at 2. This allegation relies on a post-hoc analysis of the evidence that that had not been conducted at the time that SA Haunold authored the affidavit. The Ninth Circuit has explicitly rejected the argument Defendants put forth here, that a false or inconsistent statement from the ***informant*** is insufficient to obtain a *Franks* hearing. Rather, a defendant must show that the ***affiant*** made an intentional or reckless false statement. *See United States v. Perdomo*, 800 F.2d 916, 921 (9th Cir. 1986) ("Perdomo's challenge to the warrant on this ground must fail because, even if Perdomo's statements are believed, they reflect only on the veracity of the informant who claims he overheard the conversation, not the veracity of the affiant. Allegations that statements reported in the affidavit and made to the affiant are false are not sufficient to satisfy the requirements for a *Franks* hearing unless the defendant contends that the affiant has misrepresented the statements made by another.").

Here, OPD records from the night of the shooting, as well as FBI's interview reports of Co-Conspirator 1, indicate that Co-Conspirator 1 initially told law enforcement that after Co-Conspirator 1 heard unidentified individuals smash the window of his vehicle, he armed himself, and stepped outside to investigate. Stephens Decl. Exs. 18, 21. Co-Conspirator 1 initially told law enforcement that he confronted two individuals breaking into his vehicle, one of whom shot at him, and Co-Conspirator 1 returned fire. *Id.*

In approximately August or September 2024, based on review of a number of sources of information including Co-Conspirator 1's interview after the shooting, surveillance videos from the shooting, and ShotSpotter reports, the FBI determined it was likely that Co-Conspirator 1 shot first,

rather than returning fire.  Haunold Decl. ¶ 27.  Based on that analysis, on September 13, 2024, FBI agents interviewed Co-Conspirator 1 again about the circumstances surrounding the shooting.  *Id.* During that interview, Co-Conspirator 1 stated that he believed he shot first after another individual pointed a firearm at him, and he believed his life was in danger.  *Id.*  Co-Conspirator 1 then said that the individuals retreated, and later returned and shot at Co-Conspirator 1's residence.  *Id.*  Co-Conspirator 1 stated that he did not remember what he initially told OPD about the shooting, and that he might have miscommunicated about the sequence of events in the aftermath of the shooting.  *Id.*  During that interview, Co-Conspirator 1 continued to state that he believed the shooting was orchestrated by the Duongs.  *Id.*

The undisputed evidence demonstrates that SA Haunold was not aware that Co-Conspirator 1 fired first until well after the execution of the June residential warrants.  Indeed, as Defendants acknowledge in a footnote, OPD did not even receive the ShotSpotter reports until June 15, 2025, one day *after* the June residential warrant was signed, and there is no evidence suggesting that SA Haunold suspected that Co-Conspirator 1 shot first until months after the residential warrants were executed.[6] Dkt. No. 119 at 14, n.3; Stephens Decl. Ex. 20 at 4; Haunold Decl. ¶ 18.  Regardless, even if SA Haunold had been aware that Co-Conspirator 1 shot first after confronting an armed individual in his vehicle, it would not have undermined Co-Conspirator 1 or FBI's belief at the time that the shooting was targeted due to the fact that the shooting occurred three days after Co-Conspirator 1 was interviewed by FBI along with the prior allegations by Co-Conspirator 1 that the Duong family had previously orchestrated an assault of him.  Accordingly, Defendants fall far short of meeting their burden to show that SA Haunold had a "high degree of awareness of probable falsity that a finding of recklessness would require."  *Senchenko*, 133 F.3d at 1158.

Defendants also suggest that SA Haunold omitted information suggesting that the shooting was "not an assassination attempt but a botched car burglary," specifically a statement from a witness who reported prior shooting nearby, statements from Co-Conspirator 1 that he saw the two individuals

---

[6] Defendants point to evidence indicating that witnesses heard four initial shots, and the officers found 40 caliber casings on Co-Conspirator 1's front yard, as evidence that Co-Conspirator 1's statements about returning fire were inaccurate.  Mot. at 14-15.  It is unclear, and Defendants do not specify, how this evidence would have demonstrated to SA Haunold that Co-Conspirator 1 fired first.

breaking into car prior to the shooting, and information related to J.T.'s vehicle registration. Dkt. No. 119 at 16. But the government need not include all of the information in its possession to obtain a search warrant, and none of this information available to SA Haunold indicated that Co-Conspirator 1's account of the shooting was not true. *See United States v. Johns*, 948 F.2d 599, 606-07 (9th Cir. 1991).

Of course all of this post-hoc reconstruction of the evidence from the shooting incident, which Defendants have now had months to review and analyze, should be put into the context of this *Franks* motion. This is a public corruption case, not an attempted murder case, and the affidavits at issue relied on direct evidence of that corruption scheme, including communications, phone records, financial documents, and other records. The shooting incident was described in the affidavit because it involved Co-Conspirator 1 and was included in the affidavit to provide more information to the reviewing magistrate—not less—about the events, Co-Conspirator 1's state of mind, and potential motives for their statements to law enforcement.

To the extent Defendant Andy Duong is challenging the June 20, 2024, rollover warrant for his residence, that challenge fails for the same reason, namely that he has failed show that affidavit contained intentional or reckless false statements to omissions. While an FBI task force officer received the ShotSpotter reports on June 15, 2024 (after the initial residential warrant was issued), those reports were not analyzed until several weeks later. Haunold Decl. ¶ 18. And as set forth above, there is no evidence suggesting that FBI suspected that Co-Conspirator 1 shot first until months after the residential warrants were executed.

Finally, the government addresses Defendant Thao's assertion that the affidavit intentionally omitted Co-Conspirator 1's "documented racial animus" to enhance Co-Conspirator 1's credibility because it excised two lines from a text chain between Co-Conspirator 1 and Andy Duong. *See* Dkt. No. 136 at 9-10, 12. Defendant Thao does not cite a single case in support of this argument. And the record makes clear the removal of the two lines had nothing to do with bolstering Co-Conspirator 1's credibility or concealing a known "racial animus." Specifically, the February 2024 iCloud warrant affidavit and the May 2024 email warrant affidavit, both targeting Co-Conspirator 1 and written before he spoke with the government (and therefore before he was a cooperating witness at all), also omitted the two lines at issue from the text conversation between Co-Conspirator 1 and Andy Duong. *See* Fine

Decl., Ex. 1 at ¶ 72; Ex. 4 at ¶ 85; Ex. 5 at ¶ 91. The two lines were removed from the initial affidavits targeting Co-Conspirator 1 so that the reviewing magistrate judge would focus on the actual hard evidence against Co-Conspirator 1, rather than the potentially racially-charged language in the text messages. Haunold Decl. at ¶¶ 29-30. Those same text message chains were carried over to the June 2024 residential warrant affidavit and there was no intent to somehow bolster Co-Conspirator 1's credibility. Lastly, even if this was an intentional omission to somehow bolster Co-Conspirator 1's credibility (which it was not), such an omission was not material to the probable cause determination. As made clear by the materiality section below, including these two lines in the affidavit would not change that the affidavit contained significant evidence supporting the magistrate judge's finding of probable cause.

**B.      The alleged omissions are not material to the probable cause determination.**

As demonstrated above, the affidavit did not contain intentional or reckless false statements or omissions, and thus their motions fail at the first *Franks* prong. But the Court does not need to reach that issue because Defendants have failed to establish materiality. Courts often proceed first to materiality (skipping over the first *Franks* prong of intentional or reckless false statements or omissions) and deny *Franks* hearings on that basis alone. *See United States v. Lauria*, 70 F.4th 106, 125 (2d Cir. 2023) ("The materiality requirement is often considered first because, as the Supreme Court explained in *Franks*, 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant to support a finding of probable cause, no hearing is required.'" (quoting *Franks*, 438 U.S. at 171-72)). The Court can proceed to the materiality prong here and should deny Defendants' *Franks* motion on that basis alone.

Here, Defendants are not entitled to a *Franks* hearing because they have not shown that the magistrate judge could not have found probable cause to support the warrant if she had been apprised of the alleged omissions. *United States v. Meling*, 47 F.3d 1546, 1554 (9th Cir. 1995). "[I]f when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks,* 438 U.S. at 171–72. The Court must consider "whether the affidavit, once corrected and supplemented, would provide a magistrate with a substantial basis for concluding that probable cause existed." *United*

*States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985).

As to materiality, the Ninth Circuit's decision in *United States v. Meling* is instructive. There, the defendant moved for a *Franks* hearing on the basis that the warrant affidavit failed to disclose sufficient facts about the FBI's principal informant. *Meling*, 47 F.3d at 1553. Specifically, the affidavit did not disclose that (1) the informant "had been convicted of forgery and fraud three times, and though each of these convictions was over ten years old, he had a panoply of parole violations for similar offenses stretching back to his first conviction," (2) that the informant had been convicted of a separate felony one year before submission of the affidavit "and had been committed to a mental institution, where he experienced auditory and visual hallucinations and was diagnosed as having schizophrenia," and (3) the affidavit "failed to mention that [the informant] came forward at least in part to obtain the $100,000 reward offered for information relating to the poisonings; to the contrary, the affidavit characterized [the informant's] motives as pure." *Id*.

The Ninth Circuit held that despite these glaring omissions about the key informant, the defendant was not entitled to a *Franks* hearing because they failed to demonstrate materiality. The Ninth Circuit reasoned that "[i]n determining whether an affidavit is sufficient to establish probable cause, the reviewing judge looks to the totality of the circumstances: He must assess the credibility and basis of knowledge of any informants (though neither of these factors alone determines what weight should be given the informant's tips) and weigh any other information supporting a finding of probable cause." *Id.* at 1554-1555. "Where the [affidavit] presents substantial evidence supporting a finding of probable cause independent of the information provided by an informant, that showing will compensate for an informant's low credibility." *Id.* at 1555. As to the specific omissions regarding the informant's criminal history and impure motive, the Ninth Circuit held that "including this information in the application would not completely undermine [the informant's] credibility, and thus would not require that the information he provided be completely disregarded. The omitted convictions were stale, and even if [the informant] had been motivated by the reward, that did not make him a liar." *Id*. *Meling* also pointed to other evidence corroborating the informant's allegations and also that the affidavit "contained considerable independent evidence pointing to Meling as the poisoner." *Id*.

As detailed above, SA Haunold included extensive information relevant to Co-Conspirator 1's

criminal history and background in the affidavit, including prior and pending theft and embezzlement charges, and an explicit statement that Co-Conspirator 1 appeared to be motivated by revenge. Taken together, SA Haunold's disclosures were more than sufficient for the magistrate judge to have understood Co-Conspirator 1 had potentially serious credibility issues. However, "the fact that an informant has an ulterior or impure motive in coming forward to provide information to the police does not preclude a finding that the informant is nevertheless credible." *Meling*, 47 F.3d at 1555. This is particularly true, where, as here, there is countervailing evidence to corroborate the source's reliability. *See Id.*; *United States v. Ruiz*, 758 F.3d 1144, 1149-1151 (9th Cir. 2014) (finding that corroborating evidence diminished the adverse effect of the credibility issues); *Reeves*, 210 F.3d at 1045 (no *Franks* hearing necessary where informant had previously provided reliable information); *United States v. Elliot*, 322 F.3d 710, 715 (9th Cir. 2003) (same). Here, Co-Conspirator 1's statements in the affidavit were corroborated throughout with text messages, financial records, call logs, and other documentary evidence. Given the extensive information SA Haunold disclosed to the magistrate judge relevant to Co-Conspirator 1's credibility, combined with the documentary evidence corroborating Co-Conspirator 1's statements, the omitted information about stale civil allegations of fraud and evidence that Co-Conspirator 1 made inconsistent statements about who shot first during the June 9 shooting would not have altered the magistrate judge's analysis.

Other Ninth Circuit cases have rejected *Franks* hearings at the materiality stage in similar circumstances where the disclosures in the affidavit were fulsome, as is the case here. *See, e.g., United States v. Larkins*, 2025 WL 501405 at *2 (9th Cir. Feb. 14, 2025) (unpublished) ("The district court is correct that there was 'enough here for the magistrate judge [issuing the search warrant] to have been well aware that [CD-1] had a very serious criminal history and serious potential problems with credibility, and would be ... required to look for corroboration before finding probable cause.' The omission of certain details regarding CD-1's criminal history and arrest was therefore not 'material,' as it would not 'tip[ ] the balance on the probable cause decision.'") (citing *United States v. Meek*, 366 F.3d 705, 717 (9th Cir. 2004); *United States v. Huggins*, 299 F.3d 1039, 1046 (9th Cir. 2002) (denying *Franks* motion in case where affiant did not disclose that informant was detained on pending charges because "even if Wright had known about the plea bargain, the informant's desire for favorable

treatment does not seem material in light of the partial corroboration of his statement."); *United States v. Ward*, 237 Fed.Appx. 289, 292 (9th Cir. 2007) ("The information that was allegedly withheld from the District Court—further details about the informant's varied criminal history, the existence of improper dealings between the informant and one of his 'handlers' at the FBI, and the strength of the AUSA's feelings about Ward's lack of credibility—was not substantially different from what was included. The affidavit clearly indicated that the informant's statements should be taken with a grain of salt and took pains to relate the significant corroborating evidence collected by investigators. Even had all the additional information raising questions about the informant's credibility been included in the affidavit, a reasonable district judge would still have granted the wiretap application. Thus, the omissions were not material and the District Court did not err in refusing to grant a *Franks* hearing.").

Here, even if the omitted information rendered Co-Conspirator 1's statements completely untrustworthy such that they could not be considered in any way (which it does not), the remaining evidence detailed in the affidavits supports a finding of probable cause independent of his statements to law enforcement. *Reeves,* 210 F.3d at 1044 (if omitted information renders CI's statements unworthy of belief, "probable cause must be analyzed without those statements."); *Bennett*, 219 F.3d at 1125 (finding that there was information supporting probable cause independent of information impeaching informant's credibility); *Meling*, 47 F.3d at 1555 ("the untruths and omission in the original applications relate entirely to [the CS's] credibility; they do not undermine the other evidence presented by the FBI").

In this case, the Court does not have to speculate whether the magistrate judge would have found sufficient probable cause to issue the warrant absent Co-Conspirator 1's statements to law enforcement. In February 2024, March 2024, April 2024, and May 2024, before speaking to Co-Conspirator 1, the FBI obtained iCloud, cell-site, and email warrants as to all Defendants from two different magistrate judges based solely on the documentary evidence implicating each Defendant in the bribery scheme. *See* Fine Decl. Exs. 1-5. Contrary to Defendants' suggestion, this is not a case where "the reliability of an informant . . . was central to establishing probable cause." Dkt. No. 119 at 18; *see also* Section I.C. below (distinguishing Defendants' cited cases). Instead, as in *Meling*, the "bulk of the evidence supporting probable cause came from other sources," including messages obtained from iCloud

warrants, financial records, and call logs. *Meling*, 47 F.3d at 1555. For example, as described above, the affidavit detailed a series of messages between Co-Conspirator 1 and Andy Duong explicitly laying out the quid pro quo with Thao and Jones, including David Duong's involvement in the scheme, as well as financial records corroborating the payments made in furtherance of the scheme. Fine Decl. Ex 6 at ¶¶ 88, 92, 102. 109. Significantly, the FBI obtained the vast majority of this evidence before ever speaking to Co-Conspirator 1. Because the "omissions in the [affidavit] relate entirely to [Co-Conspirator 1's] credibility; they do not undermine the other evidence presented by the FBI." *Meling*, 47 F.3d at 1555. The information provided from Co-Conspirator 1 was included for "context and completeness," and was not essential to a finding of probable cause.

Defendants' argument that Co-Conspirator 1's statements are necessary to finding of probable cause ignores the extensive documentary evidence tying Defendants to the bribery scheme detailed in the affidavit. The affidavit described a series of messages between Co-Conspirator 1 and Andy Duong where they expressed frustration that Jones was calling David Duong to get "direct access" to the "$$." Fine Decl. Ex. 6 at ¶ 88. In the same conversation, Co-Conspirator 1 stated "I feel sure David will back us up," referencing the fact that he believed David Duong would support them in conversations with Thao and Jones about the agreed upon corrupt scheme. *Id.* And after Co-Conspirator 1 detailed the bribery scheme in a message to Andy Duong and asked Andy Duong if he should share the same information with David Duong, Andy Duong responded that "David knows already." *Id.* ¶ 92. In addition to the explicit references to David Duong's knowledge of the scheme, the affidavit also described financial records and a series of messages demonstrating that David Duong was aware of, and signed off on, the corrupt payments to Jones. *Id.* ¶ 27, 102, 109. None of this documentary evidence relied on Co-Conspirator 1's statements. Contrary to Defendants' assertions, SA Haunold's statements tying these statements and financial records to the bribery scheme are not speculative. Law enforcement's opinion is "an important factor to be considered in the magistrate's determination whether probable cause existed." *United States v. Foster*, 711 F.2d 871, 878 (9th Cir. 1983).

Finally, Defendant Jones suggests that under this second prong, Co-Conspirator 1's text messages and iCloud notes, written and sent to other participants in the scheme well before he ever spoke to law enforcement or became a cooperator, and created while he was engaged in the conspiracy

with Defendants, should also be stricken from the affidavit under the *Franks* materiality analysis.
Defendants have not cited a single case to support this argument, and the government has found no case
that so holds. As set forth above, the Ninth circuit has held that if intentional or reckless material
omissions are made regarding an informant's credibility, and there is nothing else in the affidavit to
corroborate the informant, then only the informant's statements and testimony to law enforcement can
be disregarded. *See Reeves*, 210 F.3d 1041, 1045 (9th Cir. 2000) (concluding that if intentional or
reckless omissions regarding the informant's credibility were not in the affidavit, and there is nothing
else to corroborate the informant's statements, then the "informant's ***testimony*** could not be used to
support the search warrant.") (emphasis added).

As far as the government can tell, no case holds that an informant's text messages and notes,
written before he became a government witness, can or should be excised from the affidavit under this
second prong of the *Franks* analysis. Furthermore, Co-Conspirator 1's text messages and notes
discussing his conspiracy with Thao, Jones, Andy Duong, and David Duong are clearly statements
against his penal interests, which the Ninth Circuit has explicitly held bolster their reliability, rather than
undermine it. *See, e.g., United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004)
("Admissions of crimes, like admissions against propriety interests, carry their own indicia of credibility
– sufficient at least to support a finding of probable cause to search.") (citing *United States v. Estrada*,
733 F.2d 683, 686 (9th Cir. 1984)).

### C. The cases Defendants cite do not support their arguments.

While Defendants' motions are heavy on rhetorical language and unsupported and conclusory
factual inferences, they are light on case law. That is because no case supports their request for a *Franks*
hearing on the facts presented here. As set forth below, the cases Defendants rely on are far afield from
the facts of our case and are readily distinguishable.

Defendants rely heavily on the Ninth Circuit's decision in *United States v. Hall*, 113 F.3d 157
(9th Cir. 1997). In that case, state troopers arrested a drug dealer and asked for his source of supply. *Id.*
at 157. After the dealer identified Hall as the source, the troopers obtained a warrant to search Hall's
trailer based solely on the informant's tip. *Id.* at 158. The trooper's oral affidavit to the state judge
(there was no written affidavit), however, did not disclose several of the informant's criminal matters

including "two criminal matters that went to the heart of [the informant's] character and credibility, namely: the probation violation involving death threats to a wounded police officer, and the 1990 conviction for the offense of falsely reporting a crime." *Id*. The government conceded that these omissions were reckless (as the affiant knew about them) and the Ninth Circuit held suppression was appropriate because "there was virtually no evidence at all without the informant's ***testimony***. Without relying on what [the informant] said, all the magistrate knew about Hall was that he had been seen driving into a trailer court parking space in a red and white pickup truck." *Id*. at 159 (emphasis added).

*Hall* is distinguishable in two clear respects from our case. First, the affiant in *Hall* omitted criminal convictions that the affiant knew about and that went to the heart of the informant's credibility, namely that he had previously been convicted of falsely reporting a crime. Here, in contrast, the affidavit disclosed Co-Conspirator 1's entire rap sheet as well many other facts that related to his credibility. The omissions Defendants describe, largely consisting of Co-Conspirator 1's civil litigation history, are far afield from the omission of criminal convictions in *Hall*. Second, suppression was appropriate in *Hall* because the affidavit depended entirely on the informant's statements to law enforcement. Here, in contrast, the 78-page affidavit contained significant documentary evidence independent of Co-Conspirator 1's statements to law enforcement and the affidavit explicitly stated that it was not relying on Co-Conspirator 1's statements to law enforcement to establish probable cause, but was including them for "context and completeness." Fine Decl. Ex. 6 at ¶ 30, n. 2. Courts have distinguished *Hall* on the basis that the entire affidavit relied on the informant's testimony to law enforcement. *See, e.g. United States v. Ruiz*, 758 F.3d 1144, 1151 (9th Cir. 2014) ("Therefore, this case is unlike *Hall,* where the only detailed description of the facts underlying the search warrant came from an informant, and there was no significant physical evidence to corroborate his tip.") (citing *Hall*, 113 F.3d at 157); *see also United States v. Alexander*, 2022 WL 743179 at *5 (D. Alaska March 11, 2022) (distinguishing *Hall* in three material respects).

Next, Defendants rely on *Untied States v. Perkins*, 850 F.3d 1109 (9th Cir. 2017), a child pornography case wherein a warrant affidavit stated that the images at issue were unequivocally child pornography. *Id*. at 1115-16. But the affidavit in *Perkins* omitted that Canadian authorities had reviewed the same images and determined they were not actually pornographic, leading to dismissal of

the Canadian charges against the defendant. *Id*. at 1116. With this omission corrected, the Ninth Circuit affirmed suppression, holding that "a warrant application explaining that an individual with two 20–year-old convictions was in legal possession of two non-pornographic images while traveling through Canada is insufficient to support probable cause to search his home computers in Washington for child pornography." *Id*. at 1116. Unlike the copious cases the government relies on above (such as *Meling*, *Miller*, *Perdomo*, and many others), *Perkins* had nothing to do with informants or supposed omissions about their credibility. Furthermore, *Perkins* held that once the omissions were corrected, the affidavit fell well short of establishing probable cause. The affidavit in our case, in contrast, included significant documentary evidence independent of Co-Conspirator 1's statements to law enforcement.

Defendants also cite to *United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985). But *Stanert* did not address omissions about an informant's credibility, but rather described explicit false statements made by the law enforcement affiant. In *Stanert*, a state judge issued a warrant based on an oral affidavit presented by a San Diego Sheriff's officer stating that she believed there to be a clandestine drug laboratory in a residence. *Id*. at 777. The defendant asserted that the affiant intentionally misrepresented information given by an informant, fabricated assertions about the alleged laboratory's smell, misrepresented the target's criminal history and residential history, and neglected to advise the judge that agents had unsuccessfully sought a warrant from a different judge. *Id*. at 778. The Ninth Circuit remanded for a *Franks* hearing, holding that these false statements were material because the affidavit, once corrected and supplemented, did not "provide a magistrate with a substantial basis for concluding that probable cause existed." *Id*. at 782. Once again, this case is distinguishable because it did not involve supposed omissions about an informant's credibility and did not involve the same level of independent probable cause that is present in our case.

Defendant Andy Duong's motion also cites to two district court cases—*United States v. Loloee*, 2025 WL 671107 (E.D. Cal. Mar. 3, 2025) and *Donahoe v. Arpaio*, 986 F. Supp. 2d 1091 (D. Ariz. 2013).[7] In *Loloee*, however, the court denied the defendants' motion for a *Franks* hearing and held that the warrants at issue did not contain material omissions. *Loloee*, 2025 WL 671107 at *16-17. As such,

---

[7] Defendants Thao and Jones' motions cite generally to the case setting forth the *Franks* standard, but do not appear to analyze or rely on other specific legal authority.

the government fails to see how this case helps Defendants.  Similarly, *Donahoe* was a civil case that did not involve application of the *Franks* standard.

At bottom, this is not a case where the sole or primary assertions of probable cause rely on uncorroborated statements of an informant, because in this affidavit there was significant documentary evidence that was created during the crime and amongst co-conspirators.  Cases that present a different set of facts are inapposite.  In sum, the government respectfully submits that an objective review of the case law, as well as the applicable affidavit, show that Defendants have come nowhere close to making the showing necessary to obtain a *Franks* hearing.

## II.     The June 2024 Affidavit Establishes Probable Cause to Search Defendants' Residences

Separate from their *Franks* motion, Defendants also move to suppress the fruits of the June 2024 warrant on the basis that the affidavit failed to set forth a sufficient nexus between the crimes Defendants committed and the places the warrant authorized agents to search.  Defendants' motion fails for two primary reasons.  First, the affidavit did set forth a sufficient nexus.  Second, even if this were a borderline case (which it is not), the good faith doctrine precludes suppression because the reviewing magistrate issued the warrant based on the facts set forth in the affidavit and that affidavit was not so objectively lacking as to render reliance on it unreasonable.

### A.     The affidavit alleged a sufficient nexus between Defendants' residences and the crimes they committed.

A magistrate judge may issue a warrant for a residence if a "reasonable nexus" exists between the residence and the evidence sought; that is, the magistrate "need only find that it would be reasonable to seek the evidence there." *United States v. Chavez–Miranda,* 306 F.3d 973, 978 (9th Cir. 2002) (citation omitted). In making this determination, the magistrate judge must make a "practical, common-sense" decision. *Illinois v. Gates,* 462 U.S. 213, 238 (1983).  "The magistrate's probable cause determination should be paid great deference by reviewing courts.  Review is limited to ensuring that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Kvashuk*, 29 F.4th 1077, 1085 (9th Cir. 2022) (internal citation omitted).  "Additionally, issuing judges may rely on the training and experience of affiant police officers." *Chavez–Miranda,* 306 at 978.

Here, the affidavit set forth a sufficient nexus between the crimes committed and Defendants'

residences, persons, and vehicles.  Specifically, the affidavit stated that each Defendant received mail at their listed address and that agents observed Defendants' vehicles located at those addresses in the days leading up to the search warrants.  Fine Decl. Ex. 6 at ¶¶ 151-154.  The affidavit further described that cell phone location data showed Defendants Thao, Jones, and Andy Duong's cell phones at their residences in the days leading up to the search warrants.  *Id*. ¶¶ 152-153.  As to David Duong, the affidavit stated that while his phone displayed a location on the East Coast in the days before the search warrants, his iCloud indicated he had a medical appointment in the East Bay on June 21, 2024, and was thus likely to be in the East Bay before that date.  *Id*., ¶ 154.  Given the copious text messages, phone tolls, and other electronic data described in the affidavit, those cell phone were very likely to have relevant evidence on them and likely to be found at Defendants' residences.

The affidavit further described that, based on the affiant's training and experience, individuals like Defendants involved in bribery schemes maintain various forms of records, correspondence, and other electronic files in their residences, vehicles, or on their person.  *Id*., ¶¶ 157-165.  The affidavit goes on to describe various computer or storage mediums that could be found on the subject premises, vehicles, or persons.  *Id*., ¶¶ 166-167. The affidavit then asserts that based on the affiant's review of evidence related to the investigation, computer equipment was used to generate documents used in the bribery scheme and "[t]hus, there is reason to believe that there is a computer system currently located" at the residences, vehicles, or on Defendants' persons.  *Id*., ¶ 167(e).

The question raised by Defendants' nexus challenge is this and only this:  whether the affidavits at issue provide sufficient probable cause to believe that evidence of the conspiracy, including in electronic devices that the agent asserted were likely at the targets' residences, would be found in the targets' residences.  The answer to that question is yes, as Judge Westmore determined when reviewing the warrants in the first instance.  This Court must give "great deference" to that determination, making the answer even more clear.  *Kvashuk*, 29 F.4th at 1085.

Ninth Circuit and other case law makes clear that the assertions contained in the affidavit, based on an affiant's training and experience, are sufficient to establish nexus in a white-collar and document-heavy case such as this.  In *United States v. Sayakhom*, 186 F.3d 928 (9th Cir. 1999), the Ninth Circuit rejected a nexus argument similar to the one Defendants present here, holding as follows:

Sayakhom next argues that the warrant failed to establish probable cause to believe that any evidence of mail fraud would be found in her residence or car. An affidavit is sufficient if the stated facts would reasonably allow the magistrate to believe that the evidence will be found in the stated location. The relevant search warrant identified the subjects of the search as Sayakhom's residence, her person and her automobile. United States Postal Inspector George Kaufman, in an affidavit incorporated by reference in the warrant, stated his experience and belief that operators of businesses that involve paperwork typically maintain and carry business records into and out of their offices, in their cars and to and from their residences. This affidavit provided sufficient facts to allow the reasonable conclusion that the evidence described in the warrant would be found in Sayakhom's vehicle and residence. We affirm the denial of the motion to suppress.

*Id.* at 934 (citation omitted).

Additional cases hold similarly, affirming the basic proposition that subjects in white-collar and fraud cases often keep relevant documentary and electronic evidence at their residences and such assertions in an affidavit are sufficient to establish nexus. *See United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) ("Defendant's argument that there was no nexus between the locations searched, his home and his businesses, and the evidence sought is without merit. One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home. Likewise, personal financial records are also usually stored at a person's home or place of business. Defendant's claim that these were conclusory statements based on the affiant's 'meager experience' misses the mark."); *Kvashuk*, 29 F.4th at 1085 ("the nexus between the items to be seized and the place to be searched can rest on normal inferences as to where a criminal would be likely to hide evidence of his crimes.").

**B.    The good faith exception precludes suppression in this case.**

In *United States v. Leon*, 468 U.S. 897 (1984) the Supreme Court held that the fruits of a search must not be invalidated if the police acted in good faith in executing a warrant later determined to be invalid. Decisions from the Ninth Circuit and elsewhere regularly apply the good faith doctrine in nexus cases so long as the "the affidavit was not so lacking in indicia of probable cause as to render reliance upon it objectively unreasonable." *United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (reversing a district court's suppression order as to nexus because the good faith exception applied); *United States v. Ramos,* 923 F.2d 1346, 1354 (9th Cir. 1991) ("[W]hile the affidavit supporting the

Ramos search warrant may not have been the model of thoroughness, it cannot be said that the document did not link this location to the defendant.") (overruled on other grounds) (citation omitted); *United States v. Lewis*, 733 Fed.Appx 83, 85 (4th Cir. 2018) ("Viewing the investigation summary along with other information in the affidavit regarding the investigating officer's knowledge that perpetrators of financial frauds maintain and conceal records and indicia of their frauds in their residences, we conclude that the affidavit was not so lacking in indicia of probable cause as to nexus."). Furthermore, "[i]n borderline cases, preference will be accorded to warrants and to the decision of the magistrate issuing it." *United States v. Terry,* 911 F.2d 272, 275 (9th Cir. 1990) (citation omitted).

Here, even if this were a borderline case (which it is not), the good faith exception precludes suppression. As set forth above, the affidavit tied the subject locations to Defendants and the crimes at issue, and based on these assertions, Judge Westmore issued the search warrant. Given these assertions, "the affidavit was not so lacking in indicia of probable cause as to render reliance upon it objectively unreasonable." *Crews*, 502 F.3d at 1136.

The cases Defendants rely on are distinguishable. In *United States v. Hove*, 848 F.2d 137 (9th Cir. 1988), the portion of the warrant affidavit describing nexus was not sent to the magistrate judge due to a stenographer's error. *Id*. at 139. Accordingly, the Ninth Circuit held suppression was appropriate because due to that error, the affidavit "never linked Kimberly Hove or any suspected criminal activity in any way with the 2727 DeAnza residence." *Id*. In contrast, the affidavit in our case linked each Defendant to the residences to be searched. The Ninth Circuit's decision in *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012) is also far afield from our case. There, the affidavit to search Grant's residence for a murder weapon was based solely on the allegations that his sons participated in the crime and did not tie Grant or his residence to the crime in any way. *Id*. at 832-33. Our affidavit, in contrast, described each Defendant's role in the offense and the items expected to be found at their residences. Defendants also cite *United States v. Seybold*, 726 F.2d 502 (9th Cir. 1984). But in that case the Ninth Circuit held the affidavit sufficiently established nexus and rejected the defendant's suppression argument. Other cases Defendants cite, such as *Untied States v. Weber*, and *United States v. Underwood*, were not cases in which nexus was at issue.

As set forth above, case law from the Ninth Circuit, as well as other courts, make clear that the

good faith exception is applicable to our case.  None of the cases Defendants cite supports their argument that suppression is appropriate here.

**III.    The March 2024 Cell Site Warrant Was Not Overbroad**

Defendants do not contest that the March 2024 cell site warrant affidavit contained sufficient probable cause to issue a warrant for Defendant's cell phone location information.  Rather, Defendants assert that the warrant was overbroad because in addition to location information, it authorized seizure of "subscriber identities and addresses; billing and payment information; account start and service records; device and instrument identifiers; and complete connection/session records, including IP addresses, sector information, and timing-advance data."  Dkt. No. 119 at 23.

Defendant's motion fails for several reasons.  First, courts have long held that the non-content subscriber and account information Defendants seek to suppress is not protected by the Fourth Amendment.  As such, the March 2024 cell site warrant was not overbroad and no suppression is warranted.  *See United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008) ("Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation."); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (email and Internet users have no reasonable expectation of privacy in source or destination addresses of email or the IP addresses of websites visited); *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001) (finding no Fourth Amendment protection for network account holders' subscriber information obtained from communication service provider).  In a recent case, the Ninth Circuit addressed this issue head on, holding that "a defendant has no expectation of privacy in IP addresses or basic subscriber information because internet users should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information."  *United States v. Rosenow*, 50 F.4th 715, 737-38 (9th Cir. 2022) (citing *Forrester*, 512 F.3d at 510) (internal citations omitted).

The federal Stored Communications Act also makes clear that the information Defendants seek to suppress is not protected by the Fourth Amendment.  *See* 18 U.S.C. §§ 2701-2713.  While affirming that a warrant is required to obtain the *content* of electronic communications, the statute states that the government may obtain the following non-content information by issuing a subpoena (rather than a

warrant) from a provider of electronic communication: name; address; local and long distance telephone connection records, or records of session times and durations; length of service (including start date) and types of service utilized; telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and means and source of payment for such service (including any credit card or bank account number). 18 U.S.C. § 2703(c)(2). Consistent with these requirements, during its investigation the government has obtained similar non-content cell phone records via subpoena and court orders for pen register trap and trace information. Fine Decl. at ¶ 3. The fact that the government also obtained this information via the March 2024 cell-site warrant is no different. Furthermore, even if there were a violation of the Stored Communications Act (which there was not), suppression would not be the proper remedy. *See United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) ("[T]he Stored Communications Act expressly rules out exclusion as a remedy"); *Perrine*, 518 F.3d at 1202 ("[V]iolations of the ECPA do not warrant exclusion of evidence.").

Second, Defendants' motion is simply wrong on the facts. Specifically, Defendants assert that the "warrant sought broad categories of cellular data that were never even mentioned in the affidavit." Dkt. No. 119 at 2. This is incorrect. As set forth above, the affidavit described the various cell-site data being sought by the government (Fine Decl. Ex. 3 at ¶¶ 83-84), call detail and toll records, including the date, time, and duration of calls (*id*. at ¶ 85), subscriber information, including names, addresses, methods of payment, and transactional records (*id*. at ¶ 86), among other types of records maintained by the cell phone companies. The affidavit further stated that this information "may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephones users and may assist in the identification of co-conspirators and/or victims." *Id*. at ¶ 86. Based on the information contained in the affidavit, Chief Magistrate Judge Ryu issued the warrant.

Third, even if the cell site warrant were overbroad (which it is not), the good faith exception bars suppression. *See Crews*, 502 F.3d, at 1136 (9th Cir. 2007); *Terry,* 911 F.2d at 275. Here, for the reasons set forth above, it was not objectively unreasonable for the government to rely on the judicially-issued warrant and thus the good faith exception bars suppression.

## IV. The February 2024 iCloud Warrant and the May 2024 Email Warrants were not Overbroad

The Ninth Circuit has long held that reviewing courts "are required to accord deference to the magistrate's finding of probable cause and to uphold the magistrate if there is a substantial basis for concluding that the affidavit in support of the warrant established probable cause." *United States v. Greany*, 929 F.2d 523, 524 (9th Cir. 1991). Furthermore, the good faith exception applies to the duly-issued iCloud and email warrants at issue here. Accordingly, the Court may not disturb the warrants unless the affidavits were so lacking in indicia of probable cause as to render reliance on upon them objectively unreasonable. *See Crews*, 502 F.3d at 1136.

Here, as with the cell-site warrant, Defendants do not contest that the affidavits at issue contained sufficient probable cause to issue warrants for Defendant's iCloud and email accounts. Rather, Defendants assert that the warrants were overbroad because they permitted the government to seize evidence dated before December 1, 2021, and permitted seizure of communications between CWS employees (including David and Andy Duong) and state and local government officials aside from those specifically named in the affidavit.[8] Defendants fall far short of showing that the affidavits were so lacking in probable cause as to these areas so to render the government's reliance on upon them objectively unreasonable.

As to the date range, the iCloud and email affidavits contained significant relevant facts dating back to July 2021 and earlier. For example, the affidavit described that in July 2021, the Oakland City Council (of which Thao was then a member) approved a CWS project at the former Oakland Army Base and that there was further City Council activity regarding CWS's project in November of 2021, and relevant text messages in December of 2021. Fine Decl. Ex. 1 at ¶¶ 86-88; Ex. 4 at ¶¶ 125-127. This

---

[8] This part of Defendants' motion appears targeted at subsection h. of Attachment B, III., which permits the government to seize "Evidence, records, or communications related to any interactions between California Waste Solutions, Inc. (or any of its employees or representatives), and any state or local government body or government officials." Fine Decl., Ex. 1 at Attachment B, III., h. (page 66 of the document). Even if this subsection were stricken, however, other subsections of Attachment B could permit seizure of communications with state and local officials. For example, subsection d. permits seizure of evidence, records, or communications related to Evolutionary Homes, which could include communications with government officials, and Defendants' motions do not challenge those other portions of Attachment B.

fact is especially important because the affidavit also describes that the CWS project at the former Oakland Army Base was an essential part of Defendants' bribery scheme. *See* Fine Decl. Ex. 1 at ¶ 74; Ex. 4 at ¶ 87 (describing "Deal Points for Sheng Thao" and a land deal at Army base from Mayor staff as part of bribery scheme). Evidence relating to the City Council's initial approval of the CWS Army Base project in July 2021 (on which Thao voted) is relevant to the Army Base land deal that was part of Defendants' bribery scheme.

The affidavits further described the PEC's investigation into allegedly conduit political contributions made by Andy Duong and CWS to Thao and others between 2016 and 2018 and asserted that this "corroborates a pre-existing financial relationship between A. DUONG and THAO . . . and is consistent with a scheme whereby A. DUONG provides city officials financing in exchange for benefits, including official acts." Fine Decl. Ex. 1 at ¶ 104, n. 19; Ex. 4 at ¶ 144, n. 24. Given these assertions, Defendants cannot show that the affidavits were so lacking in probable cause as to information dated after July of 2021, as well as information dating back to 2020 and 2019 given the description of the preceding PEC investigation.

On this point, Judge Alsup's decision in *United States v. Lam*, 2020 WL 4349851 (N.D. Cal. July 29, 2020) is instructive. In that case, the defendants asserted that a search warrant, which allowed seizure of materials from January 1, 2009, to September of 2017, was overbroad as to date range because "the alleged trade secret theft occurred between December 2013 and the summer of 2015." *Id.* at *3. The order noted that the only assertions in the affidavit from 2009 were a single email dated August 11, 2009, that could be interpreted innocuously, and that the defendants maintained consulting relationships with competitors dating back to 2009. *Id.* at *4. In denying the motion to suppress and "affording deference to Chief Magistrate Judge Spero," the order found that probable cause was shown only to allow searches dating back to August 11, 2009 (the date of the email). *Id.* The order further held, however, that the good faith exception applied to allow searches going back further to January 1, 2009, because the warrant "was not so overbroad or so lacking in probable cause where it would have been objectively unreasonable to believe that evidence from that time period could be seized." *Id.* Accordingly, Judge Alsup denied the motion to suppress in its entirety and allowed searches for the full date range.

So too here. While most of the conduct described in the iCloud and email affidavits occurred after 2021, the affidavits contained relevant events dating back to at least July 2021 and earlier regarding the City Council's approval of CWS' Army Base deal and the potential pre-existing financial relationship between Thao and Andy Duong. Accordingly, Defendants have failed to show that the affidavit was so lacking in probable cause that it would have been objectively unreasonable to rely on the date range approved by Magistrate Judges Ryu and Westmore.[9]

Defendants' challenge to communications between CWS employees (including Andy Duong and David Duong) and any state or local government officials fares no better. While the warrant affidavits named several City of Oakland and Alameda County officials that Defendants and Co-Conspirator 1 had relevant interactions with and/or attempted to bribe, the warrant should not be limited to communications with only those named individuals. The affidavits laid out in detail that Andy Duong, David Duong, and Co-Conspirator 1 engaged in a scheme to bribe public officials to benefit Evolutionary Homes and CWS. Accordingly, the duly-issued warrants reasonably permitted the government to seize communications between CWS employees and state or local officials. Defendants do not cite any case holding that a warrant must be limited to communications among people explicitly named in the affidavit. Accordingly, Defendants have not shown that the affidavits were so lacking in probable cause such that it would have been objectively unreasonable to believe they could seize communications between CWS personnel and state and local officials.

//

//

//

//

//

---

[9] Should the Court find that that any of the warrants is overbroad as to date range, and also find the good faith exception does not apply, under the Ninth Circuit's severance doctrine, partial suppression, allows a court to strike invalid portions from a warrant and keep those that satisfy the requirements of the Fourth Amendment. *United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005). Under the severance doctrine, "[o]nly those articles seized pursuant to the invalid portions need be suppressed." *Id*. Accordingly, if the Court were to grant Defendants' motion for partial suppression, it should only do so with respect to material dated before July of 2021.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny Defendants' motion for a *Franks* hearing, deny Defendant's motion to suppress the fruits of the June 2024 residential warrants, and deny Defendants' motion to partially suppress the fruits of the February 2024 iCloud warrant, the March 2024 cell-site warrant, and the May 2024 email warrants.

DATED: January 14, 2026                          Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

___/s/_____
ABRAHAM FINE
MOLLY K. PRIEDEMAN
LLOYD FARNHAM
Assistant United States Attorneys