# EXHIBIT F

Ernie Castillo, Bar No. 220900
The Castillo Law Office
1939 Harrison Street, Suite 710
Oakland, CA 94612
Tel.: 510-686-1555
Email: Ernesto@CastilloDefense.com

Attorney for Mario Juarez

**SUPERIOR COURT OF CALIFORNIA,**

**COUNTY OF ALAMEDA**

| | |
|---|---|
| People of the State of California,<br>Plaintiff,<br>vs.<br>Mario Juarez,<br>Defendant. | Case No.: 24-CR-000882<br><br>NOTICE OF MOTION AND MOTION TO DISMISS FOR VINDICTIVE PROSEUCTION AND OUTRAGEOUS GOVERNMENT CONDUCT<br><br>DATE: OCTOBER 31, 2024<br>TIME: 9 A.M.<br>DEPT: 12 |

TO: THE DISTRICT ATTORNEY OF THE COUNTY OF ALAMEDA, AND THE CLERK OF THE ABOVE ENTITLED COURT;

PLEASE TAKE NOTICE that on October 31, 2024, in Department 12 at 9 a.m., or as soon thereafter as the matter may be heard, the defendant, Mario Juarez, will move the Court to dismiss this matter for vindictive prosecution and outrageous government conduct. This motion will be based on the attached supporting memorandum, the attached declarations,, all papers filed and records in this action, evidence taken at the hearing on this motion, and argument at that hearing.

Date: October 10, 2024

Ernie Castillo
Attorney for Mario Juarez

Ernie Castillo, Bar No. 220900
The Castillo Law Office
1939 Harrison Street, Suite 710
Oakland, CA 94612
Tel.: 510-686-1555
Email: Ernesto@CastilloDefense.com

Attorney for Mario Juarez

**SUPERIOR COURT OF CALIFORNIA,**

**COUNTY OF ALAMEDA**

| | |
|---|---|
| People of the State of California,<br>Plaintiff,<br>vs.<br>Mario Juarez,<br>Defendant. | Case No.: 24-CR-000882<br><br>MR. JUAREZ'S MEMORANDUM OF POINTS AND AUTHORITIES |

**NONSTATUTORY MOTION TO DISMISS FOR VINDICTIVE PROSECUTION AND OUTRAGEOUS GOVERNMENTAL MISCONDUCT**

**STATEMENT OF FACTS**

The defendant, Mr. Mario Juarez, has long been a vocal political opponent of the elected District Attorney, Ms. Pamela Price. In 2022, when Ms. Price was running for District Attorney, he created a website (badpam.com) dedicated to attacking Ms. Price and her political agenda. Among other things the website describes her as "a loser with a shady history" and a history of violence. The website further describes her as "4 Times a Loser" in her failed bids for the state assembly in 2016, for Alameda County District Attorney in 2018, for Mayor of Oakland in 2018, and for the Democratic Party Chair in 2020. (Exhibit F, Badpam.com Printout)

In 2024 Mr. Juarez was a candidate for Democratic Committee for the 18th District of Alameda County, running against Ms. Price. (Exhibit E, Ballot for March 5, 2024). The election was held on March 5, 2024.

He was also part owner of Evolutionary Homes LLC. Evolutionary Homes LLC made modular homes from formerly used shipping containers for homeless people. The address for the company was 1211 Embarcadero in Oakland, California.

Mr. Juarez attended the funeral services of Oakland Police Officer Tuan Le on January 7, 2024, to express his respect and condolences. He went to the services with Andy Duong, David Duong, and Cecilia Mendez. At the services, they met with Stewart Chen, President of the Oakland Chinatown Improvement Council and a close friend of the Duong family. Also in attendance were District Attorney Pamela Price and Assistant District Attorney Otis Bruce, both of whom are friends with Stewart Chan and the Duong family. At the end of the burial services, Stewart Chen invited Ms. Price and Mr. Bruce back to 1211 Embarcadero to see the modular homes. Ms. Price arrived at 1211 Embarcadero in a black SUV driven by an inspector from the District Attorney's Office. Otis Bruce drove his own vehicle and was alone.

When everyone arrived at 1211 Embarcadero, they gathered in the showroom area of the office where the modular homes were on display. During a discussion of the modular homes, Ms. Price pulled Mr. Juarez aside and away from the others to speak privately. They walked to the front entrance, close to the working area of Cecilia Mendez, an employee of Evolutionary Homes. Ms. Price talked to Mr. Juarez about changing their relationship. She explained that as the District Attorney for Alameda County she could help Mr. Juarez, but that to get her help he would "need to show love and support to her." Specifically, she wanted $25,000.00 in cash from him to support her campaign against the ongoing recall effort against her.

Mr. Juarez rejected her request for cash, saying that he did not believe it was possible. He also told her that he did not need her help with anything. He also made clear to her that he would not support her and would not contribute to her campaign against the recall effort. He told her that he would continue his "quest" against her political efforts, and he would inform the public of her shortcomings as a District Attorney. In response, Pamela Price laughed. She said, "Too bad," and she said they could have helped each other. She ended the conversation by saying that he would be hearing from her office soon and "it will not be pretty especially during the political campaign that we are both facing."

Mr. Juarez understood her to mean that she was going to use her power as the District Attorney as a threat against him if he did not make a financial contribution to her anti-recall campaign. Despite this threat he refused to donate or support Pamela Price and he has not made any financial contributions to her campaign against the recall effort.

After this conversation, Ms. Price and Mr. Juarez returned to the showroom area with everyone else. While the group was discussing the modular homes, Mr. Juarez heard Ms. Price tell Mr. David Duong she needed his financial support, and David Duong agreed.

As everyone continued to talk about the modular homes and campaign donations, Mr. Bruce and Mr. Juarez began to drink alcohol. After several hours, Ms. Price, Mr. Chen and the Duongs left. Mr. Juarez and Mr. Bruce remained.

Mr. Bruce discussed with Mr. Juarez his desire to become business partners in Evolutionary Homes and take it to Alabama or Mississippi. Mr. Bruce said that the business model could be successful in either Alabama or Mississippi and he could help with political hurdles. He assured Mr. Juarez that he would "take care of" him as a business partner. Mr. Bruce also assured Mr. Juarez that he would not have any problems with the District Attorney's

office if they became business partners. Mr. Juarez respectfully declined his request. The conversations with Otis Bruce occurred over the span of time that the others were present and after they had left my office. Mr. Bruce eventually left the office that evening alone.

Mr. Juarez has filed a complaint with the state bar claiming that his charging constituted an ethical violation by Ms. Price. (Exhibit A, Declaration of Mario Juarez.)

Portions of Ms. Price's conversation with Mr. Juarez were overheard by Mr. Pedro Jimenez, who was at 1211 Embarcadero to do maintenance work on surveillance cameras at the business. Mr. Jimenez specifically overheard Ms. Price request money in the thousands from Mr. Juarez. (Exhibit B, Declaration of Pedro Jimenez.)

Portions of Ms. Price's conversation with Mr. Juarez were also overheard by Cecilia Mendez. She heard Ms. Price telling Mr. Juarez that their relationship should be better. She heard her telling Mr. Juarez that she needed $25,000.00 for a political campaign. She heard Mr. Juarez respond to Pamela Price that he did not think that would be possible. She heard Ms. Price tell Mr. Juarez that "it would be unfortunate if he had problems with her office." Later Mr. Bruce asked for alcohol. He and Mr. Juarez began drinking. She overheard Mr. Bruce express interest in partnering with Mr. Juarez. Mr. Bruce said, "If you partner with me, I will take care of you." By that point, she believed that both Mr. Juarez and Mr. Bruce were intoxicated. (Exhibit C, Declaration of Cecilia Martinez.)

As the Court's file reflects, the instant complaint charges Mr. Juarez with a single felony of "Insufficient Funds Checks" in violation of Penal Code section 476a with an offense date of October 31, 2022. According to the probable cause declaration, Mr. Juarez commissioned the complaining witness to print and mail political mailers. Mr. Juarez wired him $31,000 in partial payments and presented checks totaling roughly $17,000.00. On the same date, $32,500 was

transferred out of Mr. Juarez's accounts, and the remaining balance was insufficient to cover the checks. The affidavit provides no proof as to whether the funds were in the account at the time the checks were presented, or whether Mr. Juarez in fact intended to defraud the complaining witness. The affidavit does not reflect any effort to contact Mr. Juarez to ascertain whether there was an intent to defraud. Nor does the affidavit reflect any effort to speak with any members of Mr. Juarez's business or employees who manage the bank account at issue in this case to determine if the insufficiency of funds was due to an accounting oversight.

The probable cause declaration in support of the complaint was signed on May 17, 2023. The complaint was filed on January 23, 2024. Thus, the complaint was filed almost a year and a half after the alleged offense (October 31, 2022). The District Attorney was in possession of the charge for at least eight months before filing it. The charges were filed just 16 days after Mr. Juarez refused to make financial campaign contributions and after Ms. Price warned Mr. Juarez that he would hear from her office very soon and that "it would not be pretty." The charge was filed just 5 weeks before the election (March 5, 2024).

After the charges were filed, Pamela Price and Otis Bruce interfered with the normal course of how cases are resolved in Alameda County. Specifically, they refused to let their deputy district attorney Angelina Clay - who was in charge of making offers and had determined that there was insufficient evidence to prove fraud here - dismiss this case, and ultimately removed her from handing this matter. (Exhibit D, Declaration of Ernie Castillo).

////

# ARGUMENT

## I. VINDICTIVE PROSECUTION

This prosecution must be dismissed because it was motivated, not by the desire to do justice, but by the District Attorney's determination to punish the defendant for the exercise of his First Amendment rights.

When the prosecution unfairly punishes a defendant for the exercise of a statutory or constitutional right, the court must review the charges against him to determine whether he is in fact a victim of "vindictive prosecution." (*See United States v. Goodwin* (1982) 457 U.S. 368, 372-73.) The concern is that defendants may be deterred from the exercise of their constitutional rights if they are, in effect, punished for that exercise. (*Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 371-72.) "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." (*Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363.) The right exercised is generally a "defined constitutional or statutory right, such as the right to a trial de novo ... the right to a retrial ... or the right to move for a new trial." (*People v. Bracey* (1994) 21 Cal.App.4th 1532, 1546 (*citations omitted*).)

"[T]he vindictive prosecution doctrine is a limit on prosecutorial discretion, and goes to the very authority of the prosecution to hale the defendant into court in the first place." *U.S. v. Griffin* (9th Cir. 1980) 617 F.2d 1342, 1345–1346 (*disapproved of by U.S. v. Brizendine* (D.C. Cir. 1981) 659 F.2d 215 and by *U.S. v. Levine* (3d Cir. 1981) 658 F.2d 113.) "The gravamen of a vindictive prosecution is the increase in charges or a new prosecution brought in retaliation for the exercise of constitutional rights." (*People v. Valli* (2010) 187 Cal.App.4th 786, 802 (*citing North Carolina v. Pearce* (1969) 395 U.S. 711, 723–726.)

When the defendant's exercise of a right is followed by the post-conviction filing of more serious charges against a defendant, there is a presumption that the prosecutor's actions were motivated by a vindictive desire to punish a defendant for the valid exercise of his rights. (*Blackledge v. Perry* (1974) 417 U.S. 21 27-29.) The presumption arises during or after the trial of a case where the prosecution has increased the charges in apparent response to the defendant's exercise of a procedural right. (*Twiggs v. Superior Court, supra*, 34 Cal.3d at 371.) The presumption is rebuttable, but has the effect of shifting to the prosecution the burden to explain the reasons for its exercise of prosecutorial discretion. (*Thigpen v. Roberts* (1984) 468 U.S. 27, 33; *People v. Bracey* (1994) 21 Cal.App.4th 1532, 1545-46.)

When the bringing or increase in charges occurs pretrial rather than in the post-trial situation, the presumption of vindictiveness does not apply. "A presumption of vindictiveness arises only if the prosecutor "ups the ante" after exercise of a postconviction right." (*Id.* at 1544.) The defendant's invocation of a right before trial may provide an opportunity for prosecutorial vindictiveness, but "a mere opportunity for vindictiveness is insufficient to justify the imposition of a prophylactic rule." (*Ibid.*) Where there is no presumption, the defendant may establish prosecutorial vindictiveness by producing direct evidence of the prosecutor's punitive motivation. (*Short v. Superior Court* (2019) 42 Cal.App.5th 905, 915; *U.S. v. Jenkins* (9th Cir. 2007) 504 F.3d 694, 699.)

The instant case differs from cited authority on vindictive prosecution because the exercise of the right at issue here occurred not only before the trial, but in fact before the District Attorney actually filed the charges. But though the doctrine most often applies when the defendant has been recharged or resentenced following the exercise of a procedural right, "[t]here may be other factual settings in which a finding of vindictive prosecution would be

justified. (*U.S. v. Herrera* (9th Cir. 1981) 640 F.2d 958, 961 at fn.6.) Given the extreme nature of the District Attorney's actions here, and given the powerful evidence of the District Attorney's personal and retaliatory motivations in bringing these charges, this case fits squarely within the doctrine.

The District Attorney here filed the instant charges in retaliation for his exercise of his First Amendment political rights to criticize her. She retaliated against him for refusing to donate to her campaign, also a punishment for the exercise of his First Amendment right.

"There is no dispute that the right to vote is fundamental." (*Boydston v. Weber* (2023) 90 Cal.App.5th 606, 619.) Categories of speech and association related to campaigns for political office "reside at the core of the First Amendment." (*Planning & Conservation League, Inc. v. Lungren* (*Lungren*) (1995) 38 Cal.App.4th 497, 505.) "[I]f it be conceded that the First Amendment was 'fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' [citation] then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office. (*Monitor Patriot Co. v. Roy* (1971) 401 U.S. 265, 271-72.)

The First Amendment applies not just to political speech, but also to the making of political contributions. (*Lungren*, *supra*, 38 Cal.App.4th at 505.) Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association. (*Federal Election Com'n v. Colorado Republican Federal Campaign Committee* (2001) 533 U.S. 431, 440.) "Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals." (*Buckley v. Valeo* (1976) 424 U.S. 1,

22.) As Justice Stevens observed, "a decision to contribute money to a campaign is a matter of First Amendment concern—not because money is speech (it is not); but because it enables speech. Through contributions the contributor associates himself with the candidate's cause, helps the candidate communicate a political message with which the contributor agrees, and helps the candidate win by attracting the votes of similarly minded voters. [Citation.] Both political association and political communication are at stake." (*Nixon v. Shrink Missouri Government PAC* (2000) 528 U.S. 377, 400 (Stevens, J., concurring).) And just as the First Amendment protects our right to make positive political assertions through financial donations, it protects our right to make statements by refusing to make political donations.

Mr. Juarez exercised his First Amendment rights by publicly criticizing Ms. Price. He had long been a vocal political opponent of Ms. Price. He operated a website called "bad.pam." On that website he publicly criticized her political views and her long track record of losing elections. He stated that she had a "shady history" and linked her to violence.

When the District Attorney personally came to Mr. Juarez's place of business on January 7, she was aware of Mr. Juarez's First Amendment activity in publicly criticizing her as a political candidate. She expressed her unhappiness with Mr. Juarez's criticism by saying that their relationship should change. She conditioned that change on his showing some "love and support" for her in the form of a $25,000.00 donation to her anti-recall campaign fund. Mr. Juarez again asserted his First Amendment rights by refusing to make the "donation" and by telling her that he would continue to criticize her campaign. Ms. Price responded by telling him it was "too bad." She warned that Mr. Juarez would be hearing from her office very soon and that "it would not be pretty." Just as she predicted, her office carried out her threat and charged Mr. Juarez with a felony just 16 days later.

In impliedly decrying Mr. Juarez's free speech and in expressly seeking to elicit a sizable campaign donation, Ms. Price was attacking both Mr. Juarez's free political speech under the First Amendment and his right to make, or refrain from making political donations, equally part and parcel of his free speech rights and his freedom of association under the First Amendment.

The timing of these events and the express words direct at Mr. Juarez proves that Ms. Price had a vindictive motive in filing the felony charge. The felony charge had been in her possession for at least eight months before her conversation with Mr. Juarez. That she held on to the potenti al charge without acting on it is proof that she saw the potential charge as leverage, not as a case requiring justice. Her opportunity came when she took aside Mr. Juarez and demanded money. When Mr. Juarez refused to make a donation and told her that he would continue to criticize her, she had her response at the ready. It was "too bad," and he would be hearing from her office "very soon." When Ms. Price told Mr. Juarez that her office could have helped him, she made clear that she would not have filed the charges had he yielded to her request for money. When she said that "it won't be pretty," she made it apparent that her actions were motivated by his refusal to donate and his ongoing political criticism. When her office filed the felony just two weeks later, the message was loud and clear: she was prosecuting Mr. Juarez in retaliation for exercising his First Amendment rights of speech and association. When Ms. Price learned that her deputy intended to dismiss this case, she interfered with the process of justice and ensured that her leverage over Mr. Juarez remain intact.

Though less explicit, Mr. Bruce, the Chief Assistant District Attorney, also demonstrated that the charges were retaliatory and would not have been filed if Mr. Juarez had yielded to his request. Mr. Bruce said that they should be business partners in Mr. Juarez's housing business, and that Mr. Bruce would make sure that Mr. Juarez had no problems with the office if the two

of them became partners. By referring to "problems" with the office, Mr. Bruce demonstrated that he too was aware of the pending charges. By saying that he could prevent those problems if Mr. Juarez would partner with him, Mr. Bruce, an officer of the state, essentially interfered with Mr. Juarez's right to do business as he saw fit. Indirectly, this burdens Mr. Juarez's rights of free trade under the commerce clause of the United States Constitution. (*See Northwest Energetic Services, LLC v. California Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 861 ("By implication, the Commerce Clause prohibits state taxation or regulation "that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'") Mr. Bruce's remarks suggest a lesser motive for the prosecution than Ms. Price's.

As stated, this case is distinct from other vindictive prosecution cases because the retaliatory motive arose before the case was actually filed. But this case is also unique in that the motive stems from what can only be called *quid pro quo* political corruption. "That Latin phrase captures the notion of a direct exchange of an official act for money." (*McCutcheon v. Federal Election Com'n* (2014) 572 U.S. 185, 192.) "Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial quid pro quo: dollars for political favors." (*Federal Election Com'n v. National Conservative Political Action Committee* (1985) 470 U.S. 480, 497.)

Though dismissal is an extreme remedy, the conduct and intentions of the District Attorney are still more extreme. As argued further below, no other remedy adequately deters such brazen and vindictive prosecution.

## II. OUTRAGEOUS GOVERNMENTAL MISCONDUCT.

Where the prosecution engages in outrageous misconduct, the court has the power to dismiss the charges under the Due Process clause of the Constitution. (*Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1259-60.) "When conduct on the part of authorities is so outrageous as to interfere with an accused's right of due process of law, proceedings against the accused are thereby rendered improper. [Citations.] Dismissal is, on occasion, used by courts to discourage flagrant and shocking misconduct by overzealous governmental officials in subsequent cases." (*Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 429.)

The courts have dismissed prosecutions where the government has engaged in conduct that "shocks the conscience." (*Rochin v. California* (1952) 342 U.S. 165, 172.) Misconduct that shocks the conscience might include a level of physical brutality. In *Rochin v. California*, the Supreme Court dismissed a case in which police officers illegally broke into the defendant's home, wrestled him to the ground forced open his mouth to retrieve apparent drug capsules, then took him to a hospital where a doctor pumped his stomach and forced him to vomit. The Court found that "this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation." (*Ibid.*)

The courts have also relied on the concept of outrageous governmental misconduct where the government has deliberately interfered with the attorney client relationship. (*See, e.g.*, *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252 (prosecutor orchestrates intentional eavesdropping of remarks between defendant and attorney in holding cell of courtroom); *People v. Boulas* (1986) 188 Cal.App.3d 422 (prosecutor speaks directly to represented defendant without attorney's knowledge and conditions plea bargain on replacement of defendant's

attorney); *Barber v. Municipal Court* (1979) 24 Cal.3d 742 (undercover officer arrested with other defendants and overhears their conversations with defense lawyers).)

"The outrageous governmental conduct defense involves a difficult area of the law. Drawing a bright line with any degree of assurance is fraught with problems. The point of division at the margins between [governmental] conduct that is just acceptable and that which goes a fraction too far probably cannot be usefully defined in the abstract. Ultimately, every case must be resolved on its own particular facts." (*U.S. v. Bogart* (9th Cir. 1986) 783 F.2d 1428, 1438, *vacated in part on reh'g sub nom.* U.S. v. Wingender (9th Cir. 1986) 790 F.2d 802.) Dismissal is appropriate, however, when government misconduct is egregious enough to prejudice a defendant's constitutional rights. (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 446.)

The District Attorney's conduct has certainly prejudiced Mr. Juarez's constitutional protections. As recounted more fully above, Mr. Juarez has been publicly critical of Ms. Price. In January, she told him that their relationship should change, and that he should show him some "love" in the form of a $25,000 dollar contribution to her campaign. Both Ms. Price, the elected District Attorney, and Mr. Bruce, her Chief Assistant, told Mr. Juarez in essence that he would have no problems with the District Attorney's Office if Mr. Juarez donated the $25,000 and made Mr. Bruce his business partner. When Mr. Juarez demurred, Ms. Price told him that he would be hearing from her office very soon, and that it wasn't going to be "pretty." This is conduct and language to expect from a crime boss, not from the chief law enforcement official of Alameda County. True to Ms. Price's word, Mr. Juarez did hear from her office just two weeks later in the form of the instant felony complaint.

This egregious conduct deprived Mr. Juarez of the right to the impartial review of charges pending against him. "A prosecutor is duty bound to exercise [her] best judgment both in deciding which suits to bring and in conducting them in court." (*Imbler v. Pachtman* (1976) 424 U.S. 409, 428.) She must exercise that judgement impartially, and in the interests of justice. (*See Berger v. U.S.* (1935) 295 U.S. 78, 88 (prosecutor's obligation is to govern impartially to ensure that "justice shall be done.")) Every citizen, including Mr. Juarez, is entitled to that fair and objective review of any charges pending against him. No such review occurred here.

Ms. Price was in possession of the probable cause declaration against Mr. Juarez for over eight months before she demanded his "contribution." That declaration made at best an equivocal showing in support of the violation of section 476a. It contains no proof that there were insufficient funds in Mr. Juarez's account at the time the checks were presented, no direct proof of intent to defraud, and no proof of an effort to contact Mr. Juarez to find out whether he had such an intent. (*See People v. Greenwood* (1962) 207 Cal.App.2d 300, 303-04 (Proof of § 476a violation requires that there be insufficient funds at the time the check was made, that the defendant knew there was insufficient funds, at that the defendant intended to defraud.)) Given the short time that elapsed between Ms. Price's veiled threat and the actual filing of the charge, it is evident that the decision to charge Mr. Juarez was motivated by his refusal to donate, not by the fair and objective review of the evidence. It is no answer that this weak charge is unlikely to withstand a jury trial. "The risk, publicity, and expense of a criminal trial may intimidate a defendant, even if he believes his defense is meritorious." (*Town of Newton v. Rumery* (1987) 480 U.S. 386, 393.) The District Attorney's atrocious behavior has injured Mr. Juarez's Due Process rights.

The damage to Mr. Juarez's Due Process rights is reflected not only in the charging decision but also in the subsequent interference with the disposition of this case and how it is being handled. The inability to fairly assess this case drove Ms. Price to stop her own deputy from dismissing this case. Despite the fact that her deputy made an independent assessment of this case and determined there was insufficient evidence to establish fraud here, Ms. Price would not allow her own deputy to take action on it. Instead, Ms. Price removed the deputy from this case and refuses to allow anyone to dismiss this case, regardless of a prosecutor's ethical obligation to do so based on the lack of evidence in this case. Ms. Price's interest in pursuing this action against Mr. Juarez clearly is not motivated by ethical obligations and justice, rather the ongoing prosecution of this case is motivated by a vindictive and politically motivated desire to win her recall election and destroy everyone who doesn't support her. This offends any notion of justice and destroys any concept of fairness that is built into our system of justice by the U.S. Constitution. In essence, Ms. Price's behavior makes it clear that Mr. Juarez is not and will not be treated fairly.

The most important reason that this Court should dismiss this case is to deter the District Attorney's unconscionable behavior. Taken as a whole, the clear message that Ms. Price sent to Mr. Juarez is that if he did not stop his public criticism of her and pay her campaign $25,000 he would be subject to criminal prosecution. As mentioned above, this is *quid pro quo* corruption. This threat is professionally reprehensible. (*See* California State Rules of Professional Conduct Rule 3.10 ("A lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute.)) Worse, the District Attorney's conduct borders on the criminal.

A person commits the felony of attempted extortion when that person tries to obtain another's property by threatening to report them for a crime. (Penal Code §§ 518, 519, 524; *People v. Sales* (2004) 116 Cal.App.4th 741, 749.) It is no defense to extortion that the victim of the extortion is guilty of the crime to be charged. (*People v. Umana* (2006) 138 Cal.App.4th 625, 638 reported.) Nor would it be any defense that the threat is thinly veiled. "[T]he accusations need only be such as to put the intended victim of the extortion in fear of being accused of some crime. The more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime." (*People v. Sanders* (1922) 188 Cal. 744, 749-50; *accord Flatley v. Mauro* (2006) 39 Cal.4th 299, 327.)

Penal Code section 68 makes it a felony "for any state, county, or city officer or employee to ask, receive, or agree to receive any bribe, upon any agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 928 (*citations and internal quotations omitted*).) The crime of bribery does not require that a specific official action be pending when the bribe is given, or that the bribe was intended to influence a particular act. (*Id.* at 929.) Both an actual payment to the official, and a promise to benefit a third party can constitute a bribe. (*People v. Moyer* (2023) 94 Cal.App.5th 999, 1013.) Thus, it is no defense that an official seeks a promise to donate to a campaign fund rather than a direct contribution.

Dismissal is the only way to deter the District Attorney's conduct. (*See U.S. v. Hasting* (1983) 461 U.S. 499, 505 (under supervisory authority of federal courts, court may dismiss as a

means of addressing official misconduct).) Though there are indications that the conduct here may be criminal, there is little likelihood that this conduct will ever be investigated, much less charged, by Alameda County law enforcement. The prospect of a civil remedy is equally dim given that prosecutors enjoy immunity for charging decisions. (*Pitts v. County of Kern* (1998) 17 Cal.4th 340, 350.) As this motion is being heard, the District Attorney is still embroiled in a recall election, and still presumably in search of campaign funds. There are certainly others in this community who might be subject to similar shakedowns for campaign funds. The only way to address the injury Mr. Juarez has suffered here and to prevent others from suffering a similar fate is to dismiss this action.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court dismiss the instant complaint with prejudice.

Date: October 10, 2024

Ernie Castillo
Attorney for Mario Juarez

PAMELA Y. PRICE
Alameda County District Attorney
7677 Oakport Street
Oakland, CA 94621
KWIXUAN MALOOF
Senior Assistant District Attorney
California State Bar No.

E-FILED
ALAMEDA COUNTY
12/9/2024
CLERK OF THE SUPERIOR COURT
/s/ Hatsy Pathoummahong

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

RENE C. DAVIDSON COURTHOUSE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, v. MARIO JUAREZ, Defendant. | Docket No. 24-CR-000882<br><br>PEOPLE'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS<br><br>Date: December 20, 2024<br>Time: 9:00<br>Dept.: 12 |

## STATEMENT OF THE CASE

On January 23, 2024, Mario Juarez ("Defendant") was charged in a felony complaint with a single violation of Penal Code section 476a, insufficient funds over $950. After an initial bench warrant for numerous failures to appear, the defendant was arraigned, and pled not guilty on April 25, 2024. Time eventually being waived for preliminary hearing, the case has had numerous pretrial hearing dates and is still in a pre-preliminary hearing posture.

## FACTUAL SUMMARY OF THE CHARGE

In October of 2022, Defendant hired Butterfly Direct Marketing, a small business out of Oakland, owned and operated by Samari Johnson ("victim"). Defendant provided three political mailers for printing and mailing to voters regarding the 2022 Oakland Mayor's race. All three mailers were negative pieces about candidates Loren Taylor and Ignacio De La Fuente, who were running for mayor against then-candidate Sheng Thao. Victim was to create, print, and mail out the

political pieces. Victim had a well-established relationship with the postal service, which allowed him to send the mailers before paying the postage. For payment to the victim, defendant was to pay a total of $84,762.60: approximately $31,000 for the printing and the remainder for the postage. Victim asked defendant to write three checks directly to the US Postal Service, for the postage for each of the three mailers.

On December 31, 2022, defendant wrote three checks from his "business checking account" to the US Postal Service, each for $17,854.40, for a total of $53,563.20. Also on December 31, 2022, defendant transferred $32,500 from this account into a "high school checking account" shared with his daughter. Thus, when the three checks to the postal service were deposited, there were insufficient funds in the account.

The two relevant bank accounts are the "business checking account" from which the checks were written and the "high school checking account" into which the money was transferred. A review of the two accounts give a more complete picture of what was occurring. At the beginning of October 2022, defendant's "business checking account" had a negative balance of $631. Then on October 17, 2022, it received a $75,000 check from California Waste Solutions, a company owned by the Duong Family which has a contract with the City of Oakland to provide waste management services. Additionally, on October 20, 2022, Defendant's "business checking account" received $50,000 from ABC Security Services, another company which has a lucrative contract with the City of Oakland. Defendant then proceeds to create and send the mailers to help Sheng Thao get elected to the Oakland Mayor's office.

After writing the checks at issue in this case and moving the money to the "high school checking account," over the next few days, defendant moves some money back and forth between the two accounts, but there is never enough to cover the three checks written to the postal service. Letters notifying the defendant of the bounced checks go out on November 4, 2022, but defendant keeps the money in the "high school checking account" until November 21, 2022. By this time, the victim has been contacted by the US postal service and his business relationship with them is terminated, which was the backbone of victim's small family business. Unable to repay the $53,563,

the postal service sent the debt to a collection's agency, who is still attempting to collect from the victim.

**THE CRIMINAL PROSECUTION**

The following is a timeline of certain procedural events relevant to this motion:

Pre-Charging Time Period

- December 11, 2022 - the victim makes an online report with the Oakland police department. *(See* Exhibit 1, OPD online report)
- May 19, 2023 - according to the District Attorney's case management system, the report is received by the office on May 19, 2023. *(See* Exhibit 2, Declaration of Monique Dorenburg)
- August 4, 2023 – Deputy District Attorney Matt Foley reviews the police report and decides to file charges. He follows the office's procedure of renaming the PDF file and moving it into the folder for the administrative staff to process. *(See* Exhibit 3, Declaration of Deputy District Attorney Matt Foley)
- Between August 4, 2023 and January 23, 2024 - the case was either misplaced or inadvertently moved or deleted from the administrative folder. *(See* Exhibit 2, Declaration of Monique Dorenburg).
- January 23, 2024 – after being contacted by the victim, Deputy District Attorney Nick Homer attempts to figure out why the case hasn't been processed and emails the administrative staff. *(See* Exhibit 4, email thread from Deputy District Attorney Nick Homer)
- January 23, 2024 – the Complaint is processed and a Notice to Appear is sent

Post-Charging Time Period

- March 7, 2024 – Then Chief Assistant Otis Bruce sends an email to Deputy District Attorneys Jimmie Wilson and Briggitte Lowe. In the email Chief Bruce states that the case had been in the news, that District Attorney Price had asked about the case,

specifically which deputy district attorney, investigator and victim advocate had been assigned. Chief Bruce asks to be notified about the status of the case, including any plea negotiations or discussions. He states that District Attorney Price wants to be notified about the status of the case. *(See* Exhibit 5, Email from Chief Assistant Bruce on March 7, 2024)

- April 25, 2024 – Defendant pleads not guilty. Around this time, defense counsel provides a letter of mitigation from defendant's Chief Financial Officer, which states that money is transferred frequently from the account.
- May 1, 2024 – Deputy District Attorney Lowe emails Deputy District Attorney Angelina Clay, who is assigned to make an offer on the case. Ms. Lowe, Ms. Clay's supervisor, reminds Ms. Clay that this was the case that Mr. Bruce wanted to be notified about before any offers are made. *(See* Exhibit 6, Email from Deputy District Attorney Lowe)
- June 12, 2024 – Deputy District Attorney Clay reviews the case and does not believe it can be proven beyond a reasonable doubt. She enters notes into case management system and communicates her concerns to her supervisor, Deputy District Attorney Lowe. *(See* Exhibit 7, Declaration of Deputy District Attorney Kate DeFerrari)
- Approximately June 12, 2024 – Ms. Lowe speaks to Chief Bruce about Ms. Clay's concerns regarding the issues of proving the case. Chief Bruce tells Ms. Lowe not to do anything like dismiss the case because District Attorney Price would not be happy about that. Chief Bruce directs Ms. Lowe, who then tells Ms. Clay, not to do anything on the case until you hear from Chief Bruce. *(See* Exhibit 7, Declaration of Deputy District Attorney Kate DeFerrari)
- June 13, 2024 – The case is on the court's calendar for pretrial. Deputy District Attorney Clay tells defense attorney Ernie Castillo that she has been told to stand down from the case, that Mr. Castillo should contact Chief Bruce about the case. *(See* Exhibit 7, Declaration of Deputy District Attorney Kate DeFerrari)

- Approximately June 25, 2024 – Chief Bruce resigns from the office. Assistant District Attorney Evanthia Pappas fills part of his position. Defense attorney Castillo reaches out to Ms. Pappas.
- July 2, 2024 – Ms. Papas emails Deputy District Attorneys Jimmie Wilson and Briggitte Lowe inquiring why Mr. Castillo had contacted her about this case. *(See* Exhibit 8, Email thread between Ms. Lowe and Ms. Pappas)
- July 3, 2024 – Deputy District Attorney Lowe responds to Ms. Pappas's email stating, "My understanding was that Chief Bruce was going to discuss this case with Madam DA and that we were not to touch the case until decisions were made by the administration." *(See* Exhibit 8, Email thread between Ms. Lowe and Ms. Pappas)
- Approximately July 3, 2024 – Deputy District Attorney Angelina Clay is told by Ms. Lowe that Ms. Clay is no longer assigned to the case. Ms. Clay is instructed not to speak to anyone about the case, including Deputy District Attorney Kevin Asvitt, to whom the case had been re-assigned. *(See* Exhibit 7, Declaration of Deputy District Attorney Kate DeFerrari)

## DEFENDANT'S MOTION

Defendant's motion to dismiss consists of two main parts: (1) Motion for vindictive prosecution based on the timing of the initial charging of the case; and (2) Motion based on outrageous government conduct which violates the defendant's due process rights at both the time of the charging and the handling of the case subsequently.

## POINTS AND AUTHORITIES

### I. No Evidence of Vindictive Prosecution

#### A. The Decision to Charge the Defendant was Made in August of 2023

The defense argues that in January of 2024, District Attorney Price and Chief Assistant Bruce attempted to extort money from the defendant and that because he declined to support DA Price politically, the instant case was charged.

In *Twiggs v. Superior Court* (1983) 34 Cal.3d 360, the California Supreme Court ruled that following trial or a mistrial a defendant who shows the prosecution has increased the seriousness of the charges, creating the possibility of greater punishment in apparent response to the assertion of a right of retrial, has made a prima facie showing of prosecutorial vindictiveness. The prosecution then bears the heavy burden of rebutting the presumption with an explanation adequately disproving actual vindictiveness.

The presumption of vindictiveness, however, does not arise in a pretrial setting. In *Twiggs*, the court distinguished cases in which more serious charges were added *pretrial* and in the "give and take" of plea bargaining, all of which were found to be proper. (See *Bordenkircher v. Hayes* (1978) 434 U.S. 357; *United States v. Goodwin* (1982) 457 U.S. 368.) More specifically, *Twiggs* discussed and distinguished *People v. Farrow* (1982) 133 Cal.App.3d 147. In *Farrow*, the appellate court held:

> Unless the [presumption] rule is limited to the postconviction appeal context, it becomes totally unworkable. Prosecutorial discretion in determining the charges to be filed is basic to the framework of our criminal justice system. [Citations.] Up to the time of verdict, the prosecution may amend the information to include additional offenses shown by the evidence at the preliminary hearing. To extend [the presumption] to the pretrial and trial context would unduly hamper the legitimate exercise of this prosecutorial discretion.

(*Id.* at p. 152.)

At the pretrial stage, there is no presumption of vindictiveness, but a defendant may produce evidence of a punitive motivation. *(See, Short v. Superior Court* (2019) 42 Cal.App.5th 905.) Claims of vindictive prosecution can be established by direct evidence of a punitive motivation or a defendant may raise a presumption of vindictiveness by making a prima facie showing of a

"reasonable likelihood of vindictiveness." *(Ibid.* at p. 915; *Twiggs v. Superior Court, supra* 34 Cal.3d 360, 373.)

In the case at bar, it goes without saying that any punitive motivation would have to exist before the charges were filed. Defense contends that on January 7, 2024, District Attorney Price asked him for $25,000 to support her campaign. Because he declined, he argues that the instant case was charged. This timing is not supported by the evidence.

While the Complaint was issued on January 23, 2024, the decision by Deputy District Attorney Matt Foley to charge it was made on August 4, 2023. Mr. Foley stated that the case came to him through the normal process and no one had spoken to him about the case before he made his decision. Further, at the time Mr. Foley made the decision to charge the case, he had never even met District Attorney Price. (Exhibit 3, Declaration of Matt Foley).

According to the administrative supervisor, after Deputy District Attorney Foley made the decision to charge, the case was either misplaced or inadvertently moved or deleted from where it should have been awaiting processing. It wasn't until the victim inquired about the case that it was discovered it had somehow fallen through the cracks. The Complaint was then promptly issued. *(See* Exhibit 2, Declaration of Monique Dornenburg; Exhibit 4, Email thread from Deputy District Attorney Nick Homer.)

Additionally, text messages sent by District Attorney Price corroborate this timeline. *(See,* Exhibit 8, Text Messages of District Attorney.)

Thus, because the decision to charge the case had occurred long before the alleged conversation between District Attorney Price and the defendant, there is no evidence of vindictive prosecution.

**B. The Case can be Proven Beyond a Reasonable Doubt**

It is worth noting that based on the evidence, the case against the defendant can be proved beyond a reasonable doubt for a number of reasons. To prove a violation of Penal Code section 476a, the People must prove that the defendant willfully, with intent to defraud, delivered a check

knowing that there were insufficient funds in the account. (Cal. Crim. § 1970.) First, the defendant's state of mind can be proven by the timing of the transactions: On the same day that the defendant wrote the checks that bounced, he transferred $32,500 to another account, which caused there to be insufficient funds for the checks he wrote. The account into which he transferred the checks is a "high school checking account" that appears to be a joint account with the defendant's daughter. In the next two days, the defendant transferred money back and forth but there was not enough money to cover the checks. On November 4, 2022, the checks to the victim bounced and Mr. Juarez was notified of insufficient funds in his account. Despite this notification, and his ability to quickly address the funding shortfall, Mr. Juarez kept the money he owed the victim in the separate "high school checking account" for two weeks. The defendant's intentional movement of this money away from the account he wrote the checks demonstrates his intent to defraud the victim.

Additional evidence of the defendant's intent is his financial motive to commit the crime. Analysis of Mr. Juarez's bank records reveal that the money that was initially in the bank account that is the subject of this fraudulent activity was likely obtained for unlawful purposes.
A thorough review of Mr. Juarez's financial transactions disclose that from October 17, 2022 to October 20, 2022, he obtained over $125,000 from ABC Security and California Waste Management Solutions. Then after the November 8, 2022 election, Defendant received an additional $170,000 total from ABC Security, the Duong Family, and California Waste Management Solutions, owned by the Duong Family. These companies have valuable contracts with the City of Oakland and an interest in the election of then candidate for mayor, Sheng Thao. Mr. Juarez's subsequent use and distribution of these funds suggests Defendant Juarez was essentially a conduit for these companies to help the mayor win and preserve and enhance the companies' access to taxpayer funded contracts. Further, an analysis of the financial records immediately after the election show two checks totaling $7500 written to Andre Jones, a name associated with Sheng Thao. This fraudulent motive further indicates Mr. Juarez's intent to defraud the victim in this check fraud case.

## II. Outrageous Government Conduct

**A. There Was No Conversation Between District Attorney Price and the Defendant**

The defense contends that when District Attorney Price was at the Embarcadero address, she demanded money from the defendant and suggested she would use the power of her office to punish him for his lack of support. This assertion is unsupported by the facts.

Inspector Middleton, who serves as Ms. Price's personal security detail, was with her the entire time she was at the Embarcadero location. Inspector Middleton says that at no time did Ms. Price have any conversation whatsoever with the defendant. Ms. Price was talking to Stewart Chen and the Duong family while Inspector Middleton and Otis Bruce passed the time with the defendant. *(See* Exhibit 10, Inspector Middleton Declaration.)

**B. The Conduct Does Not Rise to the Level of Outrageous Government Conduct**

The second part of the defense's motion focuses on the conduct that occurred after the case was charged. It is undisputed that after the case was filed, there seemed to be an interest taken in the case from the upper management of the District Attorney's Office. The authority of courts to dismiss a case for outrageous conduct stems from the due process clause of the United States Constitution. *(Rochin v. California* (1952) 342 U.S. 165, 168.) "When conduct on the part of authorities is so outrageous as to interfere with an accused right of due process of law, proceedings against the accused are thereby rendered improper." *(Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1259, *quoting Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 429.)

The conduct must be "so outrageous as to interfere with an accused's right of due process." *(Morrow v. Superior Court, supra*, 30 Cal.App.4th 1252, 1260.) The analysis is fact-specific. As stated in *United States v. Bogart* (1986) 783 F.2d 1428, 1438, "Every case must be resolved on its own particular facts."

Numerous cases where prosecutors have violated a defendant's right to counsel under the Sixth Amendment have found such conduct does not rise to the level of outrageous government conduct. The court in *United States v. Morrison* (1981) 449 U.S. 361, where law enforcement

contacted a represented defendant and told her she would be sentenced harshly if she did not cooperate, nonetheless did not dismiss the case for outrageous government conduct.

In *People v. Zapien* (1993) 4 Cal.4th 929, after finding a recording of defense counsel's perceptions and strategy notes in a death penalty case, the prosecutor told his investigator to listen to the recording, and the investigator declined to do so. Despite the prosecutor's conduct, the court did not dismiss the case for outrageous government conduct.

The defense cites *Rochin v. California* (1952) 342 U.S. 165 as an example of what constitutes outrageous government conduct. In that case, after officers forced their way into the defendant's home, saw him put capsules into his mouth, they proceeded to have his stomach pumped at the hospital against his will.

Merriam-Webster's dictionary defines the word "outrageous" as "going beyond standards of decency: utterly intolerable in a civilized society." In our case, after charges were filed, it appears that the executive management took an interest in the case. The emails reveal that then-Chief Assistant Otis Bruce wanted to be apprised of the status of the case, so as to relay the information to the elected District Attorney. When Deputy District Attorney Angelina Clay reviewed the case and felt that the charge could not be proven beyond a reasonable doubt, her superiors disagreed with her, and relayed that the District Attorney would not be happy with a dismissal. Accordingly, they gave the case to someone else to handle and told Ms. Clay not to discuss the case. While this special interest taken in the case by upper management was perhaps unusual, it does not rise to the level of outrageous government conduct.

### III. The Proper Remedy is a Recusal of the Office- Not a Dismissal of the Case Should the Court Find there is a Conflict of Interest,

California Penal Code section 1424 states that upon proper notice of at least 10 days to both the District Attorney and the Attorney General, a party may move the court to disqualify the District Attorney. Said motion may not be granted unless "the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (*Cal. Penal 1424* )

The district attorney or the Attorney General may appeal an order recusing the District Attorney. *Id.* The district attorney, the Attorney General, or both may file affidavits in opposition to the motion, and may appear at the hearing on the motion, and may file a written opinion on the disqualification issue. *Id.* The motion shall contain a statement of the facts setting forth the grounds for the claimed disqualification and the legal authorities relied upon and shall be supported by affidavits of witnesses who are competent to testify to the facts set forth in the affidavit. *Id.* The judge shall review the affidavits and determine whether an evidentiary hearing is necessary.

There is no evidence of vindictive or outrageous conduct on behalf of the District Attorney. The declarations submitted in support of the defendant's motion are biased at best and disingenuous at worst – how did witnesses who are only Spanish speaking accurately interpret English language conversations that allegedly took place?

However, if the court believes there is sufficient evidence of a conflict of interest, we respectfully request that the court convene an evidentiary hearing and allow the prosecution to question these alleged witnesses. We believe that an evidentiary hearing will reveal, at most, an appearance of impropriety, which alone is insufficient to disqualify our office, let alone dismiss the case. (See *People v. Sy* (2008) 223, Cal.App.4th 44 review denied- "only an actual likelihood of unfair treatment, not a subjective perception of impropriety, can warrant a court taking the significant step of recusing an individual prosecutor or prosecutor's office." See also*, Jensen v. Superior Court* (2021) 64 Cal.App.5th 1003 defendant failed to demonstrate a conflict of interest existed with the district attorney's office based on the codefendant's friendship with the district attorney and chief assistant that warranted severance of his prosecution from that of the defendant who was a sheriff's department captain." See also, *Melcher v. Superior Court* (2017) 10 Cal.App.5th 160 "The mere existence of a conflict, by itself, is not sufficient to require recusal of the district attorney from a criminal prosecution.")

Therefore, even under Penal Code 1424, there is insufficient evidence to support the recusal of our office.

### IV. The State Attorney's General Office Should Also Be Disqualified and A Special Prosecutor Should be Appointed Should the Court Find that the Alameda County District Attorney's Office Should be Recused-

It is well known in the Alameda County Political Arena that the defendant has close financial and political ties with Attorney General Robert Bonta. In 2012, then Vice Mayor Rob Bonta was listed as an "Elected Official" endorsee of the defendant in his failed run for the City of Oakland District 5 Council seat.[1] In May 2017 and again in June 2017, the defendant, who at the time was named as the president of Viridis Fuels of Oakland, made two contributions of $2,500 and then another two contributions that totaled $2,500 for a total donation of $5,000 to then-Assemblyman Bonta's election campaign. That same month, Assemblyman Bonta asked the California Energy Commission to grant the defendant's company, Virdis, a $3.4 million award after the Commission had originally denied the grant in 2014. After Bonta's request, Virdis received the grant.[2]

In 2016, when the defendant ran for the Alameda County Democratic Central Committee, Mia Bonta, Attorney General Bonta's wife, endorsed him. In Attorney General Bonta's 2018 campaign run, the defendant donated $5,000 to his campaign. In 2021, Bonta's wife's campaign office was located at 1241 High Street in Oakland, which was the same address Viridis Fuels used a few years earlier. In Mia Bonta's 2021 campaign for her husband's vacated State Assembly seat, the defendant made over $2,500 worth of donations to her campaign.[3]

#### A. The Political Reform Act Prohibits AG Rob Bonta and the Attorney General's Office from Prosecuting Mario Juarez Due to Financial Conflict

Section 87100 of the California Government Code[4] prohibits a public official from influencing a governmental decision in which the official knows or has a reason to know they have a financial

---

[1] http://www.smartvoter.org/2012/11/06/ca/alm/vote/juarez_m/endorse.html
[2] https://www.marinatimes.com/california-attorney-general-rob-bonta-and-his-assemblymember-wife-tied-to-disgraced-oakland-political-operative-mario-juarez?utm_source=chatgpt.com
[3] https://thevoicesf.org/the-bonta-money-trail/; https://www.opensecrets.org/donor-lookup/results?cycle=2018&order=asc&sort=D&zip=94601
[4] Also referred to as the "Political Reform Act of 1974"

interest. (*Cal Gov't Code section 87100.*) The Fair Political Practices Act aims to ensure that public officials, whether elected or appointed, perform their duties in an impartial manner, free from bias caused by their own financial interests or the financial interests of persons who have supported them. (*Cal. Gov't 81001(b))* "The whole purpose of the Political Reform Act of 1974 is to prevent government officials from participating in decisions where it appears he may not be totally objective because the outcome would likely benefit corporation or individual by whom he is also employed" (See *Witt v. Morrow* (1977) 70 Cal.App.3d 817) A "Public Official" is every member, officer, employee, or consultant of a state or local government agency, but does not include a judge or court commissioner, member of the Board of Governors, a member of the Judicial Council or a federal officer or employee serving in an official federal capacity on a state or local government agency. (*Cal. Gov't 82048)* A "State agency" means every state office, department, division, bureau, board and commission, and the Legislature. (*Cal. Gov't 82049)* A "State Candidate" means a candidate who seeks nomination or election to any elective state office. "Elective office" means any state, regional, county, municipal, district, or judicial office that is filled at an election. (*Cal. Gov't 82023)* "Elective state office" includes the office of the Attorney General. (*Cal. Gov't 82024)* "Statewide elective office" includes the office of the Attorney General. (*Cal. Gov't 82053)* "Payment to influence legislative or administrative action" includes: a payment which directly or indirectly benefits any elective state official, legislative official, or agency official or a member of the immediate family of any such official; payment, including compensation, payment, or reimbursement for the services, time, or expenses of an employee, for or in connection with direct communication with any elective state official, legislative official, or agency official; payment for or in connection with soliciting or urging other persons to enter into direct communication with any elective state official, legislative official, or agency official. (*Cal. Gov't 82045)*

Violations of the Political Reform Act as determined by the Fair Political Practices Commission can lead to a cease and desist order, an order to file reports, statements or other documents or information, and/or a payment of up to $5,000 per violation to the General Fund of the state. In

general, a public official has a conflict of interest with regard to a particular government decision if it is sufficiently likely that the outcome of the decision will have an important impact on their financial interests. It is important to emphasize that a conflict of interest under the Political Reform Act can only arise from particular kinds of financial interests.

A public official has a financial interest in a decision within Cal. Gov't 87100 if it is foreseeable that "the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official or a member of his or her immediate family or on…Any source of income, other than gifts and other than loans by a commercial lending institution in the regular course of business on terms available to the public without regard to official status, aggregating two hundred fifty dollars ($250) or more in value provided to, received by or promised to the public official within 12 months prior to the time when the decision is made."

A financial interest exists if anyone, whether an individual or an organization, from whom the official has received (or from whom they have been promised) $500 or more in income within 12 months prior to the decision about which they are concerned. Additionally, under California's community property laws, a person for whom a spouse or registered domestic partner receives income may also be a source of a conflict interest. This includes gifts which total $390129 or more within 12 months before the decision about which the official is concerned. *Id.*

Here, public records show that the defendant and Attorney General Bonta, through the years, have financially supported each other in their various election campaigns. They have publicly endorsed each other and have used the same office for their business dealings. In local democratic political circles, the defendant's and the Bonta's extensive intertwined political and business dealings are widely known. (See declaration from Margarita Lacabe Exhibit 11) On this basis, the AG would be violating the Political Reform Act by accepting the role of prosecuting the case against the defendant.

**B. The Common Law Doctrine of Conflict of Interest Disqualifies the Attorney General from Prosecuting the Case against the Defendant**

The common law doctrine of conflict of interest prohibits public officials from placing themselves in a position where their private, personal interests may conflict with their official duties. *Clarke v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1171. In fact, in a 2009 opinion written by the Office of the Attorney General to then State Assembly Member Norma J. Torres, Attorney General Edmund G. Brown, Jr. stated that while the focus of the Political Reform Act is on actual or potential financial conflicts, the common law prohibition extends to noneconomic interests as well. *92 Ops.Cal.Atty.Gen. 19* The issue Assembly Member Torres asked AG Brown to settle was whether a public official needed to abstain from participating in a board/governmental decision that would have a material financial effect on their immediate family member (son). AG Brown wrote,

> "Here, even if the agency board member cannot be said to have a statutory financial interest in her son's contract with the agency within the meaning of section 1090 or the Political Reform Act, it is difficult to imagine that the agency member has no private or personal interest in whether her son's business transactions are successful or not. At the least, an appearance of impropriety or conflict would arise by the member's participation in the negotiations and voting upon an agreement that, if executed, would presumably redound to her son's financial benefit. As one court has said with regard to the common law doctrine and the need to strictly enforce it: ' A public officer is impliedly bound to exercise the powers conferred on him with disinterested skill, zeal, and diligence and primarily for the benefit of the public.... [¶].... [¶] Actual injury is not the principle the law proceeds on. Fidelity in the agent is what is aimed at, and as a means of securing it the law will not permit him to place himself in a position in which he may be tempted by his own private interests to disregard those of his principal. This doctrine is generally applicable to private agents and trustees, but to public officers it applies with greater force, and sound policy requires that there be no relaxation of its stringency in any case that comes within its reason....'" *Id.*

Ultimately, AG Brown opined that the board member should "abstain from any official action with regard to the proposed loan agreement and make no attempt to influence the discussions, negotiations, or vote concerning that agreement." *Id.*

Due to the extensive and intertwined political and business relationships between Attorney General Bonta and the defendant, the Attorney General and his office should refrain from pursuing any official actions in this case. This is necessary to avoid a conflict of interest, as outlined by common law doctrine.

## CONCLUSION

In conclusion, we respectfully request the court deny the defendant's motion to dismiss for failure to prove any vindictive or outrageous conduct on behalf of the Alameda County District Attorney's Office. The allegations made in the defendant's motion are ridiculous and cannot be supported by evidence. If the court believes a conflict exists such that the defendant won't receive a fair trial, we request that both the Alameda County District Attorney and the State Attorney General's Offices be recused, and the case be assigned to a special prosecutor for further prosecution.

Date: 12/9/24

PAMELA Y. PRICE
District Attorney of Alameda County

By: Kristiuan H. Maloof
Deputy District Attorney