Edward W. Swanson (SBN 159859)
August P. Gugelmann (SBN 240544)
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9100
Email: ed@smllp.law
Email: august@smllp.law

Neal J. Stephens (SBN 152071)
Jeffrey B. Schenk (SBN 234355)
Thao Donnelly (SBN 355632)
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 739-3939
Facsimile: (650) 739-3900
Email: nstephens@jonesday.com
Email: jbschenk@jonesday.com
Email: tdonnelly@jonesday.com

Attorneys for Defendant
DAVID TRUNG DUONG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>SHENG THAO, et al.,<br>Defendants. | No. CR 25-0003 YGR<br><br>**DEFENDANTS' MOTION TO STRIKE TESTIMONY AND FOR CURATIVE INSTRUCTION REGARDING UNNOTICED 404(B) EVIDENCE OF ELECTION INTERFERENCE** |

During the testimony of its chief witness Mario Juarez, the government intentionally elicited allegations that David and Andy Duong instructed Juarez to interfere with public signature collection efforts following the award of the CWS recycling contract in 2014. These allegations are irrelevant to this case and would be prejudicial at any time, but to inject them into this trial on the eve of the 2026 midterms—at a time when concern about election interference is widespread—only heightens the prejudice.

Although the government knew Juarez would make these claims and asked questions to elicit them, it failed to give the required notice under Rule 404(b). Moreover, despite knowing of these allegations, the government never disclosed them in any report of its many meetings with Juarez. Defendants accordingly move to strike this testimony and for a curative instruction regarding the government's conduct in eliciting this evidence.

## STATEMENT OF FACTS

On October 30, 2026, the government elicted previously undisclosed allegations of misconduct related to California Waste Solution ("CWS") winning the recycling contract in or around 2014, eight years before the charged conspiracy. The relevant exchange was as follows:

> Q. And do you recall an incident about what happened after [CWS won the Oakland contract]?
>
> A. Days after, we heard that the losing company was interested in putting the matter for our voters -- to the voters to overturn the decision by the city council, and that created a whole set of problems for the contract.
>
> . . .
>
> Q. Now, you mentioned after this contract was awarded to CWS, I think you said something, there was an effort to overturn the vote or something like that; is that right?
>
> A. Yeah. Whatever the city council can be overturned by the—by placing it in front of the voters, and so the losing company wanted to overturn the decision by the city council by placing the vote in front of the voters, so the other company was seeking to collect signatures, and that would qualify the matter to be in place of the voters.
>
> Q. Who was that other company?
>
> A. The name of the company is Waste Management.
>
> Q. And did you have any involvement in that next phase of the operation?
>
> A. At that point we moved towards trying to prevent the signature collection. They had professional collectors in several locations, and our role was to go and try to impede the collection of those signatures, sometimes putting ourselves between the individuals that were about to sign and the collectors themselves, trying to talk to them and make arguments with them so they can waste their time and not follow the collections of the signatures.
>
> Q. And who told you to do that?
>
> A. At that point it was Andy, David. We all talked about it.
>
> Q. And what happened next?

> A. We hit the streets. I hit the streets. I remember I was assigned to the Lakeshore area. There's a Trader Joe's in that area. And there were several signature collectors in that area, and I think I got into a pushing match with a signature collector.
>
> Q. Can you describe that a little more?
>
> A. Yeah. So the signature collector was trying to get and convince voters to sign under the premise that, you know, the wrong decision has been made by the city council. So I put myself in between the collector, telling the voters: Don't sign, it's a scam. And he got angry. He started shoving me, and I shoved him back.
>
> Q. And what ultimately happened? Just a shoving match or anything else?
>
> A. It was just a shoving match, screaming. Other signature collectors came by that were nearby. And basically, he did move on from there eventually. There were other type of things that were happening around CWS to move this contract forward.
>
> Q. Did you tell David Duong about the shoving match you had gotten into?
>
> A. I did.
>
> Q. What was his response?
>
> A. He reacted with pride that a someone would stand up for him. He is someone that rewards people who are loyal. He values loyalty. And I think he saw that in me and saw that I was someone that would stand up physically and go defend CWS, California Waste Solutions.

Tr. 2343-46.

The government's questions made clear that it intentionally elicited these allegations, rather than Juarez spontaneously offering them. Accordingly, defense counsel objected to the testimony as unnoticed 404(b) evidence. The Court asked the government "whether you knew the specifics that he testified to, when—whether the FBI did, and whether or not they were disclosed to the defense." Tr. 2263-64. The government did not claim that it was surprised that Juarez made these claims. Instead, it produced two FD-302s purporting to show that it had disclosed the allegations to the defense and highlighted the following passages:

<u>06/03/2026 FD-302 page 2:</u>

> By way of background, after CWS won the Oakland city contract years ago, Waste Management (WM), the other major trash company in Oakland, attempted to take the contract away from CWS by way of ballot on an election. Juarez got in a physical altercation with people from WM at that time, which the Duongs were aware of. [The October 5, 2022 toast videos] are talking about Juarez's and the Duong's history together.

<u>10/21/2026 FD-302 page 1:</u>

> After CWS won the contract, there was an effort by some to gather signatures for a referendum on the garbage contract. D. Duong was worried the decision to award the waste contract to CWS would be overturned if the [sic] was a vote on a referendum, and the long-term business plan, the ability to get financing, obtain trucks, and invest in a facility would be harmed.

Neither the highlighted sections nor any other report contains the allegations elicited at trial. While Juarez described "a physical altercation with people from [Waste Management]" and stated that David Duong "was worried" that CWS might lose the contract in a referendum vote, the government has never disclosed any allegation that (1) David and Andy Duong directed Juarez and others to interfere with the collection of signatures for a referendum, (2) the physical altercation was with people gathering signatures rather than "people from WM," or (3) David Duong praised him for this supposed altercation.

The actions described by Juarez are potential criminal offenses under California law. *See* Elec. Code § 18630 (crime to "threaten[] to commit an assault or battery on a person circulating a referendum, initiative, or recall petition … with the intent to dissuade the circulator from circulating the petition").

## LEGAL STANDARD

Evidence of "any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Even when such evidence is offered for a permitted purpose, the prosecutor must "provide reasonable notice" of it, "articulate in the notice the permitted purpose . . . and the reasoning that supports the purpose," and do so "in writing before trial" unless "the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(3). Notice "serves as [a] condition precedent to admissibility," and "the offered evidence is inadmissible if the court decides that the notice requirement has not been met." *United States v. Vega*, 188 F.3d 1150, 1153 (9th Cir. 1999). When undisclosed other-act testimony reaches the jury, the Court may strike it and instruct the jury to disregard it, and may enter any other order that is just. *See* Fed. R. Evid. 103(d) (court must, "[t]o the extent practicable," ensure "that

inadmissible evidence is not suggested to the jury by any means"); Fed. R. Crim. P. 16(d)(2)(C)–(D) (court may "prohibit th[e] party from introducing the undisclosed evidence" or "enter any other order that is just").

## ARGUMENT

### I. Juarez's allegation of a prior bad act by Andy and David Duong should be stricken as unnoticed 404(b) evidence.

The government made 404(b) disclosures according to a schedule ordered by the Court, and the defense litigated admissibility where appropriate (*e.g.*, Dkt. 218); the defense also litigated the admissibility of other acts evidence that the government did not notice under 404(b) but that was disclosed in reports of investigation. *E.g.*, Dkt. 298. The highly prejudicial allegations of election interference were not previously disclosed and thus were not the subject of pretrial litigation.

The government's claim to have disclosed this information fails. The statements at issue did not appear in any report of Juarez's many interviews. The excerpts the government relies on say only that Juarez claimed to have gotten into a fight with a WM representative and that "the Duongs" (without specifying which Duongs) knew about it. Those excerpts gave no indication that Juarez would claim that the fight was with someone who was gathering signatures on behalf of WM for a referendum; that Juarez was attempting to impede WM's signature collection efforts when he got into the fight; that Juarez was engaging in this illegal activity at the direction of David and Andy Duong; or that David Duong was pleased to hear Juarez had gotten into a fight because he "rewards people who are loyal" and "saw that [Juarez] was someone that would stand up physically and go defend CWS." The only pretrial disclosures related to Juarez's fight concerned what *he* did. Nowhere did the government provide notice that it would elicit testimony that David or Andy Duong directed Juarez's actions or praised them afterwards.

Testimony concerning alleged bad acts eight years before the charged scheme, and unrelated to it, is 404(b) evidence. *See United States v. Strubbe*, 198 F.3d 256 (9th Cir. 1999) (finding that prior bad acts that "preceded the commencement of the conspiracy charged in this

case" are "not inextricably intertwined conduct"). Because the government failed to give notice of its intention to offer this evidence, it should be stricken. *Vega*, 188 F.3d at 1153 (notice "serves as [a] condition precedent to admissibility."); *see also United States v. Keller*, No. 18-CR-00462-VC-1, 2021 WL 5150642, at *3 (N.D. Cal. Nov. 5, 2021) (granting motion to "exclude unnoticed other acts evidence"); *United States v. Ranney*, No. 25-CR-00416-TSH-1, 2026 WL 1991529, at *9 (N.D. Cal. July 8, 2026) (same).

## II. The government has no good cause for failing to give notice.

Rule 404(b)(3)(C) allows the Court to excuse lack of notice "for good cause." No good cause excuses the lack of notice here.

*United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999), is instructive. There, a witness told an IRS investigator that he had seen the defendant win as much as $100,000 at a craps table, most likely in 1990, a charged year. *Id*. at 976. On the morning he was to testify, however, the witness told the agent that he now believed the incident had occurred in 1986 or 1987, which turned it into other-act evidence. *Id*. The Ninth Circuit found good cause for the government's request "for relief from the pre-trial disclosure requirement," because "prior to trial, the government believed that the incident had occurred in 1990, not 1986." *Id.*

Here, unlike in *Scholl*, the government was not surprised by new information immediately before Juarez's testimony. It could not have been, because the Court ordered the government to stop meeting with Juarez on October 26. Tr. 1414-15. Whatever information the government had, it learned on or before October 25—at least five days before Juarez took the stand. But while the government did not disclose this information to the defense, it was obviously prepared for Juarez to make this allegation and intentionally elicited it. In response to Juarez testifying only that "the other company was seeking to collect signatures, and that would qualify the matter to be in place of the voters," the government asked about Juarez's "involvement in that next phase of the operation"—even though Juarez had said nothing about an operation of any sort, much less about a "next phase" or his involvement in it. And having secured the testimony it sought about Juarez's obstruction of signature-collection efforts, the

government did not transition to a new topic but moved to the next piece of its prepared examination: eliciting David and Andy Duong's alleged role in the directing Juarez to engage in the illegal election interference conduct, the altercation that ensued, and David Duong's supposed pleasure at Juarez's misconduct. Because the government clearly knew well in advance of trial what it intended to elicit from Juarez but failed to disclose it, there is no good cause to excuse the lack of notice.

**III. The Court should strike the testimony and issue a curative instruction.**

Because notice is a condition precedent to admissibility, unnoticed 404(b) evidence is inadmissible for any purpose. *Vega*, 188 F.3d at 1153, 1155. The Court should strike the testimony regarding election interference, Andy and David's alleged directing of the interference, and David Duong's reaction to Juarez's fight. In addition, the Court should instruct the jury that (1) there is no evidence before it that the Duongs participated in election interference, and (2) the testimony regarding this allegation was improperly elicited by the government and must be disregarded. *See United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1029 (9th Cir. 2009) (district court offered curative instruction that "the jury disregard the comments [related to unnoticed bad acts evidence] as unsupported by the evidence"); *United States v. Liburd*, 607 F.3d 339, 344 (3d Cir. 2010) (district court instructed the jury to disregard testimony that the government failed to disclose in pretrial discovery as "statements [that] are improperly before you"); *see also Rustici v. Philips*, 497 F. Supp. 2d 452, 456 (E.D.N.Y. 2007) (state trial court instructed the jury to disregard "an improper question" asked by the prosecutor and to draw "no unfavorable inference whatsoever…from the mere fact that the question was

/ / /

asked," where prosecutor reneged on prior representations that prior bad acts evidence would not be introduced at trial).

Dated: November 4, 2026

Respectfully submitted,

/s/

Edward W. Swanson
August Gugelmann
SWANSON & McNAMARA LLP

Neal J. Stephens
Jeffrey B. Schenk
Thao Donnelly
JONES DAY

Attorneys for David Duong